**EAST COAST REPAIR & FABRICATION, LLC, Plaintiff,**

v.

**UNITED STATES of America, Through the Department of the Navy, and Its Activity, The Norfolk Ship Support Activity, Defendant.**

**Case No. 2:14cv606**

United States District Court, E.D. Virginia, **Norfolk Division.**

Signed August 9, 2016

Anthony Joseph Mazzeo, Daniel R. Weckstein, Ellen Frances Bergren, Vandeventer Black LLP, Norfolk, VA, for Plaintiff.

Edmund M. Ferguson, Steven J. Riegel, U.S. Department of Justice, Washington, DC, Virginia Lynn Van Valkenburg, United States Attorney Office, Norfolk, VA, for Defendant.

## OPINION AND ORDER

Mark S. Davis, United States District Judge

This Opinion and Order follows a ten day bench trial involving numerous disputes arising out of a maritime contract between East Coast Repair & Fabrication, LLC, ("ECR" or "Plaintiff") and the United States of America, through the Department of the Navy, and its activity the Norfolk Ship Support Activity (hereinafter collectively "Defendant," the "Government," or the "Navy"). With the benefit of the trial transcript, the parties have filed post-trial briefs and submitted proposed findings of fact and conclusions of law. Therefore, the matter is now ripe for review.

### I. Background Findings of Fact [1]

#### A. Preliminary Summary

The instant action involves numerous contract disputes arising out of the overhaul of a Navy vessel by ECR, a private ship repair company. A summary of the case would be incomplete without acknowledging at the outset that such overhaul was in many ways doomed from the start,

---

1. As noted by the parties at trial, the disputed contract issues before the Court are so numerous, and so varied, that the bench trial in this case was essentially multiple "mini-trials." In order to effectively organize the varied factual findings necessary to resolve such varied disputes, the instant section sets forth both general background factual findings that lay a foundation for the entire case, and facts associated with some of the primary, and largest dollar value, disputes. Due to the fact that there are approximately forty separate claim items in this case, additional claim-specific facts are set forth below within the Court's analysis of such individual items.

marred by disputes among the various Government teams, inexperience of key Government players, underestimation of the complexity of the repairs by ECR and its primary subcontractor Técnico Corporation ("Técnico"), a defective Government specification based on an outdated hull survey, various "moving ball" standards employed by the Government regarding the manner in which hull "deflection" was measured, multi-month delays occurring at the outset of the overhaul, and lack of training and/or understanding of the unique nature of the type of vessel being overhauled by project managers, engineers, and other persons working in key positions for ECR, Técnico, and the Government. These and other issues somewhat predictably led the parties to this Court, and the only easy conclusion to draw from the trial evidence is that it is impossible to apportion the entire blame for the contract disputes to one party or the other. Against such backdrop, the Court makes the following findings and conclusions, ultimately entering a **PARTIAL DAMAGE AWARD** to ECR, and to its primary subcontractor Técnico on multiple "pass-through" claims.

### B. Stipulated Facts and Procedural Background [2]

1. Plaintiff, ECR, is a Virginia corporation organized under the laws of the Commonwealth of Virginia with its principal place of business in Norfolk, Virginia. ECR performs ship repair work for commercial customers and for the United States Government, including the U.S. Navy.

2. The subject of this dispute arises from a contract between the Navy and ECR under contract number N50054–11–C–1107 (hereinafter the "Contract") for ship repair work on the vessel USS THUNDERBOLT (PC–12) (hereinafter the "THUNDERBOLT" or the "Vessel"). The Government has issued a Contracting Officer's Final Decision denying ECR's Request for Equitable Adjustment (hereinafter "REA") seeking additional compensation for vessel repairs performed on the THUNDERBOLT.

3. The THUNDERBOLT is a Navy Patrol Coastal Ship of the CYCLONE class ("PC") and is a public vessel of the United States being operated by the Navy as part of the United States fleet. The THUNDERBOLT has been homeported and forward deployed at Naval Support Activity Bahrain since July 3, 2013, but was, at times relevant to this lawsuit, homeported in, and the repair work at issue was completed in Hampton Roads, which is within the Eastern District of Virginia.

4. The Navy built the CYCLONE class of patrol craft, including the THUNDERBOLT (PC–7), in the early 1990's as support craft for Navy SEAL teams. The CYCLONE class ships were originally designed for a service life of fifteen years, and by 2010, the ships were found to have suffered metal fatigue in their hulls. However, when a new mission for the ships in the Arabian Gulf was identified, the Navy undertook extensive repairs to the ships to extend their usefulness in the new role.

5. As the repairs to accomplish the overhauls of the CYCLONE class ships were identified and specifications were written, an initial contract for the overhaul of the THUNDERBOLT was finalized between the Navy and Marine Hydraulics International ("MHI"). The disassembly of the THUNDERBOLT began under such contract, and the parts were stored by MHI.[3]

---

2. Unless otherwise noted, such stipulations are expressly set forth in the Final Pretrial Order. ECF Nos. 23, 25.

3. Although not set forth in the stipulations in the Final Pretrial Order, it is undisputed that the MHI availability was terminated by the Navy "for convenience."

6. In the spring of 2011, the Navy solicited another contract to complete the overhaul of the THUNDERBOLT that was begun by MHI. The solicitation sought fixed price bids for the specified repairs and advised potential bidders that the Vessel had been partially disassembled, with many parts in storage.

7. ECR prepared and submitted its quote for the THUNDERBOLT work and contract, relying on the information the Navy made available during the proposal phase regarding the scope of the work to be performed (the "specification" or "Specification Package"). The Navy awarded the Contract to ECR on August 25, 2011, at ECR's bid price of $7,317,394. Such Contract was a "Fixed Price" contract, as contrasted with a "Cost Reimbursement Contract." [4]

8. The Contract contained four (4) Contract Line Item Numbers or CLINs, and all disputes at issue in this case pertain to the performance of CLIN 1, which was the main work item. CLIN 1 required ECR to: Plan for and accomplish the dry-docking restricted availability (DRAV) of USS THUNDERBOLT (PC–12) SSP 038–11 (excluding CLIN 002). Among the Contract work to be performed was the cropping out and replacement of the THUNDERBOLT's hull structure, plate, and stiffeners, referred to as the "structural steel work." The bulk of this work was to be performed while the THUNDERBOLT was docked at ECR's repair facility.

9. Specification Package # 037–11 listed fifty-seven Navy "Standard Items" that were explicitly incorporated into the Contract, named fifty-seven more Standard Items which might be invoked as changes were made to the Contract, then described the "Planned Work" of the overhaul in fifty-nine "Work Items" that specified the exact work to be done on the Vessel.

10. The initial schedule under which the work was to be accomplished was specified in the Contract as a series of milestones. The THUNDERBOLT was towed to ECR on September 26, 2011, starting the availability, and the last milestone was the completion of the availability, which was to be accomplished by June 22, 2012. The initial performance period of the Contract was therefore 270 days. The original Contract milestones called for the docking to occur on October 7, 2011, and for undocking to occur on May 10, 2012.

11. The "Changes" clause incorporated into this Contract, Federal Acquisition Regulation ("FAR") 52.243–1 (Alt II—Aug. 1987), provides that changes to such fixed price contract can be made by the "Contracting Officer" and that: "If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract."

12. As the overhaul of the THUNDERBOLT progressed, plans and procedures for the work detailed in the specification package caused delays and new "growth" work was added to the package. As these new requirements arose, the Navy eventually issued a series of fifty-nine written Contract modifications.

13. Of these fifty-nine modifications, forty-three were bilateral, i.e., signed and agreed to by both the Navy and ECR as to the price and the impact on the then current schedule. The remaining sixteen modifications were unilateral, i.e., issued and

---

**4.** The Final Pretrial Order does not include the stipulation that the Contract at issue is a "Fixed Price" contract; however, such fact is not in dispute.

priced by the Navy but not agreed to by ECR. The unilateral modifications included prices and/or time extensions granted by the Navy but not agreed to by ECR, and several involved "credits" reducing the overall Contract price.

14. After issuance of the fifty-nine modifications, the total Contract price was $15,536,680.57, and the contractually scheduled/allowed final completion date was December 9, 2012. The performance period was therefore extended by the Navy from the original 270 days by an additional 172 days. The THUNDERBOLT availability was not complete until April 2013, several months after the modified performance date.[5]

15. On September 27, 2013, some months after ECR had completed work on the Vessel and delivered it to the Navy, ECR submitted its properly certified REA to the Navy seeking further adjustment of, and compensation for, the changes to the work scope and means and methods of performance on the THUNDERBOLT under the terms of the Contract.

16. On or about September 8, 2014, the Navy issued its Final Decision by letter Serial 414/WKR/306. The Navy's Final Decision denied ECR's REA in its entirety, to include the claims ECR submitted on behalf of its subcontractors. The Final Decision also provided notice to ECR of its right to appeal the Final Decision.

17. On or about November 25, 2014, ECR filed this timely appeal of the Contracting Officer's Final Decision in the United States District Court for the Eastern District of Virginia, Norfolk Division.

18. Subsequent to the filing of this lawsuit, ECR and one of its subcontractors, Marine & Industrial Coatings, LLC

("MIC"), entered into negotiations to resolve the then-pending subcontractor "pass-through" claim which was included with the ECR damages calculations.

19. MIC and ECR settled the MIC subcontractor REA for $650,000 which is approximately 52% of the original value of MIC's claim ($1,251,545). This settlement was acknowledged in ECR's Initial Disclosures filed in this matter, and ECR has subsequently reduced its damages request to reflect the settlement, to include a reduction in the amount claimed for "General and Administrative" expenses ("G&A") calculated based on the MIC claim. Such changes result in a revised damages amount, or ad damnum, of $11,166,815.

## C. Additional Factual Findings Based on Evidence Presented at Trial

Based on the trial evidence, the Court makes the following additional factual findings by a preponderance of the evidence:

1. The THUNDERBOLT is a thin-hulled PC class vessel engineered very differently from the "surface combatant" ships in the Navy's fleet. Such fact had broad reaching impacts on the overhaul of the THUNDERBOLT, and led to many of the disputes litigated before this Court. This is particularly the case because the Navy treated PC class vessels as "ships" during prior repair "availabilities," but took steps to change such treatment during 2011.

2. The THUNDERBOLT was one of three PC class vessels being overhauled around the same time (2011–2013) in the Hampton Roads port. In addition to the THUNDERBOLT, the USS TEMPEST was overhauled by ECR at the same Portsmouth shipyard as the THUNDER-

---

5. The parties dispute the date ECR completed work on the Vessel, with ECR asserting that the availability ended on April 1, 2013, and the Government asserting that it did not end

until April 23, 2013. The precise date of "substantial completion" is important as it impacts the calculation of liquidated damages owed by ECR to the Government.

BOLT, with the initial plan being that the major work items on the two vessels would be worked in sequence, with the THUNDERBOLT beginning first. The USS SQUALL was the third PC class vessel being overhauled, although it was overhauled by a different local shipyard located in Norfolk: Colonna's Shipyard, Inc. ("Colonna's").

3. The THUNDERBOLT overhaul, as well as the two other concurrent PC overhauls, was a high-priority availability from the Navy's perspective. However, different Navy representatives had different, and in many ways conflicting, priorities. First, there was an operational priority to finish the overhaul as soon as possible so that the Vessel could be deployed in the Middle East. Second, there was a conflicting engineering priority to conduct the repairs in a methodical and conservative manner in order to reduce risk of inadvertent hull damage and/or the need for "rework" on the thin-hulled PC class vessel. While there is no question that both Plaintiff and Defendant are responsible for delays during the THUNDERBOLT availability, needless to say, it was impossible for ECR to speed up, and slow down, at the same time.

4. The Navy's ship repair group based in Hampton Roads, Virginia, has had various names over the years, including the Norfolk Ship Support Activity ("NSSA"), the Mid-Atlantic Regional Maintenance Center ("MARMC"), and SUPSHIP. PC class vessels, including the THUNDERBOLT, have been repaired in the past on multiple occasions, including repairs at local Hampton Roads shipyards. Such prior repairs, however, were not complete overhauls aimed at resolving structural damage throughout the entire vessels.[6] When prior PC repairs

were performed locally, the Navy's Carderock Division ("Carderock"), which consists of engineers and naval architects, was not involved. Rather, in the past, engineers working at NSSA/MARMC would oversee the repairs. The contracts governing such prior repairs invoked various Navy "Standard Items" even though such standards and procedures were originally written to govern repair work on large surface combatants such as cruisers, destroyers, and frigates.

5. From a structural standpoint, the PC class vessels are not "ships," and are not "boats," but are more of a hybrid, and therefore are structurally different from Navy surface combatants. Unlike a surface combatant, a PC is a high-speed craft that will semi-plane (which makes it like a boat), and to achieve such performance, the hull structure is very lightweight (and thus very thin). Speaking generally, ships have a backbone (a keel), whereas PCs do not have a keel. A PC's structural strength is based on the shell plate, the shell plate stiffeners, the longitudinal girders, and the main deck stiffeners.

6. At the time of its overhaul by ECR, the THUNDERBOLT was several years past the end of its useful life, and large portions of structural steel, including its hull, deck, stiffeners and girders, were damaged and needed to be replaced. The degree to which a section of structural steel is "not fair," i.e., dented or bent, is referred to as "deflection." Unfortunately for all involved in the THUNDERBOLT overhaul, the Government did not update the specification for the planned overhaul with a new and detailed "survey" of the THUNDERBOLT's hull as measured im-

---

**6.** As set forth herein in the stipulated facts, the THUNDERBOLT had started to undergo an overhaul at MHI Shipyard, but such availability was canceled by the Navy and resubmitted for new bids. Additionally, several

years prior to the MHI availability, ECR acted as a subcontractor on a local THUNDERBOLT availability where the stern of the Vessel was repaired.

mediately prior to the ECR overhaul, but instead relied on an outdated hull survey that had been performed prior to the MHI availability.

7. During the summer of 2011 when ECR was awarded the Contract for the THUNDERBOLT overhaul, the following entities did not fully appreciate the engineering challenges involved in a PC overhaul involving large-scale structural steel renewal: ECR, ECR's structural steel contractor-Técnico, the Navy Contracting Officers assigned to the THUNDERBOLT (the individuals responsible for contract-related issues and authorizing growth work and new work differing from that required under the terms of the Contract, as well as compensation for such changes), the Navy maintenance team assigned to the THUNDERBOLT (the team responsible for overseeing day-to-day repairs, led by Navy Project Manager Justin Thivierge ("Thivierge")), and arguably most importantly, Navy engineers employed by NSSA, to include the lead Project Support Engineer. See, e.g., ECR Ex. 361.

8. At the time the Contract was awarded, based on knowledge obtained from prior PC overhauls occurring in the country of Bahrain, the Navy's Carderock engineers had detailed information about PCs, including newly identified structural risks associated with a large-scale overhaul. Such information, however, resided only in Carderock, and there was an internal Government "information gap" between Carderock and NSSA. Critically, it was NSSA who wrote the specification for the overhaul of the THUNDERBOLT that was bid on by ECR. The disconnect between Carderock and NSSA is further evidenced by the fact that the specification for the THUNDERBOLT overhaul omitted a reference to a newly developed Government Liaison Action Record ("LAR") specific to structural steel renewals on PC class vessels that established the updated standard for measuring deflection after structural steel repairs are performed. Although the updated LAR was not part of the Contract, the Government held ECR and Técnico to such newly developed standard during the THUNDERBOLT availability.

9. The specification provided by the Navy to enable ECR (and others) to bid on the THUNDERBOLT overhaul did not include restrictions as to how the steel repairs were to proceed, nor did the specification, or other bid documents, effectively communicate the knowledge that Navy Carderock engineers had obtained in 2010 during PC overalls in Bahrain. Moreover, ECR had prior familiarity working on PCs as required by NSSA, including the THUNDERBOLT, and the PCs were previously treated as ships by NSSA notwithstanding their "hybrid" nature. Notwithstanding such past treatment, ECR was contractually bound to perform as required in the Contract documents, and to the extent the Contract included provisions that may have been viewed as "atypical" in the industry, ECR bore the risk of the additional costs of satisfying such contractual provisions.

10. After ECR was awarded the THUNDERBOLT Contract, but before the Vessel was ever docked, the planned nine-month timeline for the availability was delayed by more than two months. Due to no fault of ECR, even after the Contract was awarded, the Navy was "still analyzing how best to lift the USS THUNDERBOLT out of the water and haul it up to the shipyard without structural damages." ECF No. 58 ¶ 28. The Navy was working on such plan because a Carderock engineering analysis had concluded that one of the "root causes" of the existing structural damage on the PC vessels was performance of past dockings utilizing the Navy's own flawed required docking plan. Trial Tr. 1353. The Navy failed to inform ECR

of such issue until after its bid was accepted.

11. As a result of the docking issues caused by the Navy, the docking of the THUNDERBOLT was delayed from October 7, 2011, until December 13, 2011, putting the availability more than two months behind schedule before the THUNDERBOLT was ever out of the water. Such delay was the subject of a bilateral Contract modification (MOD–8), and ECR was compensated $1,350,000. JE 8, Govt. Ex. 36. As part of such negotiated change, which included release language, ECR was precluded from seeking further compensation as a result of the docking delay. As a result of the agreed change, the Contract performance period was extended by approximately two months.

12. A second major issue that caused the planned timing of the THUNDERBOLT availability to derail from the start is the fact that, almost immediately after the THUNDERBOLT Contract was awarded to ECR, the Navy informed ECR that a Process Control Procedure ("PCP") would be required by the Navy for the structural steel renewals on the THUNDERBOLT. The structural steel work was the largest line item of the overhaul, and the Navy's invocation of a PCP for the structural steel would afford the Navy far more oversight of, and the authority to control, the processes and procedures used by ECR to replace the steel.

13. Because the Navy did not invoke the PCP until after ECR's bid was accepted, ECR's bid price for the THUNDERBOLT did not include the added cost of writing or implementing a PCP for the structural steel renewals. Rather, ECR's bid was based on its intent to follow "good ship-fitting" practices when removing and replacing large portions of steel simultaneously, taking the necessary steps to ensure the structural integrity of the Vessel consistent with its past work for the Navy on the THUNDERBOLT and other PC class vessels. However, from the perspective of Navy Carderock Engineer Chris Foeller (the most knowledgeable Navy Engineer at the time of the THUNDERBOLT availability regarding PC class structural steel renewals), it was unlikely that the use of "good ship-fitting practices" would ensure the Vessel's structural integrity. Trial Tr. 1367. Critically, such viewpoint: (1) was never shared with ECR prior to the availability or at the time the PCP requirement was announced by the Navy; (2) was grounded in the Navy's newly discovered undisclosed superior knowledge, purportedly learned during the prior Bahrain PC availabilities; and (3) was the viewpoint of Mr. Foeller/Carderock, and was not a fact proven by Defendant by a preponderance of the evidence.[7]

14. Prior to the 2011 PC class availabilities in Hampton Roads, the only time the Navy had invoked a PCP for structural steel repairs on a PC class vessel was the Navy-terminated availability on the THUNDERBOLT at MHI shipyard. Such availability was terminated around the same time that a structural steel PCP had been finalized, although the PCP that the Navy approved for the MHI availability was relatively basic and covered a relatively small amount of structural work.

15. As to the earlier Bahrain availabilities, the Navy had not required a PCP, but did require that the Bahrain shipyards "provide a sequence and a plan." Trial Tr.

---

7. Clarifying this final point, it was never proven at trial that ECR's initial repair plan would have failed; rather, what was proven is that the Navy, both expressly and impliedly, informed ECR in December of 2011 and January of 2012 that the Navy was not willing to accept ECR's intended process/procedure for repairing the structural steel on the THUNDERBOLT.

1350. Such required sequence/plan used in Bahrain is similar to a PCP, but is not the same, because the "plan" in Bahrain merely consisted of "general guidelines" of what the shipyard would do, and would not do, when replacing steel. Id. For example, the Bahrain shipyard would be prohibited from working on two side-by-side structural steel frames at the same time. Id. In contrast, the PCP ultimately mandated by the Government for the THUNDERBOLT availability required that every frame, every cut, be pre-planned and conducted in accordance with such sequenced plan without deviation (unless permission to deviate was subsequently granted by the Navy).

16. After informing ECR of the newly added PCP requirement, the Navy invoked Standard Item 009–09 "Process Control Procedure, Provide and Accomplish" for the structural steel work on the THUNDERBOLT (Contract Item No: 110–11–002). More specifically, on September 16, 2011, the Navy issued a Request for Contract Change (RCC–7G), requiring a structural steel PCP.

17. Around this same time, upon recommendation of the Navy, ECR solicited subcontractor bids from Técnico for the performance of the structural steel work. Técnico is a corporation that is a partial owner of ECR, but it operates independently from ECR and competes in the marketplace with ECR. The Navy suggested Técnico to ECR because Técnico was the subcontractor that had been hired to perform the structural steel work during the MHI availability on the THUNDERBOLT. Moreover, unlike ECR, Técnico had the necessary in-house engineers to develop a structural steel PCP and had previously developed the PCP for the less extensive steel work planned for the MHI availability.

18. After ECR reached out to Técnico, Técnico submitted two bids to ECR, one for the structural steel renewals, and a separate bid for developing/writing a structural steel PCP. ECR ultimately hired Técnico both to write the PCP and to perform the structural steel renewals, although ECR retained the obligation to provide labor and other support for Técnico's steel renewal efforts.

19. ECR and the Government thereafter negotiated a formal change order modifying the Contract to include a PCP for the structural steel renewals. Although there was a pricing dispute, the parties came to an agreement on November 14, 2011, incorporating RCC–7G into the Contract through "MOD–2" at a price of $39,000. JE 2.

20. On December 1, 2011, a few weeks after the PCP pricing issue was settled by MOD–2, the Navy conducted a training session for both the Navy Maintenance Team that would oversee the THUNDERBOLT overhaul (to include various Navy Quality Assurance representatives and engineers) as well as ECR and Técnico. See ECR Ex. 87. This meeting occurred during the time that Técnico was writing the PCP, and the meeting focused on relaying the "lessons learned" by the Navy in the summer of 2010 from the Bahrain PC overhauls, to include "sequence welding, fairness inspections, permissible distortion allowance, fairness measurements, fit-up, welding requirements ... pre-fit up, tack welding, weld sequence etc." Id. At such meeting, the Navy revealed its previously undisclosed knowledge as to the Navy's requirements for the process and procedure for performing large-scale steel renewals in a conservative manner designed to avoid the risk of any further damage to the PC's thin hull and structure. ECR and Técnico both had representatives at the meeting, including Técnico's Project Manager, Timothy "Spike" Harrison. As a result of what the Navy revealed during such meeting, Técnico had to shift course in drafting its PCP to make it more detailed,

and more restrictive, than both the PCP Técnico had planned to write, and the PCP Técnico had drafted for the MHI availability. Trial Tr. 730–31, 735–36, 1049–50; see also Trial Tr. 1357–58.

21. ECR submitted its first draft of the PCP to the Navy in late December, 2011, and because structural steel work could not begin until the PCP was approved by the Navy, the PCP was drafted in a manner to comply with the Navy's new requirements, as outlined at the December 1, 2011, meeting. The Navy returned the PCP to ECR with required revisions on January 20, 2012.

22. The PCP was updated and modified to incorporate the changes required by the Navy, and was ultimately approved the first week of February of 2012. Defendant contends that ECR took too long to develop the PCP, whereas Plaintiff contends that the Government took too long to review/approve the PCP. The fact that the Navy took approximately a month to review the original draft of the PCP suggests that, at least early in the availability, the Navy's caution regarding structural concerns was given more weight than the operational focus on completing the availability as soon as possible.

23. The restrictive nature of the sequencing of the steel renewal process as set forth in the approved PCP resulted in numerous delays throughout the project, with the structural steel work ultimately taking months longer than ECR, Técnico, or the Navy had anticipated. While the Navy did not share its requirements as to steel repair procedures that the Navy would insist upon until well after the Contract was bid and awarded, the Navy is not solely responsible for the delays during the structural steel renewals. First, trial testimony established that, as the author of the PCP, ECR/Técnico added unnecessary complexities and over-restrictive sequencing into the PCP that were not mandated by the Government. Second, ECR's president testified that ECR bid the job with "no plan" of attack as to how the steel work would be performed, and that ECR planned to simply "cut, fit, grind, and weld," removing large areas of steel plate with a large workforce working in multiple areas of the Vessel at the same time, treating the job like ECR would treat any other ship. Trial Tr. 104–06, 154. Such general plan of attack, which does not account for the special nature of a PC's structure, suggests that ECR underbid the project because it failed to fully appreciate the degree to which the THUNDERBOLT's inherent design would require ECR to take additional steps (even without a PCP) to ensure the Vessel maintained its structural integrity. Moreover, it appears that ECR and Técnico did not fully appreciate the added time (and expense) that would result from the mandated Government "G-point" inspections that were required by the terms of the original Contract, to include both "fit-up" inspections and "pre fit-up" inspections. ECR Ex. 15, at Item No. 110–11–002. Third, there were times during the steel renewals when Técnico failed to maintain an adequate workforce of welders, which caused ECR/Técnico to fall further behind schedule. Govt. Exs. 92, 108.

24. Also causing delays during the THUNDERBOLT availability was the Government's failure to timely negotiate and approve change orders,[8] and the fact

---

**8.** For example, ECR Ex. 90 is an internal Government email chain from May of 2012 acknowledging the Government delays getting change order work approved. Such email chain includes an email from the lead military representative at NSSA "Waterfront Ops" stating: "EVERYONE—We are NOT executing these avails successfully.... We are not functioning as a team, and that is NOT acceptable for the United States Navy's premiere maintenance organization." Id.

that the Navy's on-site maintenance team, led by Mr. Thivierge, as well as the Navy's contracting team, included individuals in key positions with limited relevant experience. In light of the high-visibility and high-priority of the THUNDERBOLT overhaul, as well as the Navy's still emerging understanding of the special complexities associated with a large-scale overhaul of a PC class vessel that was several years past the end of its useful life, it is surprising that the Government assigned: (1) an electrical, rather than a structural, engineer as its lead on-site "Project Support Engineer"; (2) inexperienced structural engineers working under, or otherwise assisting, the Project Support Engineer; (3) inexperienced Shipbuilding Specialists ("SBS") with the role of performing Government inspections ("G-points") who were not familiar with the governing Navy standards and who needed to be educated by ECR/Técnico employees; and (4) for the latter part of the availability, an Authorized Contracting Officer ("ACO"), in charge of approving all growth/change order work and responsible for negotiating pricing for such work, who had never worked a "fixed price" contract prior to the THUNDERBOLT.

25. A separate cause for delay that occurred before the structural steel repair work began in earnest was the fact that, during February of 2012, the Navy failed to timely approve the cutting of Temporary Access Openings ("TAOs") that would allow the structural steel work to begin. Notably, in light of the design of the structural frame of a PC class vessel and the numerous small spaces in which repair work and welding was required on the THUNDERBOLT, TAOs were critical to the completion of the steel renewals. As required, Técnico submitted its TAO request three days before it intended to cut a TAO, but the Government approval for some TAOs took weeks. To the extent the Government asserted at trial that Técnico requested too many TAOs at the start of the availability and it was impossible for the Navy to research and approve the TAOs in a timely manner, such claim at best evidences a Government staffing issue, a failure that does not fall on the shoulders of ECR or Técnico under these circumstances.

26. Based on the docking delays, PCP drafting/approval delays, and TAO delays, structural steel work that was initially scheduled to begin in October of 2011 did not start until late February of 2012. These delays also led to the structural steel work on the TEMPEST beginning long before the completion of the steel work on the THUNDERBOLT, leading to steel renewals at ECR's shipyard being performed largely in parallel, rather than in sequence. Such fact led to a strain on both ECR's and Técnico's workforce, which contributed to numerous performance issues on the part of ECR and Técnico, as there was a limited number of welders that were skilled enough and/or willing to work on the thin-hulled THUNDERBOLT and TEMPEST. Cf. ECR Ex. 2, at 8. Moreover, mounting Government concerns regarding slower than expected progress on the steel renewals resulted in increased pressure on ECR from the Navy, which trickled down to the Técnico workforce, ultimately resulting in less than ideal working conditions that, at times, made it difficult for Técnico to keep the structural steel renewals fully manned. Additionally: (1) some members of Técnico's workforce already had future work scheduled in other ports, and the fact that the THUNDERBOLT availability was months behind schedule caused some workers to leave for other projects; and (2) working on structural steel in the heat of the summer, rather than in the fall and winter as originally planned, was another negative that caused dissatisfaction among

some of the Técnico workforce.[9] See Govt. Ex. 92 (email from Técnico to ECR in May of 2012 indicating as follows: "The fact is that the work requirements and physical constraints of the work areas are creating havoc with our attempts to maintain a constant and stable work force. Either a high percentage of the personnel are not up to the higher than anticipated requirements or if they are, feel they can obtain easier work elsewhere.").

27. Although it is undisputed that the Government caused over two months of docking delays that contributed to some of the above staffing issues, it is critical to note that the Contract was modified by MOD-8/RCC-20G in order to fully compensate ECR for the two months of docking delays. Such modification includes a release that prevents ECR, or Técnico, from recovering any additional damages that flow from such delay. Accordingly, to the extent ECR failed at the time it negotiated MOD-8 to fully anticipate how the docking delay would "disrupt" its performance of the steel work several months later (to include "disruption" from the impact of the THUNDERBOLT and TEMPEST steel work being performed in parallel), such risk falls entirely on ECR.

28. In addition to Plaintiff being barred from recovering damages based on the docking delay and other bilateral Contract changes that included a "release," the trial evidence revealed that Plaintiff was responsible, to a degree, for delayed performance. The trial evidence demonstrated that, particularly at the beginning of the structural steel work, ECR/Técnico's performance at times failed to meet Contract requirements. Notably, the PC learning curve discussed above with respect to Navy personnel was also applicable to ECR, Técnico, and their workforce. The

Court therefore finds that ECR and Técnico bear responsibility for some of the delays and "rework" for which they attempt to shift the blame to the Government.

## II. Legal Standards and Preliminary Conclusions of Law

### A. Jurisdiction over ECR's Claims

 It is undisputed that this Court has jurisdiction over ECR's claims alleging that ECR suffered damages as a result of the Government's failure to provide compensation for alleged change order work pursuant to the parties' written Contract, such jurisdiction being established by the Contract Disputes Act ("CDA") of 1978, 41 U.S.C. § 7101–09. Pursuant to § 7102(d), appeals of a Contracting Officer's Final Decision arising out of a maritime contract are governed by the Suits in Admiralty Act, 46 U.S.C. § 30901, et. seq. A contract to repair a vessel constitutes a maritime contract. New Bedford Dry Dock Co. v. Purdy (The Jack–O–Lantern), 258 U.S. 96, 99, 42 S.Ct. 243, 66 L.Ed. 482 (1922). Accordingly, there is no dispute as to whether the Contract at issue is a maritime contract, whether a "Final Decision" was rendered by a Contracting Officer, or whether this case was timely filed in the proper court. Moreover, while ECR was required to obtain a "Final Decision" from the Contracting Officer prior to filing suit in this Court, the instant case is a de novo proceeding and the Contracting Officer's decision is not entitled to any deference. See Assurance Co. v. United States, 813 F.2d 1202, 1206 (Fed.Cir.1987); 41 U.S.C. §§ 7102(d), 7104(b).

### B. Pass-through Claims— Subcontractors

 The Government asserts that ECR has failed to demonstrate that the pass-through claims advanced by ECR, on

---

**9.** Técnico staffed the THUNDERBOLT availability with both welders that were Técnico employees and welders hired by Técnico on a temporary basis through a manpower company called "Platinum." Trial Tr. 1121–22.

behalf of subcontractors Técnico and MIC, are properly before this Court. It is well-established that "subcontractors do not have standing to sue the government under the Tucker Act, 28 U.S.C. § 1491, in the event of an alleged government breach or to enforce a claim for equitable adjustment under the Contract Disputes Act of 1978." Erickson Air Crane Co. of Washington v. United States, 731 F.2d 810, 813 (Fed.Cir.1984) (citations omitted). Subcontractors lack standing because the "government consents to be sued only by those with whom it has privity of contract, which it does not have with subcontractors." Id. An aggrieved subcontractor may, however, "prosecut[e] a claim against the government through and in right of the prime contractor's contract, and with the prime contractor's consent and cooperation." Id. Such claims are referred to as "pass-through" claims, and they must ultimately demonstrate that the Government breached an obligation under the terms of the contract with the prime contractor. Cf. E.R. Mitchell Const. Co. v. Danzig, 175 F.3d 1369, 1370 (Fed.Cir.1999) (citing Severin v. United States, 99 Ct.Cl. 435 (1943)).

█ Notwithstanding the Government's arguments to the contrary, the Court finds that it has jurisdiction to consider the claims advanced by Técnico and MIC, further finding that none of the claims fail for lack of standing.[10] ECR's trial evidence demonstrated that the Government both caused delays and required ECR to perform additional work for which additional compensation was required under the "Changes" clause of the Contract between ECR and the Government. Such additional work was performed in part by ECR, and in part by its subcontractors, and both ECR, and its subcontractors through ECR, assert that they are owed compensation under the primary Contract for the changed scope of work demanded by the Government during the THUNDERBOLT availability. The claims addressed herein by the Court, both direct and "pass-through," are not "breach of contract" claims in the traditional sense, but instead seek compensation under "a specific contract adjustment provision," of the Contract. Cf. United States v. Utah Const. & Min. Co., 384 U.S. 394, 401–02, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) (discussing the "distinction between disputes over rights given by the contract and disputes over a violation of the contract" and noting that "to the extent complete relief is available under a specific contract adjustment provi-

10. The Government has not demonstrated that ECR, as prime contractor, lacks an obligation to Técnico or MIC for the costs at issue in their pass-through claims. While the Government cites to Severin v. United States, 99 Ct.Cl. 435 (1943) as well as a First Circuit case from 1967 in an effort to demonstrate a failure of Plaintiff's proof on this issue, the Government appears to ignore more recent precedent on the "Severin Doctrine." For example, in E.R. Mitchell Const. Co. v. Danzig, 175 F.3d 1369 (Fed.Cir.1999), the Federal Circuit explained that the party bearing the burden under such doctrine "shifted" several decades ago, and "[t]hus, it became, and still is, the burden of the government to prove that the prime contractor is not responsible for the costs incurred by the subcontractor that are at issue in the pass-through suit." Id. at 1370.

Here, not only has the Government failed to carry its burden on this issue, it appears questionable whether the Severin doctrine is even applicable to Técnico and MIC's pass-through claims. Notably, because these pass-through claims seek recovery pursuant to a specific contractual price adjustment provision (the "Changes" clause), as contrasted with seeking recovery based on a material "breach" of contract, the Government fails to distinguish case law establishing that the Severin doctrine is inapplicable where "the relief sought is an equitable adjustment under the changes clause of the prime contract." Hernandez, Kroone & Associates, Inc. v. United States, 110 Fed.Cl. 496, 522 (2013) (citing Blount Bros. Constr. Co. v. United States, 172 Ct.Cl. 1, 348 F.2d 471 (1965)); see Seger v. United States, 469 F.2d 292, 300 n. 32 (Ct.Cl.1972).

sion, such as the changes or changed conditions clauses, the controversy falls within the disputes clause" and should proceed under the disputes clause procedure rather than as an independent breach of contract action). While the Government is correct that neither Técnico nor MIC can recover damages based on additional work that is covered by a bilateral Contract change between ECR and the Government when such agreed-upon change included release language, such fact-intensive and issue-specific findings are not subject to a broad preliminary ruling couched as a jurisdictional or standing challenge.

## C. Burden of Proof

### 1. Contractor Claims Under the "Changes" Clause

It is undisputed, and unremarkable, that Plaintiff has the burden to prove, by a preponderance of the evidence, its affirmative claims seeking an adjustment in the Contract price pursuant to the "Changes" clause. Delhur Indus., Inc. v. United States, 95 Fed.Cl. 446, 454 (2010). That is, for each instance in which ECR asserts that the Government required ECR/Técnico to perform additional work outside the scope of the original Contract requirements, but within the general scope of the work contemplated by the Contract, ECR/Técnico must demonstrate that such work was "demanded by the Navy and not required under" the terms of the Contract. Colonna's Shipyard, Inc. v. United States, No. 2:14cv331, 2015 WL 9008222, at *10 (E.D.Va. Dec. 14, 2015) (unpublished); cf. Stipulated Fact 12 (indicating that the Contracting Officer has the authority to make changes to the fixed price Contract, and that if such changes increase or decrease the cost, or time of performance, the Contracting Officer has the obligation to make "an equitable adjustment in the contract price, the delivery schedule, or both"); see Servidone Const. Corp. v. Unit-

ed States, 931 F.2d 860, 861 (Fed.Cir.1991) ("To receive an equitable adjustment from the Government, a contractor must show three necessary elements—liability, causation, and resultant injury."); Delhur Indus., 95 Fed.Cl. at 453–54 ("To prove entitlement to an equitable adjustment, [the contractor] must show [by a preponderance of the evidence] 'liability, causation, and injury, and it must prove that the government somehow delayed, accelerated, augmented, or complicated the work, and thereby caused [it] to incur specific additional costs, and that those costs were reasonable, allowable, and allocable to the contract.'" (emphasis in original) (quoting SAB Constr., Inc. v. United States, 66 Fed.Cl. 77, 84–85 (2005))).

Stated differently, the contractual "breaches" that form the primary basis of ECR's case are not breaches in the traditional sense, but are . the Government's alleged failure to provide compensation under the "Changes" clause after the Government demanded performance that varied from that required under the terms of the written Contract. See The Redland Co. v. United States, 97 Fed.Cl. 736, 755 (2011) ("As the Federal Circuit has explained, 'contingencies contemplated by various contract clauses are remediable under those clauses of the contract, not as a breach of the contract.'" (quoting Triax–Pacific v. Stone, 958 F.2d 351, 354 (Fed.Cir.1992))); cf. Design & Prod., Inc. v. United States, 18 Cl.Ct. 168, 196 (1989) ("A plaintiff is entitled to an equitable adjustment when required to perform work not called for in the contract, when performance generated additional expense, by a defendant who has mistakenly interpreted the contract to require that work." (citing United States v. Turner Constr. Co., 819 F.2d 283, 286 (Fed.Cir.1987))).

 In addition to formal changes in performance expressly ordered in writing

by the Government's Contracting Officer, a contractor may obtain an equitable adjustment pursuant to the Changes clause under a theory referred to as a "constructive change." See The Redland Co., 97 Fed.Cl. at 755 ("Even when a contingency is not contemplated by a contract clause, such as when 'a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the [g]overnment,' the situation is treated as a constructive change to the contact, not as a breach." (quoting Int'l Data Prods. Corp. v. United States, 492 F.3d 1317, 1325 (Fed.Cir. 2007)))."For a contract to be constructively changed, the plaintiff must demonstrate that the [g]overnment expressly or impliedly ordered the contractor to perform work that was outside the contract requirements." Tecom, Inc. v. United States, 66 Fed.Cl. 736, 774 (2005). As explained in detail by the United States Court of Federal Claims:

> A constructive change entails two base components, the change component and the order or fault component. Al Johnson Constr. Co. v. United States, 20 Cl.Ct. 184, 204 (1990). The "change" component describes work outside of the scope of the contract, while the "order/fault" component describes the reason that the contractor performed the work. Embassy Moving & Storage Co. v. United States, 191 Ct.Cl. 537, 545, 424 F.2d 602, 607 (1970); Eggers & Higgins & Edwin A. Keeble Assocs., Inc. v. United States, 185 Ct.Cl. 765, 785, 403 F.2d 225, 236 (1968). Thus, if the Government either expressly or impliedly ordered work outside the scope of the contract, or if the Government otherwise caused

the contractor to incur additional work, a constructive change arises for that work performed outside of the scope of the contract. Lathan Co. v. United States, 20 Cl.Ct. 122, 128 (1990). While the constructive change doctrine provides a means for a contractor recovery, the rationale for constructive changes involves the objective of persuading a contractor to continue to work pending resolution of any dispute involving the work at issue. American Line Builders, Inc. v. United States, 26 Cl.Ct. 1155, 1176 (1992).

Miller Elevator Co. v. United States, 30 Fed.Cl. 662, 678 (1994); see 1 Bruner & O'Connor Construction Law § 4:25 ("The doctrine of 'constructive change' is a legal fiction created in the mid–20th century by the federal judiciary and federal boards of contract appeal to (1) remediate contractor claims for extra work, and (2) permit contractors to perform disputed work without having to risk abandonment of their contracts to preserve their claims. The theory underlying the constructive change concept is that where the government 'should have' issued a change order authorizing the extra work in the first place, the court or board may direct the government to do what 'should have been done' by directing the government to issue a formal change order."). Five distinct types of "constructive changes" have been identified by legal scholars and the courts: "(I) disputes over contract interpretation during performance; (II) Government interference or failure to cooperate; (III) defective specifications; (IV) misrepresentation and nondisclosure of superior knowledge; and (V) acceleration." Miller Elevator Co., 30 Fed.Cl. at 678 (citations omitted); [11] see 1 Bruner & O'Connor Con-

---

**11.** While the court in Miller concluded that the plaintiff had demonstrated a constructive change based on the government's failure to disclose superior knowledge, it noted that the non-disclosure of superior knowledge has historically been analyzed as an independent breach of contract claim See Miller Elevator Co., 30 Fed.Cl. at 678 n. 2 (citing cases); but see Johnson & Sons Erectors Co. v. United

struction Law § 4:25 (outlining the same five types of constructive change); 1 Government Contract Changes § 10:7 (same); cf. ECR Ex. 60 §§ 2.18.4, 2.18.4.1, 2.18.4.1 (Navy "Joint Fleet Maintenance Manual" discussing "constructive change orders" occurring when: (1) the Government insists on more expensive performance than was actually required by the contract; (2) "the Government provides defective specifications · and the contractor incurs additional expense attempting to perform"; (3) "the contractor undertakes to perform the contract without knowledge of vital information that · affects performance" when the Government is aware that the contractor had no such knowledge).

 If a formal change, or a constructive change, is proven, the contractor's "actual costs" of the changed work, provided that such costs are reasonable, will typically "provide the measure of the equitable adjustment." Delhur Indus., 95 Fed.Cl. at 454 (citing George Sollitt Constr. Co. v. United States, 64 Fed.Cl. 229, 245 (2005)). However, in complex cases, the determination of damages may

not be possible with precision, and thus," 'where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness.' " Id. (quoting CEMS, Inc. v. United States, 59 Fed.Cl. 168, 227 (2003)). In such cases, a contractor can "meet its burden of proving damages if it 'furnishes the court with a reasonable basis for computation, even though the result is only approximate.' " Id. (quoting CEMS, Inc., 59 Fed.Cl. at 227).

### 2. Government Credits Under the "Changes" Clause

 In contrast to the above, "when the government has deleted work and/or costs from a fixed price construction contract, the government, not the contractor, bears the burden of proving the amount of any downward equitable adjustment to the contract price." George Sollitt Constr., 64 Fed.Cl. at 246; see Nager Elec. Co. v. United States, 194 Ct.Cl. 835, 442 F.2d 936, 946 (1971) ("Just as the contractor has [the burden] when an upward adjustment is sought under the Changes clause, so the

States, 231 Ct.Cl. 753, 757–59 (1982) (indicating that, depending on the circumstances, withholding of superior knowledge may warrant an equitable adjustment, or may "be [a] breach claim[ ] after all," but acknowledging the inherent danger in precluding a contractor from seeking an "equitable adjustment" for conduct that would otherwise constitute a "breach" because the contractor, if not allowed to pursue an equitable adjustment, "may be obliged to ·declare the contract at an end and cease performance in order to avoid a waiver and save its rights"). Here, ECR's complaint not only seeks an equitable adjustment based on "both directed and constructive" changes, but advances several alternative legal theories: "Breach of Duty to Disclose Superior Knowledge," "Quantum Meruit," "Breach of Contract," and "Breach of Contract—Cardinal Change." ECF No. 1. As set forth in the Final Pretrial Order, ECR appeared to later abandon such alternative theories of relief, instead focusing its case solely on its "Contract adjustment" claim.

ECF No. 23, at 149–51. The instant Opinion, therefore, does not address the alternative legal theories that ECR abandoned at trial, instead concluding that ECR has stated a valid "contract adjustment" claim premised, in part, on the Government's failure to disclose superior knowledge. Moreover, to the extent the trial record can be interpreted as ECR maintaining a stand-alone claim alleging that Defendant breached a disclosure duty, the Court finds that any award on such alternative theory would be duplicative to the Court's determination that ECR is entitled to compensation for a constructive change order premised, in part, on the Government's failure to disclose superior knowledge. Stated differently, the damages awarded by the Court on ECR's "Contract adjustment" claim fully compensates ECR for all of the Government's alleged "breaches" such that ECR is not entitled to any additional damages on any alternative legal theory that is arguably still before the Court.

defendant has the laboring oar, <u>and bears the risk of failure of proof, when a decrease is at issue.</u>") (emphasis added); 2 Government Contract Changes § 19:5 ("When the Government asserts that a change decreased the costs of performance-and hence that it is entitled to a downward equitable adjustment in the price of the contract—it has the burden of proof."). As discussed below, while the instant action primarily involves ECR/Técnico's affirmative requests for upward adjustments in the Contract price, there are also several Government credits that ECR attacks as being improperly claimed by Defendant.

### 3. Liquidated Damages

The contours of the legal standard governing disputes over the assessment of liquidated damages appears somewhat less settled than the standards discussed above, at least when both parties to a contract are responsible for contributing to delayed performance. The Federal Circuit has held that "[a]s a general rule, a party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled." <u>Sauer Inc. v. Danzig</u>, 224 F.3d 1340, 1347 (Fed.Cir.2000). An arguably more complete statement of the applicable legal standard is as follows:

> In the context of litigating liquidated damages assessed by the government in a construction contract, the government first must meet its initial burden of showing that "the contract performance requirements were not substantially completed by the contract completion date and that the period for which the assessment was made was proper." Once the government has met that burden, the burden then shifts to the contractor "to show that any delays were excusable and that it should be relieved of all or part of the assessment."

<u>George Sollitt Constr.</u>, 64 Fed.Cl. at 243 (quoting <u>PCL Constr. Servs., Inc. v. United States</u>, 53 Fed.Cl. 479, 484 (2002), <u>aff'd</u>, 96 Fed.Appx. 672 (Fed.Cir.2004)). In order for the contractor to carry its burden it must "demonstrate that the excusable event caused a delay to the overall completion of the contract, i.e., that the delay affected activities on the critical path" because the contractor "is entitled to only so much time extension as the excusable cause actually delayed" completion of the contract. <u>Morganti Nat'l, Inc. v. United States</u>, 49 Fed.Cl. 110, 132 (2001), <u>aff'd</u>, 36 Fed.Appx. 452 (Fed.Cir.2002) (internal quotation marks and citations omitted).

If the contractor demonstrates that the government has contributed to the delay of project completion, there appears to be conflicting authority as to whether the government has waived liquidated damages entirely, or whether a partial award is appropriate after the delays are apportioned among the parties. See <u>R.P. Wallace, Inc. v. United States</u>, 63 Fed.Cl. 402, 409–13 (Ct.Fed.Cl.2004) (discussing, at length, the "thorny" legal issues "posed by concurrent or sequential delays," noting that the "more heated debate" surrounds sequential delays, "where one party and then the other cause different delays"); see also <u>Sauer Inc. v. Danzig</u>, 224 F.3d 1340, 1347 (Fed.Cir.2000) (acknowledging prior cases holding that " '[w]here both parties contribute to a delay neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party' ") (quoting <u>Coath & Goss, Inc. v. United States</u>, 101 Ct.Cl. 702, 714–15 (1944)).

Having considered the somewhat conflicting positions taken on this issue in prior federal cases, this Court finds that the better legal interpretation regarding the proper treatment of "sequential delays" (where one party causes a delay followed by a separate-in-time delay caused

by the other), is that "apportionment" should be permitted when the evidence provides a reliable basis on which to determine which party is responsible for which delay. R.P. Wallace, Inc., 63 Fed.Cl. at 411–13. Stated differently, the fact that the Government was solely responsible for some delays in this case (such as the delay associated with approving the TAOs), does not preclude the Government as a matter of law from recovering some amount of liquidated damages as a result of subsequent, and conceptually distinct, delays deemed to be solely the fault of ECR/Técnico.

As to performance delays deemed to be "concurrent," (both parties causing a delay at the same time), the established law reveals that ECR is permitted to seek an extension of the project completion date for such delay, as long as the delay caused by the Government would have disrupted the "critical path" in the absence of the delay caused by the contractor. Id. at 410. However, while ECR may seek an extension of the performance period for a concurrent delay, ECR is precluded by law from obtaining a monetary award to compensate it for "delay damages" for such delays, with the appropriate relief being only the extension of the project completion date (which, in effect, results in a day-for-day reduction of the Government's liquidated damages claim). Cf. ECR Ex. 60 § 7.11.7 (Navy "Joint Fleet Maintenance Manual" stating that when the contractor and the government are responsible for a "concurrent delay" the government may not recover liquidated damages from the contractor and the contractor may not recover delay damages from the government).

**D. Jury Verdict Method of Damages**

■ As referenced above, a contractor bringing a claim for additional compensation under the Changes clause is not required to prove its damages with absolute precision. Delhur Indus., 95 Fed.Cl. at 454; see Ralph L. Jones Co. v. United States, 33 Fed.Cl. 327, 336 (1995) ("A contractor seeking an equitable adjustment need not prove his damages with absolute certainty or mathematical exactitude.") (internal quotation marks and citation omitted). In instances where actual damages for specific changes cannot be documented, federal courts have, on appropriate facts, still awarded damages under either the "total cost method" or the "jury verdict" method of calculating damages. CEMS, Inc., 59 Fed.Cl. at 227.

■ The total cost method compares the contractor's actual total costs to its original bid in an effort to quantify the damages associated with the increase in the work scope. Id. However, such damages theory is highly disfavored because it can operate to improperly shift the risk from the contractor to the government and can operate to afford the contractor a windfall in cases where the contractor failed to effectively control its costs, underbid the original job, and/or contributed to additional costs through its own deficient performance. Id.

■ The "jury verdict" method of calculating damages is "designed to produce an approximation of damages based on the entire record." Raytheon Co. v. White, 305 F.3d 1354, 1367 (Fed.Cir.2002). Such method is employed when " 'damages cannot be ascertained by any reasonable computation from actual figures,' but it 'is not favored and may be used only when other, more exact, methods cannot be applied.' " CEMS, Inc., 59 Fed.Cl. at 228 (quoting Dawco Constr., Inc. v. United States, 930 F.2d 872, 880 (Fed.Cir.1991), rev'd on other grounds, Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed.Cir.1995) (en banc)). Accordingly, as explained by the United States Court of Claims:

In situations where the court has rejected the 'total cost' method of proving

damages, but where the record nevertheless contains reasonably satisfactory evidence of what the damages are, computed on an acceptable basis, the court has adopted such other evidence; or where such other evidence, although not satisfactory in and of itself upon which to base a judgment, has nevertheless been considered at least sufficient upon which to predicate a 'jury verdict' award, it has rendered a judgment based on such a verdict.

Boyajian v. United States, 423 F.2d 1231, 1244 (Ct.Cl.1970) (internal citations omitted).

As recognized by the Federal Circuit, the primary peril of using the jury verdict method is "the risk that unrealistic assumptions will be adopted and extrapolated, greatly multiplying an award beyond reason, and rewarding preparers of imprecise claims based on undocumented costs with unjustified windfalls." Dawco Constr., 930 F.2d at 882. Accordingly, "[b]efore resorting to the jury verdict method, a court ... must determine (1) that clear proof of injury exists; (2) that there is no more reliable method for calculating damages;[12] and (3) that the evidence is sufficient to make a fair and reasonable approximation of the damages." Raytheon Co., 305 F.3d at 1367 (citing WRB Corp. v. United States, 183 Ct.Cl. 409 (1968)).

Here, ECR/Técnico's claimed damages are not based on "actual costs" associated with specific Contract changes. Rather, because ECR/Técnico did not track man-hours on the THUNDERBOLT availability to specific tasks, Plaintiff's claims for equitable adjustments are estimates of the additional costs incurred as a direct result of each specific Contract change at issue, with such costs driven primarily by the labor expenses of ECR or Técnico employees. The Government asserts that, because ECR/Técnico failed to prove actual costs tracked to specific timecards documenting man-hours worked by an identified employee on a specific change order, this Court should refuse to apply the jury verdict method and hold that ECR's "estimates" constitute a wholesale failure of proof.

In determining the quantum of damages in this case, the Court rejects the "total cost method," which would focus at a macro level on ECR/Técnico's actual costs of performance of the entire Contract. Notably, because the trial evidence established that ECR/Técnico caused concurrent and sequential delays, to include those caused by deficiencies in ECR/Técnico's performance, such method would be woefully inaccurate and unreliable in this case. Moreover, the trial evidence revealed that, at the time of their initial bids (as prime contractor and subcontractor), ECR and Técnico underbid the Contract as a result of their failure to anticipate the complexities inherent in the express contractual requirements. Because ECR/Técnico must bear the cost of both their bidding and performance deficiencies, the total cost method will not yield a reliable result.

The Court does, however, find that the use of the "jury verdict" method on a claim by claim basis is appropriate because it will, as to many disputed items, provide a sufficiently reliable damages calculation. As discussed below, the record sufficiently demonstrates: (1) that ECR/Técnico is not able to demonstrate actual costs of the additional work; (2) that there is no more reliable method of calculating damages; and (3) that the Court has before it credible trial testimony of ECR and Técnico's

---

12. In Dawco Constr., the Federal Circuit reversed the damages award and remanded "for a redetermination of the equitable adjustment" under the "actual cost method," based on the fact that the record failed to demonstrate that the contractor "justifiably could not have submitted an 'actual cost claim.'" Dawco Constr., 930 F.2d at 882

experienced estimators and project managers, coupled with hundreds of pages of exhibits documenting ECR/Técnico's detailed damages claims; these findings allow the Court to make a "fair and reasonable approximation" of Plaintiff's damages.

In concluding that the jury verdict method is appropriate in this case, the Court considered the following factors that contributed to ECR's inability to present evidence of actual costs at trial: (1) the overall complexity of the THUNDERBOLT availability, exacerbated by the lack of training and/or Contract interpretation mistakes by key Government personnel; (2) the parties' Contract is a "fixed price" contract for which the initial bid, and subsequent change orders, was based on a flat fee for specified performance, with the custom in the industry being that the contractor does not capture hours allocated to each specific task, by each individual worker, as the cost of doing so would outweigh the benefits; (3) defects in the Government's specification and hull survey led to confusion as to whether work being demanded by the Government was new work, changed work, or work within the scope of ECR's original contractual obligations; [13] (4) the difficulty in capturing the costs stemming from numerous delays caused by Government personnel (to include delays based on funding issues), for which the Government continues to assert that it is not at fault; (5) the Government's repeated failure to engage in timely negotia-

tions of Contract modifications; (6) the fact that, as an apparent result of ineffective internal communication among different Government "teams" associated with the THUNDERBOLT overhaul, the Government placed mixed, conflicting, and at times demonstrably incorrect demands on ECR/Técnico regarding the standards of performance and/or the areas on the Vessel that required steel repairs, making it all but impossible for ECR to know when to act, how to act, and most importantly, how to "compartmentalize" its costs for work being performed; and (7) the course of the parties' dealing throughout the THUNDERBOLT availability and the Government's failure to request cost-tracking on virtually every change required by the Government during the availability.[14]

Summarizing the parties' course of dealing under the Contract, when the parties agreed that additional growth work or change work was necessary, ECR would provide its "estimate" of the cost of the change and the Government would calculate its own Independent Government Estimate ("IGE"). The parties would then negotiate an agreed upon "fixed price" for the change. Such negotiated fixed price, whether it was negotiated before or after ECR started performing the new/changed work, was not based on "actual hours" recorded by a specific ECR employee performing a specific task; but rather, was based on estimates from experienced estimators on both sides of the table.[15] Such

**13.** See, e.g., ECR Ex. 86 (Government authored summary of various problems occurring during the THUNDERBOLT/TEMPEST/SQUALL availabilities, including the fact that "Less than optimum Work Specifications were issued").

**14.** The Court further notes that, notwithstanding the fact that this was a complex overhaul of a unique class of vessel, the Government did not limit its solicitation to contractors with advanced capabilities sufficient to quali-

fy them as a Master Ship Repair Agreement (MSRA) contractor, but instead accepted bids from less advanced contractors performing under an Agreement for Boat Repair (ABR). As the Government was well-aware, ECR was an ABR contractor at the time of the THUNDERBOLT availability, and ECR would not normally capture the time it allocated to each individual work item. Trial Tr. 269.

**15.** The Contract expressly incorporates "by reference" FAR clause 52.243–6. JE 60, at 43;

estimates were derived from the specific tasks to be performed, including the estimated "man-hours" to perform the work (with such hours further broken down by "trade" of the employee needed to perform the work (ex. Welder, Electrician, Engineering Tech., Firewatch, etc.)), and a separate estimate for the cost of materials, consumables, subcontractor expenses, as well as overhead/administrative markups and profit.[16] Notably, even near the end of the availability when the Government and ECR attempted to negotiate change or- ders for work that had already been performed, it appears that estimates were used by both parties rather than actual costs. Unsurprisingly, when ECR later pursued an "equitable adjustment" after the availability ended, it was unable to turn back the clock and document its "actual costs" for countless tasks performed by countless employees over a multi-year availability. Rather, the REA submitted by ECR, like the evidence at trial, was based almost exclusively on estimates.[17]

---

see also JE 60, at 49 (indicating that clauses incorporated by reference have the same force as if reproduced in the contract in "full text"). The text of the incorporated FAR clause states as follows:

> The Contracting Officer <u>may require</u> change order accounting whenever the estimated cost of a change or series of related changes exceeds $100,000. The Contractor, for each change or series of related changes, shall maintain separate accounts, by job order or other suitable accounting procedure, of all incurred segregable, direct costs (less allocable credits) of work, both changed and not changed, allocable to the change. The Contractor shall maintain such accounts until the parties agree to an equitable adjustment for the changes ordered by the Contracting Officer or the matter is conclusively disposed of in accordance with the Disputes clause.

FAR 52.243–6, <u>available at</u> 48 C.F.R. § 52.243–6. While such Contract clause clearly requires ECR to segregate and track costs when requested by the Government, <u>no such request</u> was made by the Government in this case with the exception of the implementation of the Heavy Weather Plan associated with Hurricane Sandy (see Part D below), even though numerous changes exceeded the $100,000 threshold. Trial Tr. 268, 271; <u>see, e.g.,</u> JE 1, 3, 5–6, 8, 16–19.

16. ECR's damage estimates use a Government approved "blended labor rate" for each additional hour that Plaintiff asserts its employees were performing change order work. Defendant does not dispute the accuracy of the calculation of the claimed labor rates.

17. In <u>Dawco Construction</u>, the Federal Circuit noted that the contractor "could have, and should have, been" in an ideal position to document its additional costs and that "[t]he issuance of a change order request should signal to the prudent contractor that it must maintain records detailing any <u>additional</u> work, just as should the encountering of differing site conditions." <u>Dawco Constr.</u>, 930 F.2d at 881. In this case, however, the parties' course of dealing over a multi-year period indicated that settling of Contract changes (including those over $100,000, and thus covered by FAR clause 52.243–6) would be based solely on estimates, and not actual costs. Accordingly, while the better practice surely would have been for ECR to more effectively track its costs, the failure to do so was apparently consistent with <u>both parties'</u> expectations at the time regarding changes. With such established history, the impossibility of creating such records years later supports the finding that there was no reliable basis for computing actual damages at the time the REA was prepared and/or at the time of trial. <u>Cf. WRB Corp. v. United States,</u> 183 Ct.Cl. 409, 425 (1968) (voicing the Court's displeasure with the use of the jury verdict method, but noting that there did not appear to be another alternative that "would produce any better foundation for an award."). Stated differently, while this Court must not award Plaintiff a "windfall" based on its knowing decision not to track costs, the Court must also ensure that the Government does not receive a windfall through failing to request cost-tracking during the availability, and arguably tacitly approving ECR/Técnico's failure to track costs over a multi-year period, only to demand the presentation of detailed records that do not exist more than a year after the work was completed.

When applying the jury verdict method to the trial evidence, the Court will not allow the leniency permitted "as to the actual mechanics of computation" to relieve ECR/Técnico of the burden to establish the "fundamental facts of liability, causation, and resultant injury," Wunderlich Contracting Co. v. United States, 351 F.2d 956, 968 (Ct.Cl.1965) (emphasis added), and will act carefully to avoid "rewarding imprecise claims based on undocumented costs with unjustified windfalls," Dawco Constr., 930 F.2d at 882. However, having sat through ten days of a bench trial, having judged the credibility of witnesses through firsthand observation, having asked many questions of witnesses and counsel, and having given much thought to how it can best apportion and calculate damages, the Court concludes that it is capable of making a sufficiently reliable damages calculation with respect to certain claims. On the other hand, where the Court finds that evidence of damages is insufficient to support a reliable calculation, the Court will not award damages even if ECR or Técnico have effectively demonstrated that they performed additional work without compensation.

### III. Factual and Legal Analysis of the Claims under the "Changes" Clause

With the above background factual and legal findings, the Court now turns to an issue by issue analysis of ECR's direct claims, and ECR's pass-through claims asserted on behalf of Técnico and MIC. Within such analysis, the Court makes additional factual and legal findings, as necessary, to determine the extent to which Plaintiff has demonstrated that it is entitled to an equitable adjustment under the Changes clause, either on a theory of a direct or constructive change, or based on the assertion that the Government improp-

erly assessed a "credit," under the parties' Contract.

### A. Structural Steel PCP—ECR Item 8, Técnico Item D

One of the primary disputes in this action was whether RCC–7G, incorporated into the Contract by MOD–2, bound ECR to merely develop and write the structural steel PCP (as argued by ECR) or whether it bound ECR to develop and write the PCP as well as to implement it (as argued by the Government). Associated with such matter is the factual dispute as to whether implementing a PCP necessarily changes the scope of the work (as argued by ECR) or whether a PCP merely documents the method that the contractor had always proposed to perform the work (as argued by the Government). To the extent that the evidence demonstrates that the PCP in this case increased ECR/Técnico's cost of performance, the parties further dispute whether ECR/Técnico took on the risk and/or waived its claim to recover such costs by agreeing to the MOD–2 change order.

While the answers to the above questions may vary from contract to contract, as discussed in detail below, the Court finds that, on this record, ECR is entitled to an equitable adjustment based on the increased cost of performance stemming from the PCP. Such equitable adjustment is appropriate based on a theory of "constructive change" resulting from the Government's failure to disclose superior knowledge to ECR. Alternatively, the Court finds a constructive change through informal agreement based on evidence establishing that after the PCP change order was negotiated and finalized, the Government engineers, representatives from the Navy "Waterfront Ops," and most importantly, a Government Contracting Officer, all agreed that the Government had dictat-

ed a method of performance that increased the costs of ECR's performance, thus entitling ECR to additional compensation.

 As to the quantum of damages, ECR seeks $1,995,345 on its PCP line item, as well as tens of thousands of dollars in damages for delay days caused by the Government.[18] Técnico seeks $430,718.52 in direct costs associated with the PCP, as well as over $100,000 in disruption damages and between $68,000 and $120,000 in delay damages.[19] As set forth below, after applying the jury verdict method, the Court awards ECR $730,449 in damages, consisting of $715,000 in direct and disruption damages, and $15,449 in delay damages. Técnico is awarded $270,000 in direct and disruption damages.

18. ECR's monetary claim for delay damages is not stated by the Court with any degree of specificity (on this line item, or others) because it is impossible for the Court to quantify ECR's individual requests with precision. This is so because ECR asserts that the Government is responsible for 230 total delay days, resulting in an "actual delay" of 120 days, but ECR requests monetary compensation for only ninety-nine of these 120 days. ECR Ex. 4. ECR seeks $2,207 for each of the ninety-nine days for which it seeks compensation, for a total of $218,493.

19. The Government does not appear to dispute the fact that, when a compensable change to a fixed price contract occurs, an award for "disruption" may be appropriate to compensate the contractor for the impact such change has on the overall availability (such as increased overtime costs, additional labor costs due to inefficiencies, or costs incurred as a result of the need to reschedule future work). See Bell BCI Co. v. United States, 72 Fed.Cl. 164, 168 (2006) ("There is a distinction in the law between: (1) a 'delay' claim; and (2) a 'disruption' or 'cumulative impact' claim. Although the two claim types often arise together in the same project, a "delay" claim captures the time and cost of not being able to work, while a 'disruption' claim captures the cost of working less efficiently than planned."). ECR has included its

## 1. ECR Agreed to both Write and Implement a PCP in November 2011

It is undisputed that the Government informed ECR that it was requiring a structural steel PCP at the post-award conference in September of 2011, but it was not until the middle of November 2011 that the parties finalized the written Contract modification adding the PCP.[20] The record reveals a significant dispute between the parties prior to the November agreement as to whether ECR should be compensated as little as $5,000, or as much as $50,000 for the PCP change order. The trial evidence supports the finding that the Government initially balked at the cost proposed by ECR, asserting that the change only required ECR to write a docu-

"disruption" damages within its item-by-item claims, whereas Técnico has chosen to limit its item-by-item claims to its "direct costs" and has separately advanced an independent claim item seeking to recover for "disruption." Técnico presents two different theories for calculating disruption, one of which applies an across-the-board percentage (25.83%) to Técnico's direct costs (the percentage was calculated through use the "range method"), the other seeks to estimate a disruption percentage on an item-by-item basis, taking into account the facts of the individual issues. As to delay damages, Técnico seeks $5,712 for each delay day based on its "production support costs," which are the daily costs for Técnico to have its project managers, superintendents, supervisors, etc. on the job even if no physical work is being performed on the Vessel on a given day.

20. The trial record establishes that, at any point prior to the parties' agreement on the written change order, the Navy could have canceled RCC–7G, that is, it could have changed its mind about requiring the PCP and permitted the steel work to begin with a generalized "plan and sequence" similar to that used during the Bahrain PC overhauls, or it could have merely left the process/procedure in ECR's hands as a capable shipbuilder, the latter course being what was called for by the original Contract.

ment. The evidentiary record, to include ECR's PCP bid proposal, ECR Ex. 205, as well as trial testimony, Trial Tr. 99–101, confirms that ECR focused its cost proposal solely on writing the document, not implementing it. Cf. Trial Tr. 1051–52 (indicating that Técnico, who was drafting the PCP for ECR, was happy to modify the PCP in any way requested by the Government because Técnico's view was that the cost of performance would be negotiated at a later time). Moreover, it appears that the Government was likewise focused solely on the cost of writing the document. Trial Tr. 100; see Govt. Ex. 26 (Government's independent estimate of the cost of the PCP change order indicating that a PCP was being added and "[t]herefore, labor hours were allowed for the Contractor's QA department to develop a PCP for the ship's [hull]").

Notwithstanding the above facts supporting ECR's contention that, in November of 2011, both parties were focused solely on the cost of writing the PCP, such evidence does not resolve the associated question as to whether adoption of the PCP would increase the cost of performance. As noted above, whether ECR has a valid claim for additional compensation for implementing the PCP is intertwined with the dispute as to whether the PCP being negotiated was to merely memorialize ECR's existing planned procedure for

structural steel repairs, or whether it would change ECR's existing plan/procedure. To the extent that the PCP would merely document, in writing, ECR's then-existing plan for performance, it would be expected that the parties would focus negotiations solely on the cost of writing the document because, absent unforeseen events occurring during the availability, following the same (now written) plan that ECR used to bid the Contract should not materially increase the cost of performance. On the other hand, if the PCP was to create an entirely new plan of performance that was more complicated and more time-consuming (and thus more costly), then the cost of writing the PCP and the cost of implementing the PCP would be two conceptually distinct matters.

 Turning to the Contract itself, the Contract language adopted by both parties clearly and unambiguously indicates that ECR was to both provide and accomplish the PCP.[21] While such language is "standard" Navy language drafted by Defendant, in light of ECR's years of experience contracting with the Navy, such fact further undercuts, rather than supports, ECR's position because the inclusion of this PCP, at least as of November 2011, was no different than PCPs encountered by ECR on past contracts. The Court is therefore compelled to reject ECR's characterization of MOD–2/RCC–7G as being strictly limited to adding the requirement that ECR draft a PCP.[22] In rejecting

---

**21.** Specifically, the Contract modification agreed to by the parties required ECR to "Accomplish the requirements of 009–09 for a Process Control Procedure defining the sequence, processes and techniques that will be in place during the structural repairs ..." JE 70. Navy standard item 009–09 is titled "Process Control Procedure (PCP); provide and accomplish" and states in § 3.4 that the contractor must "Accomplish the requirements of the reviewed PCP." JE 63, at 009–09. While ambiguous clauses in a maritime contract are generally interpreted against the drafter, Colonna's Shipyard, 2015 WL 9008222, at *9 (citing Dann Marine Towing LC v. Gen. Ship

Repair Corp., 31 F.Supp.3d 743, 746 (D.Md. 2014)), ECR fails to demonstrate that such clearly worded language contains any ambiguity.

**22.** The Court similarly rejects Plaintiff's contention that it was impossible to estimate the cost of performing the PCP prior to determining what the PCP would entail-the fact that future costs cannot be stated with precision is precisely why a projection of yet to be incurred costs is called an "estimate." As discussed at length during the trial, ECR appeared fully capable of bidding/estimating a much higher price per square foot for struc-

ECR's position, the Court highlights the fact that the unambiguous language of MOD–2/RCC–7G represents the <u>written expression of the parties' final agreement.</u> Such written modification was agreed to by <u>both parties</u> and trumps any prior oral statements commenting on whether the parties were negotiating to "write a piece of paper." [23] <u>See</u> O'Brien v. Miller, 168 U.S. 287, 297, 18 S.Ct. 140, 42 L.Ed. 469 (1897) (indicating that "the whole contract must be ... interpreted with reference to the nature of the obligations between the parties, and the intention <u>which they have manifested in forming them</u>") (emphasis added) (citation omitted); Bullwinkel v. New England Mut. Life Ins. Co., 18 F.3d 429, 431 (7th Cir.1994) (indicating that, under federal common law, a reviewing court must "give effect to the words which denote the bargain, not in light of public policy considerations, but in light of their plain meaning"); <u>cf.</u> Virginia Elec. & Power Co. v. N. Virginia Reg'l Park Auth., 270 Va. 309, 316, 618 S.E.2d 323, 326 (2005) (" 'The pole star for the construction of a contract is the intention of the contracting parties <u>as expressed by them in the words they have used</u> .... It is the court's duty to declare what the instrument itself says it says.' " (alteration in original) (quoting Ames v. Am. Nat'l Bank of Portsmouth, 163 Va. 1, 38, 176 S.E. 204, 216 (1934))). Accordingly, for the above stated reasons, the Court finds that ECR agreed to write <u>and implement</u> a PCP in November of 2011.

### 2. The Navy's Failure to Disclose its Superior Knowledge prior to November 2011 resulted in a Constructive Change, ultimately requiring ECR to write and implement a *different* PCP than required by MOD–2

Notwithstanding the Court's conclusion that ECR was contractually bound to write <u>and implement</u> a structural steel PCP, it was only <u>after</u> such Contract modification (requiring the writing and implementation of a PCP) was signed that the Government revealed recently obtained internal Navy knowledge regarding the method of performance that would be <u>required by the Navy</u>. Although ECR, as contractor, agreed in November to write and implement <u>a PCP</u> documenting ECR's plan for structural steel renewals based on ECR's established experience in the shipbuilding industry and <u>ECR's assessment</u> of the risk factors associated with the THUNDERBOLT overhaul, the Government subsequently revealed its superior knowledge regarding its interpretation of acceptable performance methods for a large-scale PC overhaul, and such newly disclosed knowledge was the equivalent of a mandate that ECR draft and accomplish <u>a PCP materially different from</u> that contemplated by ECR when it agreed to MOD–2.

More specifically, as set forth above in the Court's factual findings, on December 1, 2011, subsequent to MOD–2, the Government revealed to ECR/Ticnico the <u>Government's internal knowledge</u> of the elevated risks associated with the overhaul of the THUNDERBOLT based on knowledge that the Government had only recently learned through overhauls of other PC class vessels conducted in Bahrain. Such

---

tural steel renewals on the TEMPEST overhaul, which included in the original specification package the express requirement that a PCP govern the structural steel renewals.

**23.** In fact, such language, deemed unambiguous by the Court, appears to render it improper to even consider the earlier oral statements and/or alleged oral promises made during negotiations. See Bell BCI Co. v. United States, 570 F.3d 1337, 1341 (Fed.Cir.2009).

knowledge was not tantamount to "industry practice" such that any experienced shipbuilder would be aware of it, but instead consisted of performance requirements and procedures that were not even fully known to NSSA, but instead resided solely in the Navy's Carderock Division of engineers. The Court therefore finds that the Contract was "constructively changed" based on the Navy's "nondisclosure of superior knowledge" which was critical to ECR's ability to provide: (1) an accurate original bid for performing the structural steel renewals on the THUNDERBOLT; and (2) an accurate estimate of the cost of writing and accomplishing the structural steel PCP. Miller Elevator Co., 30 Fed.Cl. at 678; cf. ECR Ex. 60 § 2.18.4.2 (Navy "Joint Fleet Maintenance Manual" discussing "constructive change orders" based on the Government's "Failure to Disclose Vital Information," explaining as follows: "Nondisclosure is a change to the contract where the contractor undertakes to perform a contract without knowledge of vital information that affects performance. In order to be liable, the Government must be aware the contractor had no such knowledge, the specifications misled the contractor and did not put the contractor on notice to make inquiry and the Government failed to provide the information.").

To explain the Court's findings on this issue in the simplest form, similar to the Government's recent discovery that its PC class vessels had suffered structural damage over time based on the fact that they were treated as "ships" when being docked pursuant to the Navy-approved docking plan (thus requiring a new Government mandated docking plan for the THUNDERBOLT availability) the Government learned in Bahrain, but failed to disclose to ECR prior to the negotiation of RCC–7G, that performing structural steel repairs using "good ship-fitting practices" as planned by ECR may cause additional structural damage (thus requiring a new Government mandated structural steel renewal plan for the THUNDERBOLT availability). While Defendant negotiated and settled a change order with ECR for the new docking plan early in the availability, and multiple Navy officials (including high-ranking Navy members of "Waterfront Ops" and the Contracting Officer on site at ECR) agreed with ECR in early 2012 to negotiate a change order regarding the obvious fact that the finalized PCP would cost far more to implement than ECR's performance plan as of the time of its bid and as of the time that RCC–7G was negotiated and settled, senior Contracting Officer Kenny Rice made the decision, apparently on less than complete information, that "nothing had changed" since RCC–7G was negotiated. ECR Ex. 208. As explained below, Mr. Rice's contention that the waiver in MOD–2 acted to bar ECR's claims for additional compensation is rejected by the Court as unsupported by the evidence.

In concluding that the Government's withholding of information constituted a "constructive change" to the Contract, the Court resolves in ECR's favor the factual dispute as to whether the Government mandated, in part, what was included in the structural steel PCP, as contrasted with Government Engineers merely making "suggestions" to ECR/Técnico, ultimately leaving it to the contractor to document the process and procedure that ECR/Técnico planned to follow in order to perform the structural steel renewals. Timothy "Spike" Harrison, the experienced project manager for Técnico on the THUNDERBOLT availability, was present at the December 1, 2011, meeting when the Government first presented its in-depth knowledge learned during prior PC availabilities in Bahrain. Mr. Harrison testified at trial in a credible and compelling manner, indicating that he carefully listened to the Navy's presentation while taking notes, and later followed up with Navy Project Manager Justin Thivierge to

ask several questions. Mr. Harrison testified that the requirement of "pre-fit" inspections was new to him, and he wanted additional clarity as to this and other matters.[24] Mr. Harrison credibly testified that Mr. Thivierge told Mr. Harrison during this conversation that Técnico needed to "put every cut, where you're going to cut it and when you're going to cut it, in your PCP, and once we review it we'll let you know if that's satisfactory." Trial Tr. 1048, ECF No. 49 (emphasis added). Mr. Harrison indicated that the first thing he likely did after the meeting was contact Jon Black, the Técnico engineer who was the primary author of the structural steel PCP, to tell him "we're going to have to get way more detailed than what we originally expected." Id. at 1049–50.

Mr. Harrison acknowledged at trial that he had not personally worked a structural steel job with a PCP before, and that while Técnico had written a PCP for the earlier MHI availability on the THUNDERBOLT, critically, the "level of detail" being required by the Navy after the December meeting exceeded the requirements of the MHI PCP. Id. at 1048–49. Mr. Harrison's testimony also explained that the sequencing that the Navy made Técnico include in the PCP "took away all [of Técnico's] flexibility" resulting in work halting when an issue arose rather than Técnico's workers moving on to the next area needing repair while the issue was resolved. Id. at 1050.

The Court recognizes the possibility that Mr. Thivierge may have a starkly different recollection of what, if anything, was mandated by him personally, or by the Navy generally, at the December meeting. However, such evidence was not presented at trial because the Navy did not produce Mr. Thivierge as a trial witness.[25] As the Court is not permitted to speculate as to what

---

**24.** The Court notes that counsel for ECR/Técnico contended at trial, as best evidenced by the redirect examination of Carderock Naval Architect Thomas Helfridge, that the fact that the PCP included not only a "fit-up" inspection, but also a "pre fit-up" inspection, demonstrates that the Government mandated such additional time-consuming step at the December 1, 2011 meeting. Trial Tr. 1647–48. The Court rejects such contention, finding that Plaintiff's counsel appears to have misstated the Contract requirements when questioning Mr. Helfridge. Notably, the requirements that there be both a "pre fit-up" inspection and a "fit-up" inspection were included in the structural steel line item in both the original Contract specification and Errata 6. ECR Ex. 11, at 110–11–002 §§ 3.2.1, 3.2.2; ECR Ex. 15 at 110–11–002 §§ 3.3.1, 3.3.2. Although Mr. Harrison acknowledged during his testimony that, according to his understanding, a pre "fit-up" would have been required on this job even without the PCP, Mr. Harrison's general unfamiliarity with pre "fit-up" inspections after his many years in the industry demonstrates, in conjunction with other evidence, that: (1) even before the PCP was invoked, the THUNDERBOLT specification required an atypical additional step that would increase the cost of the structural steel repairs; (2) ECR/T6cnico bore the risk of this additional cost as it was expressly included in the specification; and (3) it appears that ECR's initial bid did not fully account for the complexities that should have been recognized by the contractor based on both the atypical structural steel requirements set forth in the Government specification and the class of vessel being overhauled.

**25.** The Navy's failure to call Mr. Thivierge at trial is generously labeled as "curious," as he was the Navy's project manager for nearly the entire THUNDERBOLT availability, an overhaul that spanned multiple years, involved over 15 million dollars in agreed repairs, and millions of dollars more in disputed repairs. The parties stipulated that "because the Navy's Project Manager for the THUNDERBOLT availability, Justin Thivierge, is serving overseas and is not available for trial," emails and other documents sent to him or authored by him would not be objected to at trial as hearsay or on the basis of "genuineness, foundation, or authenticity." ECF No. 23 ¶ 33. Such stipulation, however, has proven inadequate to help fill in the blanks as to many of the factual disputes at issue in this case.

Mr. Thivierge might have said, the Court relies on Mr. Harrison's credible testimony recounting the conversation.

In addition to Mr. Harrison's testimony, the Court found the testimony of John Black, Técnico's Engineer who drafted the PCP, to be detailed and credible. Mr. Black explained under oath that "after the meeting on December 1st," the PCP used for the MHI availability could no longer be used because the Navy was requiring "far greater" detail and, in response, Técnico "shifted gears" because the Navy had ultimate approval and was telling ECR what the Navy wanted in the PCP. Id. at 735–36, 740. On this point, ECR's president, Jorge Rivera, also credibly testified, as follows:

> [T]heir engineer came back from Washington or from wherever they came from, and they gave us and said we don't want this. We won't allow this. We won't allow this. But all that information wasn't known at the time that we priced the PCP....
>
> We priced to build a PCP in accordance with our plan but it never work. They have their own agenda. They knew exactly what they wanted but they never told us what they wanted.

Id. at 114.

The Court's finding that the Government increased the scope of ECR's required performance by withholding supe-

rior knowledge until after MOD–2 was executed is further supported by the following circumstantial facts: (1) apparently a symptom of the Navy's unrealistic timeline for completion of the availability, as well as an expedited bidding process influenced by the Government's fiscal year, the timing of the December meeting is another example of the Navy's failure to timely communicate critical contract requirements and/or conditions of the Vessel-other examples include the timing of the Navy's disclosure of the docking issue (revealed post-Contract), the Navy's failure to invoke a PCP until after the Contract was awarded, the Navy's failure to perform an updated survey of the THUNDERBOLT's hull prior to preparing the specification package for bidding, and the Navy's failure to include in the Contract the Navy's own updated PC-specific LARs;[26] (2) after hearing such additional requirements, and during the time period that the PCP was being drafted and revised by ECR/Técnico, ECR indicated to the Navy that the PCP requirements were increasing the cost of ECR's planned work and would require additional compensation; and (3) after the PCP was finally approved by the Navy, Navy documents reveal that Navy personnel, including a Contracting Officer, agreed to negotiate with ECR to provide additional compensation for the cost of implementing the approved PCP, confirming the

---

**26.** The trial record does not include any evidence suggesting that the Navy nefariously withheld critical information from ECR until after MOD–2 was negotiated. As the Court has no reason to question the Navy's good faith, the fact that the Navy waited until after MOD–2 was priced and finalized to disclose its superior knowledge, and PCP requirements, arguably suggests that: (1) as noted immediately above, the Navy's rushed timeline resulted in its failure to make critical disclosures in a timely fashion; (2) as otherwise documented in the trial record, the Navy's actions were the result of the Govern-

ment's failure to effectively communicate internally within the various Government departments; and/or (3) similar to the docking issue, notwithstanding the Navy's operational desire to complete the THUNDERBOLT overhaul as soon as possible, when faced with two options during the availability, the Navy repeatedly chose to mandate the more cautious, and thus more expensive, procedure in an effort to eliminate any risk of further structural damage to the badly damaged THUNDERBOLT, which was several years past the end of its useful life.

fact that the Navy's direction on this issue came not just from engineers and Justin Thivierge, but from some of the highest-ranking Navy officials involved through "Waterfront Ops" and from the Contracts department overseeing the purse strings of the overhaul. The decision to provide additional compensation, however, was overruled by the senior Contracting Officer, Kenny Rice, who relied on the flawed proposition, relayed by the Project Manager, that "nothing in the PCP has changed since MOD–2 was issued." ECR Ex. 208. Although Project Manager Justin Thivierge may have been able to clarify his comments to Mr. Rice regarding the fact that "nothing in the PCP ha[d] changed," between November of 2011 and early February of 2012, the Navy did not present his testimony at trial.

Summarizing the above, the Court finds that ECR has demonstrated that it is entitled to an equitable adjustment on this issue even though RCC–7G required ECR to both write and accomplish a structural steel PCP.[27] While ECR was contractually-bound to write and accomplish a PCP, it was not contractually bound to write and accomplish a PCP to include yet to be disclosed <u>Government requirements</u> that significantly increased the cost of performance through increasing the focus on risk mitigation at the expense of efficient completion of the structural steel repairs. When the Government first revealed its superior knowledge learned during the 2010 Bahrain overhauls, to include <u>the only method</u> the Government would accept for performing structural steel repairs on the THUNDERBOLT, it made representations, both express and implied, indicating that ECR's structural steel PCP <u>would not be approved by the Government</u> unless the PCP included the <u>newly-mandated</u> steps/procedures. This included PCP sequencing restrictions, restrictions regarding areas of the Vessel that could be worked at the same time, and restrictions regarding the amount of plate and/or size of plate that could be removed at any one time. Such constructive change was material to the scope of ECR's required performance on the most extensive, and expensive, portion of the availability, and it falls outside of the waiver of additional claims included in MOD–2. ECR has thus proven its entitlement to an equitable adjustment based on the Government's conduct subsequent to the PCP negotiations that culminated in MOD–2/RCC–7G.[28]

---

**27.** The Court rejects Government counsel's argument that MOD–8/RCC–20G, a subsequent change order focusing on the docking delay, waived any additional compensation for the PCP. Mr. Rice testified at trial that while he did not negotiate such Contract change, he does not interpret RCC–20G as having any bearing on the PCP issue. The Court agrees with Mr. Rice's position, as further evidence by Government Exhibit 36, which includes a handwritten clarification of the scope of RCC–20G, appearing to more strictly limit it to the docking delay by deleting language that may have been associated with claimed additional costs expected by the contractor, at least in part, due to the addition of a PCP. Govt. Ex. 39.

**28.** As an alternative to the finding that a constructive change occurred based on the withholding of superior knowledge, the Court finds that a constructive change occurred based on an "informal order" from Navy contracting officers with requisite authority as a result of "disputes over contract interpretation during performance." Miller Elevator Co., 30 Fed.Cl. at 678. As testified to by ECR's president, after the PCP was finalized following Government-mandated revisions, ECR (now knowing the scope of its required performance) sought to open negotiations with the Government as to the newly added cost of performing the steel repairs through the more expensive approach mandated by Government engineers. The on-site Contracting Officer acknowledged ECR's apparent entitlement to additional compensation, as did high-ranking Navy Officials, and agreed to negotiate an increase in the Contract price. Importantly, the agreement to provide compensa-

### 3. PCP Damages

█ ECR has clearly demonstrated that it is entitled to an equitable adjustment based on the Government's expansion of the scope of work and subsequent refusal to provide ECR with "fair and reasonable" compensation for such additional work. However, Plaintiff's trial evidence falls far short of establishing that the entirety of the more than 2.5 million dollars in combined compensation sought by ECR and Técnico on this issue was a result of "new" PCP requirements demanded by the Government. First, trial evidence demonstrates that ECR/Técnico are responsible, to some degree, for including unnecessarily restrictive requirements in the PCP as ECR, not the Government, was the party responsible for drafting the

PCP. While the Government used the December 1, 2011 meeting to mandate sequencing and other requirements that must be included in the PCP to garner Government approval, it appears that ECR/Técnico included more restrictions in the PCP than necessary, with the Government subsequently "relaxing" some of such requirements to prevent work stoppages. Second, as previously discussed, at the time the Contract was bid and awarded, and at the time the PCP was priced through negotiations and a modification was issued, neither ECR nor Técnico appreciated the degree of complexity that the structural steel repairs would involve, even without a PCP. In most circumstances, the failure to adequately assess the cost of performance in a fixed price environment

tion came prior to performance under the PCP, and thus, the method of performance could still have been changed if the Navy was unwilling to pay for the more expensive method. Immediately following the agreement to negotiate over the added cost of the newly formulated plan of performance, a senior Contracting Officer overruled such agreement, concluding that ECR had waived all claims for additional compensation associated with the PCP. Importantly, it is undisputed that after ECR was informed that the Navy would not provide additional compensation, the Government still required ECR to perform work in the more expensive manner documented in the recently approved PCP. Because the Court's factual and legal findings, outlined herein, establish that ECR did not waive additional compensation in November of 2011 regarding yet to be disclosed Government-mandated performance requirements, when ECR was ordered to continue performance in compliance with the Government-approved PCP, there was a constructive change to the Contract through an "informal order" from the senior Contracting Officer. Cf. ECR Ex. 60 § 2.18.4.2 (Navy "Joint Fleet Maintenance Manual" labeling as the "most common and earliest type of constructive change order" a change occurring "where the contractor and the Government disagree on the work necessary to meet contract requirements" and after "the Contracting Officer insists a more expensive method is required,"

the contractor performs "in accordance with the Government's interpretation to avoid the risk of default"). ECR is thus entitled to compensation on such alternative theory. Moreover, to the extent the Contracting Officer's statements and actions did not constitute a binding "informal order," they appear to constitute an "implied ratification," and/or "institutional ratification" of the mandates of the Navy engineers because the Contracting Officer, after learning that Navy engineers had mandated a more expensive procedure, took actions and made statements, to include knowingly allowing the yet-to-be performed expensive procedure to proceed, and later, knowingly accepting the benefit of such procedure. See 1 Government Contract Changes § 5:18 ("There is little question that Contracting Officers have the inherent legal power to ratify the acts or statements of unauthorized employees of the Government as long as the Contracting Officer had the authority to order the resulting change in the first instance."); cf. Seven Resorts, Inc. v. United States, 112 Fed.Cl. 745, 779 (2013) ("If an official lacks authority to bind the government in its contractual relations, however, the knowing acceptance of benefits by those empowered to bind the government can result in ratification of the unauthorized official's promise.") (quotation marks and citations omitted).

is a risk to be borne solely by the contractor, and for that reason, Plaintiff's earlier-in-time bidding deficiencies cannot be shifted to the Government merely because the scope of performance was subsequently increased through the Government's handling of the PCP. Third, as discussed in the Court's factual findings above, ECR/Técnico had their own failures in staffing welders.[29] Accordingly, while ECR and Técnico are entitled to a damages award, the proper award is far less than requested by Plaintiff.

■ Although a precise measure of damages has not been provided by ECR or Técnico, the Court recognizes that such a showing is virtually impossible due to the reasons discussed above in Part II.D. These reasons include the complexity and breadth of the structural steel renewal process, the changing Government standards regarding what constitutes acceptable performance, and the practical reality that, absent performing the entire availability without the PCP, and then re-performing it with the PCP for comparison sake, it was impossible to precisely capture the true "cost" of the Government-mandated PCP requirements as they did not involve a conceptually distinct task performed on a specific day by a specific worker, but instead involved performing the entire multi-month structural steel renewal process required by the Contract in a very different sequence/method than ECR would have otherwise undertaken.

Accordingly, after considering the degree to which the Government dictated PCP sequencing/method requirements, and the degree to which ECR effectively demonstrated that such additional requirements resulted in additional man-hours and/or reduced productivity, both of which result in additional labor costs, delay costs,

and disruption, the Court uses the jury verdict method to find that ECR is entitled to damages of **$730,449**, consisting of **$715,000** in direct and disruption damages, and **$15,449** in delay damages. Técnico is entitled to damages of **$270,000**, which includes direct damages (sought in Técnico Item D) and disruption damages (sought in Técnico Item M). While the Court acknowledges the possibility that ECR and Técnico may have suffered significantly more damages on this item than awarded herein, the Court's award is the appropriate figure based on the trial evidence. Such award as to ECR was calculated based on the finding that **seven compensable "sequential" delay days** are attributable solely to the Government (attributed based on the Government's delayed review/approval of ECR's initial draft of the PCP). The Court further finds that the Government's sequencing demands, limitations on the permissible size of steel cut-outs, and limitations on the areas of the Vessel that could be worked simultaneously, contributed to an additional sixteen "critical path" delay days. These delay days, however, are inextricably intertwined with delays being caused by ECR/Técnico's failure to provide the welding workforce necessary to perform acceptable repairs in a timely manner, and thus they are properly classified as "concurrent." As explained above in the discussion of the burden of proof regarding liquidated damages, while no damages are awarded to ECR or Técnico based on such concurrent delay days, the delivery date must be extended by a total of twenty-three additional days (the sum of the seven sequential and sixteen concurrent delay days), thus reducing the Government's liquidated damages claim.

---

**29.** The Court further notes that while there were revisions to the PCP during January 2012 that were mandated by the Government,

ECR fails to effectively demonstrate which of these revised requirements, if any, increased the cost of performance.

## B. Alignments—ECR 1, 14, 15

ECR asserts that it was not required under the Contract to physically align the THUNDERBOLT's main propulsion diesel engines ("MPDEs"), but that the Government required ECR to physically align such engines three times. In ECR's claims associated with aligning the engines (ECR Claims 1, 15), ECR seeks approximately $500,000 in compensation for direct and disruption damages, along with an award of delay days and tens of thousands of dollars in delay damages. ECR separately seeks the reversal of a unilateral credit of $363,421 taken by the Government (ECR Claim 14). The Government opposes any award to ECR, asserting that ECR was required by Contract to physically align the engines, that it did so on two (not three) occasions, and that the credit was properly assessed by the Government because it is undisputed that ECR never physically removed the MPDEs from the THUNDERBOLT. As explained below, while the Court finds that ECR's claim for affirmative damages fails, it also finds that the Government has not demonstrated that the credit was properly assessed, thus entitling ECR to recover $363,421 through reversal of the unilateral credit.

The original Government-drafted specification for the THUNDERBOLT overhaul appears to provide for the discretionary removal of the THUNDERBOLT's four MPDEs as an "interference" to the structural steel work to be performed, further requiring a physical alignment on reinstallation. JE 62, at 110–11–002. However, before the Contract was awarded, the work specification was modified by "Errata 6," and the revised specification appears to eliminate the contractor's discretion in the structural steel line item, instead appearing to require that the engines be removed. ECR Ex. 15, at 110–11–002; Trial Tr. 481. Moreover, a separate and distinct Contract provision appears to require ECR to remove the MPDEs and perform a subsequent realignment. Id. at 233–11–001.

Notwithstanding the revised specification, stating in two separate places that the MPDEs were to be removed and later realigned, which is ultimately what controlled ECR's performance, ECR presented evidence at trial indicating that ECR and the Government verbally agreed, after the Contract was executed, that it was beneficial for both parties to leave the main engines in place. Such agreement was triggered by the fact that the THUNDERBOLT had been "gutted" during the MHI availability, and the engines were the only remaining fixed reference point to assist in reconstructing the Vessel. While there is no contemporaneous document verifying such oral agreement,[30] ECR presented credible evidence indicating that: (1) by leaving the engines in place, other repair work became more complicated, and more costly, because the engines were in the way; (2) while the engines were never removed from the Vessel, associated re-

---

30. There is an internal Navy email dated May 24, 2012, from Justin Thivierge indicating (without complaint) that ECR "did not find it necessary" to remove the main propulsion engines as an interference, and as Mr. Thivierge did not appear at trial to testify to clarify the matter, the Court accepts ECR's testimony indicating that the parties agreed to keep the engines in place as they would provide the benefit of acting as a fixed reference point. ECR Ex. 124. ECR's factual assertion on this issue is further bolstered by the testimony of Carderock Engineer Chris Foeller, who testified that PC class vessels have a unique shafting system where the "only fixed component . . . is the stern tube," because the engines, the reduction gear and the struts can all be removed. Trial Tr. 1412. Moreover, on the THUNDERBOLT, the stern tubes were corroded and needed to be removed, a fact that further supports ECR's assertion that leaving the engines in place would be beneficial for both parties.

install work was still performed by ECR (including hoisting the engines into the air and performing two engine alignments); and (3) prior to deciding to leave the engines in place, ECR had incurred substantial costs making the necessary arrangements to remove the engines from the Vessel and store them while the overhaul was being conducted. Additionally, as a lens through which to view the MPDE dispute, the record clearly demonstrates that the decision to leave the engines in place occurred in early 2012, yet it was not until the parties' relationship broke down in 2013 that the Government asserted that it was owed a "credit" based on ECR's failure to remove the engines a year earlier. Cf. FAR 43.204(b) ("Contracting officers shall negotiate equitable adjustments resulting from change orders in the shortest practicable time.").[31]

Long after the conclusion of the availability, the Navy acted unilaterally to delete portions of the Contract directing that the main propulsion engines be removed (Contract Item No: 233–11–001), and further took a unilateral credit of $363,421 based on the fact that the engines were left in place. Although it is undisputed that the engines were never completely physically removed from the THUNDERBOLT's engine room, it is likewise undisputed that, near the end of the availability, the engines were hoisted into the air by ECR, realigned by ECR, and new "chockfast" mounts were poured by ECR. In fact, the trial evidence demonstrates that the engines were hoisted and physically aligned by ECR on a second occasion after the Vessel was waterborne.

After carefully considering the various Contract interpretation disputes associated with the MPDEs, and the differing versions of the facts advanced at trial, the Court finds that the Government fails to carry its burden to demonstrate that there was a reduction in scope in the Contract in light of the fact that: (1) the parties agreed early in the availability to leave the MPDEs in place as a reference point, and doing so rendered other work in the engine room more time-consuming, i.e. more costly, for ECR/Técnico; and (2) William Wren's testimony indicating that ECR performed approximately ninety percent of the work called for in the "233–11–001 work specification" in preparation for engine removal but stopped short of actually completely removing the engine from the Vessel to a new location, Trial Tr. 456–57, 488–90;[32] and (3) the fact that the engines, while not removed from the Vessel to a new location, were still later hoisted up and aligned, and a new chockfast was poured, on two separate occasions. In light of the Government's failure to carry its burden to establish by a preponderance of the evidence that it was entitled to a credit for the asserted reduction in work scope, ECR is entitled to the reversal of the **$363,421 unilateral credit** taken by the Government.[33]

---

**31.** It does not appear that such FAR provision is expressly incorporated into the Contract before the Court.

**32.** At the time of trial, William Wren was ECR's Vice President of Sales and Business Development. At the time of the THUNDERBOLT overhaul, he was the ECR "Program Manager" for the PC availabilities. At trial, Mr. Wren was Plaintiff's in-court representative and its primary trial witness, and the Court has a very favorable view of Mr. Wren's credibility.

**33.** Even assuming that the Government was entitled to some credit on this line item for a reduction in work scope because the engines were not physically removed from the Vessel and taken to a new location, the Government failed to demonstrate at trial a reliable basis for making an estimation of the appropriate credit, even under the jury verdict method. Cf. Trial Tr. 2172–73.

While the Court finds in favor of ECR regarding the insufficiently substantiated Government credit, the Court finds that ECR fails to carry its burden on its affirmative claims seeking approximately $500,000 in additional damages for performing MPDE alignments. ECR failed to establish that the two engine alignments that were performed were additional work outside the scope of the alignments required by the Contract. Notably, Contract "Item No: 233–11–001," which in light of the above ruling is not viewed by the Court as having been properly "deleted" from the Contract by the Government, requires that ECR "accomplish alignment of the main propulsion diesel engine ... including the removal and installation of new Pourable Epoxy Resin Chocking System." ECR Ex. 15. Similarly, Item No. 11011–002 references a "final alignment" performed after the Vessel is waterborne. Id. Although it is true that, as argued by ECR, Item No. 110–11–002 requires an "optical alignment," it also requires a "final alignment" that must be performed after the Vessel is waterborne, and it states within the description of the alignment procedure that it includes "removal and installation of a new" pourable chockfast system. Id. Because the evidence before the Court is that a new pourable chocking engine mount can only be poured when the engine is physically hoisted or jacked into the air, such requirement unambiguously requires an actual physical alignment, not merely an optical alignment "check" as argued by ECR.[34] Moreover, as highlighted by Defendant, the Contract expressly required that the alignments be performed "in accordance with 2.38 through 2.49," and cross-referenced document 2.43 provides a detailed step by step physical alignment procedure specific to PC class vessels. ECR Ex. 15, at Item No. 110–11–002 § 3.7; Govt. Ex. 43.

In addition to the above, ECR failed to demonstrate by a preponderance that it performed a third physical alignment for the purpose of replacing the MPDE anti-

---

**34.** The Court places minimal weight on ECR's trial exhibits consisting of internal Navy emails among individuals not part of the Navy contracts department voicing concerns about whether an MPDE alignment is contractually required. As noted above, the Court finds that the Contract language is unambiguous. However, even assuming that the Contract's reference to an "optical" alignment created an internal conflict resulting in an ambiguity, such ambiguity could only be categorized as "patent," as the requirement that an optical check be performed appears in the very same single sentence provision that requires a new chockfast to be poured. Accordingly, if such provision is deemed ambiguous, such patent ambiguity placed a duty of inquiry on ECR prior to the submission of its bid. Triax Pac., Inc. v. W., 130 F.3d 1469, 1475 (Fed.Cir. 1997); see Interstate Gen. Gov't Contractors, Inc. v. Stone, 980 F.2d 1433, 1436 (Fed.Cir. 1992) ("[T]he very fact that this contract is patently ambiguous places a burden on the contractor to seek clarification of its rights and obligations before bidding."); see also H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed.Cir.1998) (indicating that "a proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents"). There being no evidence that ECR made such inquiry, the Court alternatively rejects ECR's invitation to construe such purportedly ambiguous requirement against the Government. Triax Pac., 130 F.3d at 1475. The Court notes that a similar issue arose in Colonna's Shipyard, Inc. v. United States, No. 2:14cv331, 2015 WL 9008222, at *11–*13 (E.D.Va. Dec. 14, 2015), a case tried before another judge of this Court that involved the USS SQUALL. While the instant case is a very different case factually from the Colonna's case, and this Court does not rely on the findings made in such factually distinct matter, the Court does note that the resolution of the engine alignment dispute is consistent across both cases. Moreover, it appears noteworthy that Colonna's Shipyard made inquiry into the potential need for an engine alignment prior to bidding. Id. at *12.

vibration mounts after the Production Completion Date ("PCD"), which allegedly occurred near the very end of the availability. See Trial Tr. 336–37. Notably, ECR Exhibit 119 indicates that, during an alignment that had occurred as of January 20, 2013, ECR was asked to replace the anti-vibration mounts (with the new mounts being provided by the Government) and that such additional work, to include the machining of some shims, was outside the scope of the Contract and required additional compensation of approximately $8,000 for work already performed by ECR. The Government later compensated ECR for such work, as well as some additional unrelated work, through MOD–57, a unilateral modification in the amount of $19,458. JE 57, 78. In light of such evidence, ECR fails to establish that the anti-vibration mount replacement, for which it presently seeks more than $150,000, occurred during a third engine alignment after PCD, as contrasted with being an added piece of work that was performed during the course of one of the two prior engine alignments.[35]

For the reasons set forth above, the Court finds that both parties fail to carry their burden on these related issues. Because the Government failed to adequately justify the unilateral credit regarding the main engines, ECR is awarded $363,421 in damages.

### C. Anchor Chain—ECR 13

ECR seeks the reversal of a $29,578 unilateral credit assessed by the Government as a result of ECR's alleged failure to repair and paint the THUNDERBOLT's anchor chain. The Government, in essence, asserts that ECR was provided with a replacement chain by the Govern-ment and was never ordered to repair and paint it, whereas ECR asserts that the replacement chain, like the original chain, was not new, and thus required the repairs and painting dictated by the Contract. As set forth below, the Government fails to demonstrate that it properly assessed the unilateral credit.

■ It is undisputed that ECR was required by Contract to perform work on the THUNDERBOLT's anchor chain, including painting. The trial evidence demonstrates that, prior to such work being completed, the Government decided to transfer the THUNDERBOLT's anchor chain to another vessel. ECR was then asked by the Government to obtain a price for purchasing a new anchor chain, but both the price and lead time were deemed unacceptable by the Government. In light of the high cost and long lead time, the Government canceled its request that ECR purchase a new anchor chain, and the Government located and provided a replacement chain. At the conclusion of the availability, the Government deleted the applicable work Item associated with repairing and painting the anchor chain from the Contract and took a $29,578 unilateral credit.

ECR presented testimony at trial on this issue through Mr. Wren, who testified that, similar to the Government's decision to "cannibalize" the THUNDERBOLT's anchor chain early in the availability to use for another vessel, the Government-supplied replacement anchor chain was cannibalized from another ship, was not in the best condition, needed to be welded and painted, and was in fact welded and painted. Trial Tr. 374–82.[36] The Government

---

35. ECR also fails to establish, in the alternative, that it was not adequately compensated for the labor associated with replacing the anti-vibration mounts and shims, as compensated by unilateral MOD–57.

36. While the Court relies on the testimony of Mr. Wren, it does not consider any of the emails from MIC that the Government asserts are hearsay.

offered little to counter ECR's evidence, and the testimony of Government ACO Tara Carvey–Boyd revealed that Ms. Carvey–Boyd had no personal recollection of why she had issued a unilateral credit on the anchor chain line item. Rather, Ms. Carvey–Boyd freely admitted that she previously relied on facts relayed to her by Navy Project Manager Justin Thivierge when taking a credit and reducing the Contract price based on the dispute over the anchor chain. Trial Tr. 1782–83. Of course, Mr. Thivierge was not at trial to testify to the facts that underlie the Government's assertion of entitlement to a credit.

Based on the above, the Court finds that there is no record evidence supporting the Government's entitlement to a credit on this item.[37] Accordingly, ECR is awarded $29,578, representing the reversal of the unilateral credit taken by the Government.

### D. Hurricane Sandy—ECR 5

 ECR seeks $490,491 under the Changes clause, as well as nine delay days, to compensate ECR for implementing its "Heavy Weather Plan" in October of 2012 in preparation for "Hurricane Sandy." It is undisputed that ECR implemented its heavy weather plan (a multi-day process involving removing all "staging" and equip-ment from the Vessel's exterior and later reinstalling everything that was removed) after being ordered to do so by the senior Government Contracting Officer. Moreover, the trial record plainly establishes that ECR and Government ACO Tara Carvey–Boyd later reached an agreement for ECR to be compensated $701,322, and a fourteen day Contract extension, for such change. However, senior Contracting Officer Kenny Rice later determined that the agreement reached by Ms. Boyd was only "tentative," and after asserting that ECR failed to adequately document its expenses, the Government ultimately issued a unilateral change order awarding ECR $210,831 and a five day Contract extension. For the reasons stated below, the Court awards ECR the full amount sought on this item.

The Government's instruction to ECR to implement its heavy weather plan in preparation for Hurricane Sandy was unlike every other Change Order in this case because ECR was required by Contract, and by express request, to track and document its actual costs associated with the heavy weather plan. Approximately one month after the heavy weather plan was implemented, ECR and the Government met to negotiate and resolve ECR's com-

---

**37.** The Court notes that even if the burden was on ECR on this issue (rather than the Government), the Court would reach the same conclusion. Although ECR presented limited evidence regarding the condition of the replacement anchor chain and work performed thereon, the Government failed to undercut or otherwise rebut such evidence, rendering ECR's evidence sufficient to prove that it is "more likely than not" that ECR performed the work-item required by the Contract on the "used" anchor chain supplied by the Government. Mr. Rice's testimony as a supervising contracting officer indicating that he was not aware of any ACO directing ECR to perform the same contractual work on what he referred to as the "new" anchor chain is afforded minimal weight as it merely recounts an absence of knowledge. Trial Tr. 1995. Moreover, even if it were assumed that no such express order was given, in light of the condition of the replacement chain and ECR's existing contractual obligation to perform chain repairs, the Court alternatively finds that there was a "constructive change" to the Contract. Cf. ECR Ex. 60 § 2.18.2.4 (Navy "Joint Fleet Maintenance Manual" discussing "constructive change orders" as an "unwritten change to the Contract as a result of Government actions or inactions"; further indicating that such "judicially developed doctrine" is designed to "achieve equity" and it applies when "some Course of conduct by the Government" is treated as a formal change order under the "Changes" clause).

pensation for implementing the heavy weather plan. Representing the Government at such negotiation was ACO Tara Carvey–Boyd, a warranted Contracting Officer with authority to bind the Government to contract changes up to $5,000,000. Also present at such negotiation was a representative(s) from the Government's "Technical Advisory Group" ("TAR") who participated in, and documented, the negotiation. Although ECR initially sought over $1,000,000 in compensation, the Government ultimately offered to settle the Contract change for $701,322. As testified to by Ms. Carvey–Boyd:

> Q. And at some point after going round and round in negotiations do you recall where the Navy ultimately offered to settle that evening for $701,000?
>
> A. Yes, sir.
>
> Q. And that was your offer, wasn't it?
>
> A. Yes, sir.
>
> Q. And did [the president] of East Coast Repair accept that offer?
>
> A. Yes, sir.
>
> Q. Was there a TAR member present as well?
>
> A. Yes, sir.
>
> Q. TAR is the Technical Advisory Report team that helps you determine fair and reasonableness?
>
> A. Yes, sir.
>
> Q. After you reached settlement that night and you reached a fair and reasonable agreement that night and Jorge Rivera accepted your offer for $701,000, did you ask Bill Wren to submit a settlement sheet that night?
>
> A. Yes, sir.

> Q. Did he do so?
>
> A. Yes, sir.

Trial Tr. 1767–68.[38] Upon additional questioning, Ms. Carvey–Boyd explained that her supervisor, Kenny Rice, later told her that he believed that the settlement was not supported by sufficient documentation and that the Government needed "to retract the settlement." Id. at 1770. Ms. Carvey–Boyd again confirmed under oath, however, that when she walked out of the negotiations with ECR over compensation for the heavy weather plan, her view as ACO was that the "settlement was final." Id. at 1769–70.

Notwithstanding such final settlement, Ms. Carvey–Boyd later retracted the agreement at the direction of Mr. Rice. Such retraction is documented by an email sent from Mr. Rice to Mr. Wren. ECR Ex. 156. Mr. Rice's email includes the self-serving label of the prior final settlement as "tentative," and even though such agreement was made by an ACO with authority to settle the matter on behalf of the Navy, Mr. Rice asserts that it was his responsibility to make sure that settlements reached by Ms. Carvey–Boyd were "fair and reasonable." Id. A subsequent letter/email from Mr. Wren responding to Mr. Rice confirms ECR's position that the prior settlement had already been finalized, and highlights the reality that the only person asserting that the settlement was "tentative," is Mr. Rice, who was not present during the eight hour negotiation session that resulted in the final agreement. ECR Ex. 158. Subsequent to such communications, the Government, through

---

38. Mr. Wren testified that, consistent with the practice utilized by Ms. Carvey–Boyd, he provided the "settlement sheet" to Ms. Carvey–Boyd to document the settled value of the Contract change. Trial Tr. 367. Ms. Carvey–Boyd's testimony confirmed that she viewed the document sent by Mr. Wren as a document memorializing their final agreement notwithstanding the fact that such "settlement sheet" is phrased as ECR's "proposal." Trial Tr. 1767–68; ECR Ex. 155. The need to resolve this issue through litigation perhaps provides a valuable lesson as to why a written document should clearly communicate its intended purpose on its face.

unilateral change, compensated ECR $210,831 and a five day Contract extension. JE 49.

Although Mr. Rice's trial testimony clearly evidences his belief that he has a right and/or obligation to perform an after-the-fact review of his subordinate's work, he was unable to explain on what legal basis he could retract a $701,322 settlement reached by a warranted Contracting Officer with authority to bind the Government to changes up to $5,000,000. As argued by ECR, relevant case law appears to establish the contrary. See, e.g., Fischbach & Moore Int'l Corp. v. United States, 617 F.2d 223, 226 (Ct.Cl.1980) ("We have consistently held that where the contract or the controlling regulations designate (without qualification) a specific officer or body as the one to render a contractual decision under a Disputes clause (or comparable provision), other persons (including higher officials) cannot displace the designated decision-maker."). That said, it is undisputed that a formal written bilateral contract "MOD" was not jointly executed prior to Mr. Rice's "retraction" of the otherwise final oral settlement.

The Court easily concludes that the trial evidence supports the finding by a preponderance of the evidence that the Hurricane Sandy "settlement" represented a final and complete oral agreement as to all terms, reached after a detailed arm's-length negotiation between individuals with authority to bind both ECR and the Government. Such final agreement was documented and memorialized by the TAR group on behalf of the Government, and by Mr. Wren on behalf of ECR and at the request of Ms. Carvey–Boyd. While it appears that Mr. Rice views Ms. Carvey–Boyd's inexperience as having led her to negotiate a "bad deal," such deal was declared a "fair and reasonable" resolution of the dispute by not only a warranted Contracting Officer trusted by the United States to negotiate items up to $5,000,000, but by the representative(s) of the Government's TAR group called upon to ensure that the high-figure change order was "fair and reasonable." [39] ECR Ex. 161.

In light of the above findings, the Court need not determine whether the contemporaneous writings in the record are legally sufficient to constitute a binding bilateral Contract modification in the absence of a formal written "MOD" signed by both parties because: (1) it is undisputed that Hurricane Sandy represented a compensable Contract change whereby ECR was owed additional compensation; and (2) the trial record, considered as a whole, demonstrates that the contemporaneous oral agreement regarding the proper amount of compensation for such change that was reached by ECR and Ms. Carvey–Boyd, with the assistance/oversight of the Government TAR group, was "fair and reasonable," whereas the unilateral change issued

---

**39.** The Government's efforts to "rescind" such otherwise final agreement approximately a month after it was reached, rather than issue a timely written MOD, raises the specter of Mr. Rice improperly interfering with Ms. Carvey–Boyd's "independent judgment" as well as questions regarding whether the Government's conduct violated its obligation to issue a change order in the shortest practicable time and/or its obligation to "[e]nsure that contractors receive impartial, fair, and equitable treatment." 48 C.F.R. § 1.602–2; see N. Star Alaska Hous. Corp. v. United States, 76 Fed.Cl. 158, 209, n. 67 (2007) (explaining that while a Contracting Officer may surely consult with other advisors before reaching a decision (i.e., a TAR group or the "contracting office"), she may not forsake her obligation to exercise her own independent judgment and/or her obligation to treat the contractor equitably based on external pressure from another, including a superior, further noting that "various cases emphasize that the integrity of the dispute resolution process should not be undercut by influence and meddling"). N. Star Alaska Hous. Corp. v. United States, 76 Fed.Cl. 158, 215, dismissed, 226 Fed.Appx. 1004 (Fed.Cir.2007).

by the Government was not.[40] Notably, notwithstanding Mr. Rice's contention that he has the final say over his subordinates' negotiations, the best evidence before the Court of the "fair and reasonable" value of the work performed by ECR is the final agreed-upon value determined by those with the most direct knowledge of the facts after an arm's-length negotiation session between individuals with the authority to bind the respective parties. The fact that the TAR group was present at such negotiation further supports the Court's finding, particularly because the TAR report clearly establishes that the "TAR Analysis [i]ncluded the following: a. Review of pricing data; b. Review of contractor's price proposal/back-up data; c. Technical Knowledge." ECR Ex. 161 (emphasis added).

ECR is therefore awarded $490,491, the difference between the unilateral modification dictated by Mr. Rice, and the oral settlement of $701,322 agreed to by ECR and the Government's ACO, as approved/confirmed by the Government TAR group. Additionally, the Contract delivery date is extended an additional **nine days**, the difference between the fourteen days previously agreed to by the parties and the five days unilaterally awarded by the Government.[41]

### E. Government Furnished Steel— ECR 12, Técnico J

ECR seeks $428,427 under the Changes clause, as well as delay days, to compensate ECR for the costs, disruption and delay associated with defective material (steel) provided by the Government during the THUNDERBOLT availability. ECR's damages claim consists of an affirmative claim seeking $328,835 in added costs and disruption, and a claim seeking the reversal of a $99,592 unilateral credit assessed by the Government. Técnico separately seeks $205,575.27 in direct costs associated with the defective steel as well as disruption and delay damages. The Government asserts that no damages should be awarded to either ECR or Técnico, arguing that, beginning in January of 2012, ECR was contractually bound to provide steel on the THUNDERBOLT overhaul and that the Government properly assessed a $99,592 credit based, in part, on steel provided by the Government after that date. As discussed below, the Court rejects ECR and Técnico's affirmative claims for damages, but does reverse the $99,592 unilateral credit taken by the Government.

 Pursuant to the terms of the original Contract, the Government was responsible for providing ECR with the steel necessary to perform the structural renewals on the THUNDERBOLT, and such steel was initially provided to ECR in large "Connex" storage boxes supplied by the Government. After ECR/Técnico inventoried the materials in the Connex boxes early in the availability, it was discovered that there was an insufficient quantity

---

40. The costs associated with Hurricane Sandy included the disruption to the ongoing Contract work caused by the storm, as well as the costs associated with the Contract being extended. ECR initially proposed a twenty day Contract extension based on Hurricane Sandy delays and disruption but agreed during the negotiation session to a fourteen day Contract extension. The Government presented evidence at trial in an effort to demonstrate that even fourteen days was not reasonable. However, such evidence, which was largely circumstantial, is uncompelling, particularly because the TAR report states that the ACO's decision to award a fourteen day extension was agreed to by "the Maintenance Team and the Contractor," demonstrating that the onsite Navy personnel with the most knowledge of the actual delay found that fourteen days was reasonable. ECR Ex. 161 (emphasis added).

41. ECR's monetary compensation for all forms of damage suffered as a result of Hurricane Sandy is included within the $490,491 in compensation awarded herein.

of steel to perform all of the necessary repairs. The parties thereafter agreed to MOD–5 to the Contract whereby ECR was compensated to provide contractor furnished steel after the Government furnished steel was depleted. See JE 5 (indicating that MOD–5 is a settlement of RCC–24G); JE 73 (indicating that RCC–24G adds the following paragraph to the Contract "Compensate [ECR] to perform [structural steel renewals] with CFM [contractor furnished material] after GFM [Government furnished material] . . . is expended"); JE 74 (ECR's December 9, 2011 estimate for several items, including the purchase of additional steel).

Trial testimony established that after MOD–5 had been executed, Defendant acquired additional steel from a local Navy base and provided it to ECR for use on the renewals of the THUNDERBOLT and/or the TEMPEST. The Government's position is that, after MOD–5, the Government was under no legal obligation to supply such steel, that portions of the excess steel provided by the Government went missing at the conclusion of the THUNDERBOLT availability, and that the Government properly claimed a unilateral credit of $99,592 on the THUNDERBOLT.[42]

In contrast to the Government's position, ECR first asserts that the Government was obligated to provide the steel in question due to growth in the work specification and the impact of the structural steel PCP. Trial Tr. 499. Second, ECR asserts that the steel provided by the Government in early 2012 was badly deteriorated and required hundreds of thousands of dollars of extra labor to render it usable. Third, ECR argues that, not only did the Government overcharge for the damaged steel in assessing the credit, but that ECR could have procured new undamaged steel at a very low cost and avoided these additional expenses. Fourth and finally, although it appears to conflict somewhat with ECR's affirmative claim for additional damages, ECR's trial evidence reveals substantial uncertainty regarding what amount of steel in question was actually used on the THUNDERBOLT, as contrasted with the TEMPEST. Based on the above contentions, ECR's position is essentially that, in addition to the reversal of the unilateral credit taken by the Government, both ECR and Técnico are entitled to hundreds of thousands of dollars in damages based on the additional efforts purportedly necessary to utilize the deteriorated GFM steel.

First addressing the Government's credit, the Government fails to demonstrate by a preponderance of the evidence that it is entitled to a credit for having provided the deteriorated steel. It remains unclear from the trial record: (1) why the Government provided the additional steel after MOD–5 was signed; (2) whether such steel, which was delivered to the TEMPEST, was intended to be used on the THUNDERBOLT; and (3) what portion of the deteriorated steel was actually used on the THUNDERBOLT. See ECR Ex. 261 (indicating that 46 plates of steel were delivered to the TEMPEST in February 2012); cf. Trial Tr. 503 (revealing an apparent

---

**42.** According to the Government, such credit is based on both the cost of the additional GFM steel and the Government's approval of ECR's request to use a time-saving process to construct "T-bars." Trial Tr. 1789–91. Such testimony, however, further reveals that the credit was not based on ACO Tara Carvey–Boyd's personal knowledge, but instead on information relayed to her by Justin Thivierge. Ms. Carvey–Boyd's admitted lack of direct knowledge and lack of recollection of the relayed knowledge, coupled with the Government's decision not to call Mr. Thivierge (the individual with direct knowledge of the critical facts) results in Ms. Carvey–Boyd's testimony on this issue being afforded no weight by the Court. Id.

conflict, or at a minimum a lack of clarity, in Mr. Wren's testimony as it appears that Mr. Wren claims that the credit was improperly taken by the Government because the steel was used on the TEMPEST, not the THUNDERBOLT, yet Mr. Wren still requests hundreds of thousands of dollars in additional costs on the THUNDERBOLT availability based on the expense associated with utilizing the deteriorated steel).

Even assuming that some of the steel at issue was used on the THUNDERBOLT, the Government fails to demonstrate what amount was used on the THUNDERBOLT and/or demonstrate how the Government calculated the unilateral credit that it claimed. Justin Thivierge did not testify to clarify the critical facts on this issue, and Ms. Carvey–Boyd testified that she was not working on the THUNDERBOLT at the time the steel was delivered, thus preventing her from providing meaningful testimony on this issue. Trial Tr. 1788.[43] Accordingly, the Government fails to carry its burden to demonstrate that the Government properly claimed a credit on the THUNDERBOLT Contract for GFM steel and/or a modified plan for constructing T-bars, and based on the Government's failure of proof, ECR is entitled to a reversal of the credit of $99,592.

Similar to the Government's failure of proof on this issue, the Court finds that ECR fails to demonstrate that it is entitled to an equitable adjustment for alleged ex-penses associated with the claimed additional labor necessary to render the Government's "defective" steel usable. First and foremost, it remains unclear from Mr. Wren's testimony, and ECR Exhibit 258, whether the steel the Government furnished in February of 2012 (a month after MOD–5 was signed by ECR) was even used on the THUNDERBOLT, as contrasted with the TEMPEST.[44]

Second, Mr. Wren's contention that the invocation of the PCP required additional steel and that the Government was responsible for providing such steel is negated by both the fact that: (1) the Government's PCP sequencing requirements and limitations on the size of steel cut-outs were well-known by ECR on January 10, 2012 when ECR signed MOD–5; and (2) the fact that MOD–5/RCC–24G expressly shifts the obligation from the Government to ECR to provide steel after the GFM steel in the Connex boxes was expended. If there was an agreement to shift such burden back to the Government for any additional "growth" work agreed to after MOD–5 was executed, it is not documented by a contemporaneous written exhibit nor is it effectively established through trial testimony.

Third, ECR fails to demonstrate by a preponderance of the evidence that ECR was ordered by the Government to use the defective steel for the THUNDERBOLT rather than procuring its own new steel.

---

**43.** Ms. Carvey–Boyd testified at trial that she relied on information relayed to her from the Project Manager and others, and that she recalls being told that there was "an initial batch of steel and then there was extra steel that no one knows what happened to," and that because members of the Navy maintenance team "were adamant" about their position, she issued a unilateral credit for the steel. Trial Tr. 1786–88.

**44.** At trial, as "background" evidence on the PCP issue, the Court heard testimony that the quantity of structural steel needed for the TEMPEST overhaul increased dramatically shortly after such contract was bid. Moreover, ECR Ex. 261 states that the steel was delivered to the TEMPEST. In light of the fact that the TEMPEST and THUNDERBOLT were docked next to each other at the same shipyard, and were being overhauled by the same contractor (ECR) and the same subcontractor (Técnico), the Court finds the trial evidence insufficient to support any reasonable estimate as to what portion of the steel in question was used on the THUNDERBOLT.

To the contrary, ECR's ability to obtain steel at its own cost was not only authorized, it was contractually required by MOD–5.

Fourth, ECR is precluded by Contract from recovering damages associated with any costs/delay/disruption as a result of ECR's discovery of an inadequate supply of GFM steel in the Connex boxes. Notably, such discovery occurred near the start of the availability, and any delay/disruption costs associated with the lack of steel should have been included by ECR in negotiating RCC–24G as such contractual modification released further claims based on the Government's failure to supply a sufficient quantity of GFM steel.[45]

For all of the above reasons, ECR has failed to demonstrate that it is entitled to recover its claimed additional costs, or additional delay days, for working with the GFM steel delivered to the TEMPEST and/or THUNDERBOLT after MOD–5 was executed. For the same reasons that ECR's evidence is insufficient on this issue, Técnico fails to demonstrate by a preponderance of the evidence that it is due additional compensation. Técnico Item J seeks compensation based on the additional efforts associated with modifying Técnico's steel fabrication process due to the condition of the GFM steel. While the Court does not question the fact that Técnico expended such additional efforts (on either the TEMPEST, the THUNDERBOLT, or both), ECR and Técnico collectively fail to prove by a preponderance that the Government is legally responsible for such additional costs on the THUNDERBOLT availability, particularly in light of the release in MOD–5. Accordingly, these related line items are resolved by awarding ECR $99,592, representing the reversal of the unilateral credit assessed by the Government.

### F. Propulsion System Sequencing— ECR 2, 3 and 4

ECR seeks a total of $93,592 for direct and disruption damages associated with the fact that the Government required ECR to perform work on components of the THUNDERBOLT'S propulsion system in a "sequence" not otherwise provided for by the Contract. ECR further seeks tens of thousands of dollars in additional damages as a result of several weeks of "critical path" delays allegedly caused by the Government on these related items. The Government asserts that no compensation is due, contending that ECR was obligated to perform in a sequenced manner and/or that the sequencing did not increase the cost of performance. As discussed below, applying the jury verdict method, the Court awards ECR $67,070, which includes direct, disruption, and delay day damages.

 Pursuant to the Contract, as modified by MOD–45, ECR was to perform work on the THUNDERBOLT'S stern tubes and struts, to include a strut alignment. The trial evidence demonstrated that a separate PCP was invoked for the new strut alignment work, but such PCP did not include several sequencing requirements later mandated by the Government. Cf. ECR Exs. 111, 135. Moreover, while such individuals are not responsible for the legal interpretation of the Contract, Justin Thivierge and two Government engineers that worked on the

---

**45.** Contrary to ECR's contention in its proposed findings of fact that RCC–24G by its language deals only with shifting docking blocks, RCC–24G indicates on its face that ECR is being compensated to perform 3.3 (structural repairs as numbered in Contract Errata 6) with CFM after GFM is expended.

Accordingly, the Court agrees with the Government that any additional costs incurred by either ECR (or Técnico) that are associated with "inventorying" the GFM and/or attempting to calculate how much additional steel needed to be purchased has been released as a part of MOD–5/RCC–24G.

THUNDERBOLT acknowledged during the availability that there was no contractual requirement (pursuant to the Contract as modified) mandating the sequencing procedure ultimately required by the Government. Trial Tr. 1609–10. Far more importantly, Mr. Rice, the Government's supervising Contracting Officer who is responsible for Contract interpretation, was present in the courtroom throughout the trial as the Government's representative, and when questioned about the earlier testimony regarding the apparent lack of a contractual sequencing requirement, he was unable to point to any written Contract provision mandating such sequencing. Id. at 2124–29. Mr. Rice, however, asserted that the sequence required by the Government did not delay the process at all, although his assertion did not appear to be based on any personal factual knowledge regarding these specific repairs, and he admitted that he lacks technical expertise in such area.[46] Id. at 2129–30.

ECR does not dispute that the additional sequencing requirements ultimately demanded by the Government, see, e.g., ECR Ex. 136, are a technically sound procedure that lowered the risk of creating additional work through misalignment. However, ECR asserts that such additional precautions were time-consuming and amount to the Government dictating the means and methods of the contractor's work without a contractual right to do so. Because, after numerous oral and written communications on the issue, ECR ultimately complied with its obligation to heed the Government's instructions and employ the more conservative, and more expensive, approach, ECR asserts that it is entitled to compensation under the Changes clause. In addition to Mr. Rice's testimony, the Government counters ECR's claim by asserting that ECR waived any further compensation on this issue by agreeing to MOD-45.

Considering all relevant trial evidence on this issue, ECR has carried its burden to establish by a preponderance of the evidence that it is entitled to an equitable adjustment on this issue because the Government mandated several sequencing procedures not otherwise required by the Contract, as modified, that increased the cost of the repairs to the propulsion system and caused disruption to other planned work. See SIPCO Servs. & Marine, Inc. v. United States, 41 Fed.Cl. 196, 218 (1998) (explaining that when, during performance, the Government's actions constitute "significant interference and unjustified owner direction" in an effort to secure a "much safer project than its specification required," the contractor "possesses a strong and viable claim" for an equitable adjustment). As to the Government's "release" defense, while MOD-45

---

**46.** The Court notes that Mr. Rice is a very knowledgeable contracting officer, but his testimony in general suggested a degree of inflexibility and/or overconfidence that appears to have contributed to some of the disputes that ultimately resulted in the breakdown in communications leading to the instant lawsuit. While the Court recognizes that Mr. Rice laudably seeks to protect the Government coffers both by minimizing unnecessary spending and requiring rules and procedures to be followed, the Court's interpretation of his testimony as a whole is that Mr. Rice at times elevated form over substance and acted in a manner that lost focus on the Government's obligation to provide "fair and reasonable" compensation to the contractor when appropriate. That said, the Court recognizes that it may not be privy to all of the facts and pressure bearing on Mr. Rice's decisions, particularly as there was a great deal of interest in rapid completion of the Contract by senior Government officials—as evidenced by their multiple visits to the ECR site. Mr. Rice's testimony, therefore, was credited by the Court in some instances, and not given substantial weight in others.

indicates that it settles RCC–157N for the addition of the propulsion strut alignment, such document goes on to state that "[n]otwithstanding the forgoing language ... both parties agree that they have <u>not</u> settled certain specifically identified costs." JE 45. Later on the same page, MOD–45 expressly identifies, as an unsettled issue, ECR's contention that the Government had improperly changed the sequencing requirements regarding struts and stern tubes <u>after</u> agreement was reached on RCC–157N on September 26, 2012. JE 45. The Court therefore finds that neither RCC–45, nor any other trial evidence, establishes that ECR "released" its claim that the Government required ECR to engage in a more time-consuming sequenced procedure, and by doing so, increased ECR's cost of performance, thus entitling ECR to an equitable adjustment.

As with the other disputed issues, ECR fails to demonstrate its actual costs for this change, instead providing an estimate driven primarily by the additional man-hours that ECR <u>estimates</u> were expended to perform the more conservative sequencing procedure. Although ECR has only provided an estimate, it is based on both the specific tasks performed on the THUNDERBOLT as well as years of industry experience, which is necessary to compare the cost of performing the job in the manner dictated by the Government with the expected cost of performing as planned by ECR.[47] After considering ECR's testimony and documentary evidence in support of its damages estimate of $93,592, a figure which does not include the tens of thousands of dollars in delay damages also sought by ECR, the Court awards ECR a total of **$67,070** on ECR Claims Two through Four. Such award represents $45,000 in direct and disruption damages, as well as $22,070 as compensation for **ten sequential delay days**. Such delay days are awarded because, based on the modified work schedule for the availability, it appears by a preponderance that such work was within the critical path of the availability. The Court's award is substantially reduced from that requested by ECR based primarily on the Court's conclusion that ECR failed to provide sufficient factual detail to prove that the Government-mandated sequencing requirements complicated/delayed ECR's performance <u>to the degree</u> asserted by ECR.

### G. LOA/LOE—ECR 7

On this claim item, the parties dispute the proper compensation owed to ECR based on the Government's request for additional time to perform LOA/LOE (hereinafter, LOA), which is essentially a time period near the end of the availability, after PCD, when a Navy crew works on testing a vessel's systems, including testing and grooming the main engines. The Government ultimately provided some compensation to ECR on this line item when it issued unilateral MOD–53, which settled RCC–181G, awarding ECR $17,766 in compensation as well as a seven day Contract extension. JE 53; JE 69. The dispute as to this line item includes a dispute as to both: (1) whether the parties had previously entered into a final settlement on this line item for $141,011 and a twenty-one day Contract extension; and (2)

---

**47.** The instant issue provides another good example of why it was at times impossible for ECR to document the <u>actual costs</u> of Government mandated changes. ECR did not perform the work as bid and then separately perform a side job that could be easily tracked, but instead, was required to change the entire process of performance. In such circumstance, the only way to calculate the added cost is through an estimate. That said, ECR's proof of damages would have been more compelling if it had tracked its actual costs associated with the propulsion sequencing work (as performed) and then compared such costs to the estimate of performing the work as originally planned by ECR.

whether, because the Contract already provides for a fourteen day period dedicated to LOA, the Government requested and potentially owes compensation for an additional twenty-three days (arguably negotiated down to twenty-one days), or whether there were actually only seven to nine additional days for which compensation was being negotiated in this case. As discussed below, the Court finds that ECR fails to demonstrate that a final oral settlement was reached, but ultimately provides an award of $32,995 to compensate ECR for sixteen delay days.

Mr. Wren testified at trial, and later clarified during ECR's rebuttal case, that the Government took control of the Vessel to perform LOA work prior to PCD, which not only caused a greater interruption in work than a typical LOA period, but due to damage caused by the crew, resulted in ECR performing additional repairs. Trial Tr. 332–33; 459–60. While Mr. Wren initially requested over $200,000 in compensation and as many as twenty-five delay days on this item, he asserts that, after negotiations, the parties reached a final oral settlement of $141,011 and a twenty-one day extension. Id. at 461–62; see JE 91. As noted above, while the Government ultimately issued a unilateral change order compensating ECR for RCC–181G, it only awarded $17,766 in compensation and a seven day Contract extension.

Unlike the Hurricane Sandy negotiation, the Court finds that there is insufficient evidence to demonstrate by a preponderance of the evidence that a final oral settlement was agreed to by the parties at the time of the initial negotiations. Cf. ECR Ex. 196; Trial Tr. 1797–98. Ms. Carvey–Boyd testified that she was unsure whether she agreed to a settlement on this line item or whether talks were ongoing when

Mr. Wren sent her a proposed settlement sheet and that she would "have to see the email" from Mr. Wren. Trial Tr. 1797. Plaintiff's counsel then noted that such email was not a trial exhibit. Id. at 1798. While the Court acknowledges the possibility that an oral settlement was reached, the trial testimony and record evidence, taken together (including two contemporaneous Government documents within ECR Ex. 198 suggesting that the Government's view of the cost of this change was between approximately $18,000 and $70,000) results in ECR failing to carry its burden to demonstrate that there was a final oral agreement to $141,011.

Notwithstanding ECR's failure to prove such fact, the Court finds that ECR has established that it is more likely than not that the RCC being negotiated at that time was for an additional twenty-one to twenty-three days rather than for an additional seven to nine days. Notably, the language written by the Navy in drafting RCC–181G clearly and expressly calls for "an additional dedicated twenty-three (23) day time frame for ship's force (SF) to start, run repair, and test engines prior to Light Off Assessment (LOA)." JE 69 (emphasis added). Such unambiguous language alone supports the Court's finding. While Mr. Rice essentially asks the Court to ignore such clear language, asserting that it was a mistake and does not state what the parties really meant, Trial Tr. 2174–75, even assuming that consideration of additional extrinsic evidence is permissible, it supports, rather than undercuts, ECR's claim for an equitable adjustment.

First, the "upward obligation" request written by Justin Thivierge around the same date listed on RCC–181G expressly reveals his knowledge that the Contract already provided for fourteen LOA days.[48]

48. The upward obligation request is dated March 8, 2013, identifies Mr. Thivierge as the "Requesting Technical POC," ECR Ex. 198, and Ms. Carvey–Boyd testified that such document was "the recommendation by the PM." Trial Tr. 1798. As to RCC–181G, Mr. Rice

Second, such proposed Contract change was numbered as § 3.3 of Contract item 982–11–011, and § 3.2.2 of the existing Contract expressly called for a "dedicated fourteen (14) day time frame _after_ main space turnover ... for ship's force to complete light-off examination in machinery spaces." JE 62, at Item No. 981–11–001 (emphasis added). Not only does the sequential numbering and the use of the word "additional" establish that Defendant was asking for twenty-three days in addition to the fourteen days already provided by Contract, but RCC–181G states that such time is needed "prior to Light Off Assessment," indicating that such provision was more likely intended to supplement, not replace, the Contract provision already in existence that allotted time for the LOA after main space turnover. JE 69. Although the dates set forth on the face of RCC–181G appear to indicate that the Government's pre-PCD engine testing took approximately two weeks (as opposed to twenty-three days), it is notable that RCC–181G is dated _after_ such engine testing occurred, yet it still seeks an "additional" twenty-three days. Id. Such timing arguably suggests that, even after the initial testing, the Government was still projecting a longer than normal LOA period. Third, the Government's independent estimate of the cost of the change being negotiated prices such change based on twenty-

three days, not seven days or nine days. ECR Ex. 198. Fourth, the "upward obligation" request apparently created by Justin Thivierge, appears to demonstrate that, consistent with the Government's conservative approach as to other issues that arose during the THUNDERBOLT availability, the Navy "Fleet Forces Command" decided nearly a year prior to the THUNDERBOLT's completion that the engines would be tested prior to PCD, as "risk mitigation." Id. Such document further indicates that _after_ the Government had completed its pre-PCD engine testing, it informed ECR that it required twenty-five days for LOA preparations.[49] Id. Fifth, a document introduced at trial titled "Lessons Learned" that was purportedly authored by Justin Thivierge, after the availability, states that on PC overhauls, the Navy Maintenance Team needs a "robust LOE to LOA" of "at least $1,000,000 of 6000 MHRs and $600,000 Materials thru Sea Trials," which far surpasses the time and money allocated to the LOA/LOE in the original THUNDERBOLT Contract. ECR Ex. 59; see Trial Tr. 281–82; JE 62, at Item No. 981–11–001. Moreover, such same document states as follows: "Schedule more time for SF [ship's force] MPDE [Main Propulsion Diesel Engine] and SSDG maintenance. TBOLT 23 + 14 = 37 days." ECR Ex. 59 (emphasis added).

---

testified that it was written by NSSA, id. at 2174, but it appears to similarly be based on a request by Justin Thivierge as his name is listed in the header under "Authority" and his name and the date of March 14, 2013 is typed on the bottom of such document on the signature line for the "Ship Building Specialist." ECR Ex. 198.

**49.** Adding the initial ten to fourteen day pre-PCD engine testing period already completed to the twenty-five.days apparently still needed for LOA preparations results in a period of thirty-five to thirty-nine days total, which, after subtracting the fourteen days provided by the original Contract, supports ECR's conten-

tion that the Government required approximately three additional weeks (total) for pre-PCD and post-PCD engine testing and grooming. While the description of the issue in the upward obligation document, if considered alone, could be interpreted as supporting Mr. Rice's view that only seven to nine additional days were being negotiated (to include its reference to a cost under $18,000), the Court does not consider such document in a vacuum. Moreover, the Court reiterates that Mr. Rice did not have any knowledge of the relevant facts, and the Navy failed to present clarifying testimony from Justin Thivierge, or any other Navy witness, with factual knowledge of this issue.

As with the Court's analysis of the structural steel PCP Contract modification, and the Hurricane Sandy Contract modification, the parties' contemporaneous writings documenting the Contract changes on this issue are the most compelling evidence of what actually occurred. Both the express language of the Contract change itself and the "Lesson's Learned" document confirm that the Navy worked on the MPDEs for a total of thirty-seven days during the THUNDERBOLT availability. The Government's contention at trial that ECR is only entitled to a seven day Contract extension conflicts with both the weight of the documentary evidence indicating that the Government actually required a twenty-three day extension, and the rebuttal testimony of Mr. Wren highlighting the existence of two separate engine test periods, one before PCD and one after. Trial Tr. 2208–10. While there may be another reasonable and competing interpretation of the relevant documents on this issue, the Navy did not call Mr. Thivierge to challenge Mr. Wren's testimony, and Ms. Carvey–Boyd was admittedly

"foggy" as to the details of the disagreement between the maintenance team and ECR.[50] Id. at 1793–94. The Court therefore accepts the majority of Mr. Wren's testimony on this issue, as supported by the above referenced documents.[51]

In light of the above, the Court finds that ECR has demonstrated, by a preponderance, that RCC–181G, a change order formally issued by the Government through MOD–53, see JE 53, requires that ECR be compensated for an additional twenty-three days (23 × $2,207 = $50,761).[52] As the Government has already awarded a unilateral payment to ECR of $17,766, the Court awards ECR **$32,995** in damages on this line item ($50,761–$17,766). Additionally, as ECR has already been awarded a seven day extension, it is now awarded an additional **sixteen days** based on the Government's sequential delay (23–7 = 16). As to additional damages sought by ECR based on work or rework or other inefficiencies resulting from the fact that the Government took over the engine room prior to PCD, the Court finds that ECR's evidence of damages was gen-

**50.** Ms. Carvey–Boyd's testimony indicated that her recollection was that ECR was not performing much work in the main engine spaces at the time that these spaces were taken over by the Government, and that the position of the maintenance team was that the additional grooming period required by the Government should not translate to a day-for-day extension in the Contract as ECR could continue to perform other work. Such contention, while facially plausible, is not supported by sufficient evidence for the Court, as factfinder, to ascribe significant weight to it.

**51.** The Government attacks the reliability of Mr. Wren's rebuttal testimony in its post-trial brief, suggesting that Mr. Wren inaccurately, or even falsely, asserted that the Navy performed engine testing on two occasions, once prior to PCD, and once after PCD. ECF No. 57, at 7. However, rather than pointing to affirmative evidence that undercuts Mr. Wren's testimony, the Government relied on the purported lack of evidence to corroborate

it. In concluding that the Government fails to successfully discredit Mr. Wren on this issue, the Court notes that, as indicated above, ECR Ex. 198 (Bates # US–TBOLG–001069) is interpreted by the Court as supporting Mr. Wren's rebuttal testimony, as does the express language of RCC–181G, and Justin Thivierge's "Lessons Learned" document.

**52.** As stated above, ECR's litigation position is that it is entitled to a $141,011 increase and a twenty-one day extension (less the amount awarded by the unilateral change order). While the Court awards two days more than ECR requests, it does so in light of the trial record and the fact that the twenty-one day extension sought by ECR includes a concession necessarily intertwined with the alleged agreement to over $140,000 in monetary compensation. The Court's monetary award of just over $50,000 and twenty-three days is, when considered collectively, significantly less than that sought by ECR on this issue.

eralized and vague, and therefore was not sufficient to allow the Court "to make a fair and reasonable approximation of the damages" beyond the award of compensable delay days. Raytheon Co., 305 F.3d at 1367.

### H. Propellers—ECR 6 & 9

██ ECR seeks $21,171 in compensation for work associated with the THUNDERBOLT's propellers, which were discovered to have latent defects when being repaired by a specialty subcontractor during the availability. While the Government acknowledges that the propeller repairs, through no fault of ECR, took months longer than expected, the Government asserts that ECR is not entitled to any delay or other damages because: (1) the Government had substitute propellers ready to provide to ECR in the event that ECR reached the point in the availability when the propellers were needed and the THUNDERBOLT's propellers were not yet repaired; and (2) that the THUNDERBOLT propellers were in fact fully repaired by the time ECR was ready to install them. Ultimately, the Court finds that ECR has proved entitlement to a very small equitable adjustment on this issue.

Several discrete disputes exist regarding the multiple issues that arose during the THUNDERBOLT availability associated with the propellers. Summarizing these issues from a macro level, when ECR reached a point where it believed that the propellers would be installed in the near future, the Government (admittedly) acted improperly by using the false promise of replacement Government furnished propellers (Ready for Issue ("RFI") propellers) as a negotiating tool. See ECR Ex. 220 (email directing ECR to pick up Government RFI propellers at a local Navy base—the propellers were not there when ECR arrived to pick them up); ECR Ex. 187 (internal Government email from the lead military representative at NSSA "Waterfront Ops" stating as follows: "Every-

one: the GOV used these RFI props as a bargaining position and then essentially retracted the availability [of such props] after negotiation. This is not allowable"). Moreover, the Government's failure to communicate effectively, both across Government departments, and with ECR, appears to be the primary, if not the sole, cause for failures associated with the propellers. See ECR Ex. 224 (email from the same NSSA Commander stating: "We caused [these delays/problems], team, so we are going to have to suck it up").

The Court therefore finds that ECR has demonstrated by a preponderance that it is entitled to additional compensation for a constructive change to the Contract resulting from Government fault, based on an arguably intentional decision to interfere with ECR's performance of its contractual obligations through giving Mr. Wren the "run around" regarding the availability of the promised RFI propellers. In so finding, the Court concludes that Mr. Rice's testimony on such issue regarding the availability of the RFI propellers is not entitled to significant weight. ECR has similarly demonstrated that the Government ineffectively handled the repairs to the propellers in that Government officials were interacting directly with the propeller subcontractor, leaving ECR unclear as to the direction/authorization of growth work that was necessitated by the latent defects in the propellers. Such communication issues resulted in additional costs to ECR through wasted efforts coming in multiple forms.

Notwithstanding the above findings, ECR has failed to demonstrate by a preponderance of the evidence that the months of delay before propeller repairs were completed were a "critical path" item that extended the availability. See Wilner v. United States, 24 F.3d 1397, 1399 n. 5 (Fed.Cir.1994) (explaining that a " 'critical

path' is a way of grouping interrelated activities in a construction project," and that "[a] delay to an activity that is on the 'critical path' usually results in a corresponding delay to the completion of the project.").[53] ECR fails to make such showing in light of the various other delays to the availability, including PCP and structural steel delays caused by either ECR/Técnico or the Government, TAO delays, delays caused by the propulsion sequencing, as well as other delays discussed below.[54] Moreover, it appears that the Government did have multiple contingency plans in place (including using propellers from the TEMPEST on the THUNDERBOLT if necessary) to ensure that the THUNDERBOLT availability was not delayed by the multiple extensions of time that the propeller subcontractor needed to complete the repairs.

Accordingly, while the Government's handling of the propellers is another example of the Government being at fault for ineffectively handling an unexpected issue that arose during the availability, the proven damages award on this issue is minimal. See Eden Isle Marina, Inc. v. United States, 113 Fed.Cl. 372, 494 (2013) ("[N] o matter how unreasonable the Government's delay, there can be no recovery without proof that delay caused material damage." (quoting Commerce Int'l Co. v. United States, 338 F.2d 81, 89 (Ct.Cl. 1964))). The Court therefore finds that ECR has demonstrated that is entitled to an equitable adjustment of $5,000 based on Government interference with Mr. Wren's efforts to ensure that the propellers were ready for installation.[55] Such award does not include compensation for any additional sequential delay days. Moreover, because the Government appears to have had a viable contingency plan to use the propellers from the TEMPEST if necessary, no additional concurrent delays are recognized on this line item.

## I. Bitt Testing—ECR 11

ECR's next claim arises out of the parties dispute over whether the Contract,

53. An item is not on the "critical path" if the availability itself is not delayed by its delayed completion. For example, if propeller repairs take two months longer than anticipated, but are still completed prior to the date that the contractor is ready to install the propellers, the delay is not a critical path item. Cf. Trial Tr. 2217 (testimony of Mr. Wren acknowledging that the propellers were not needed until much later in the availability based on other Government-caused changes to the performance schedule).

54. The trial evidence is clearly sufficient to demonstrate that the structural steel work was a "critical path" item and it was not completed until late September or early October 2012. Trial Tr. 905. The documents relied on by ECR to establish propeller delays appear to date as far back as May 2012, ECR Ex. 225, and continue through November 2012. See ECR Ex. 186 (indicating: (1) that the THUNDERBOLT propellers were still not fully repaired by the propeller subcontractor as of mid-November 2012, but that they were expected to be completed soon; (2) that ECR was not planning on installing the propellers

for several more weeks; and (3) that the TEMPEST propellers could be installed on the THUNDERBOLT if the THUNDERBOLT propellers were not done on time in order to avoid a delay to the THUNDERBOLT availability). After the structural steel work was completed, ECR had additional "critical path" jobs to perform, to include the Government-mandated propulsion system sequencing.

55. Pursuant to unilateral MOD–42, ECR was allowed a three day extension and awarded $31,453.57 as a unilateral settlement of RCC–150, which was associated with additional work actually performed on the propellers, to include an $18,000 payment owed to the propeller subcontractor, as well as various other associated costs. JE 42. The additional labor hours ECR incurred based on the Government's mismanagement of this issue, to include apparently obstructive conduct, form the basis for the additional equitable adjustment awarded herein.

as modified by MOD–36, required ECR to "pull test" all bitts/deck fittings that it replaced on the THUNDERBOLT due to their deteriorated condition, or whether ECR was required to pull test only a small percentage of the bitts/fittings per the "Bollinger Test Method" referenced in RCC–142G (which was incorporated into the Contract through MOD–36). ECR Ex. 238, JE 36, JE 72.[56] The Bollinger method is a written procedure governing "pull testing" of the Vessel's bitts, and in part because such procedure is dangerous to perform, the Bollinger method only requires a small subset of bitts/fittings be pull tested. As documented through "Condition Found Reports" ("CFRs") issued by ECR during the availability, as well as Defendant's responses thereto, ECR believed that it was obligated to pull test only a small sample of newly installed bitts, whereas the Government asserted that MOD–36 required ECR to pull test every bitt that ECR had installed. Because the Government ultimately instructed ECR to pull test every bitt, and ECR followed such directive, ECR now seeks $77,229 in compensation, as well as four delay days, for what it asserts was additional change order work. The Court awards ECR $9,707 in damages and one sequential delay day.

The parties' conflicting positions on this issue result from differing interpretations of RCC–142N. ECR Ex. 238. Such document requires installation of new deck fittings, and includes several sections governing testing after installation. Section 3.4 requires a radiograph inspection, Section 3.5 requires visual and magnetic particle inspection, Section 3.6 requires a weight test, and Section 3.7 requires a visual inspection, with each item expressly stating that the inspection/testing is to be accomplished "in accordance with 2.9." Id. A subsequent section labeled as "Notes" further states: "Most deck fittings were removed by [ECR] as interferences for repair of the deck. Retest for all the deck fittings must be performed in compliance with 2.9." Id. § 4.1.

Turning to § 2.9, it provides a cross-reference to "ESR 12–2335 Testing of Deck Fittings." Id. § 2.9. Joint Exhibit 72 is a copy of "ESR 12–2335," and such document indicates that the contractor should be instructed to "Complete the testing IAW Bollinger Test Procedure using the following weights ...." JE 72. Importantly, after setting forth the weights incorporated from either the Bollinger Test Procedure or "GSO Para 582(g)," ESR 12–2335 states as follows: "All [57] (chocks, bitts and cleats) shall have butt welds radiographed and fillet welds dye penetrate or magnetic particle tested. All attachment welds shall be dye penetrate or magnetic particle tested. All tests shall have OQE properly documented and retained." JE 72. Critically absent from ESR 12–2335 is any similar requirement that "all chocks, bitts and cleats" shall be static load tested; rather, ECR was required to "accomplish a static test" in accordance with the requirements of ESR 12–2335, which requires that ECR "Complete the Bollinger Test Procedure" with the weights stated therein.

Reading such documents together, the Court finds that 12–2335, the document repeatedly referenced as the outline for all

---

56. Mr. Wren's testimony on this topic also discussed RCC–99G, ECR Ex. 236; however, it appears that such proposed Contract change was never adopted, with the parties instead incorporating RCC–142N into the Contract. See JE 26 (voiding RCC–99G); JE 36 (settling RCC–142N).

57. The first letter in the word "All" is obscured by a hole punched in the document in the exhibit copy provided to the Court; the Court nevertheless interprets such document as stating "All."

required testing, fails to require that all newly replaced bitts be weight tested.[58] Not only does such requirement not appear on the face of ESR 12–2335, but when such document discusses the pull weights of bitts/fittings to be tested under the Bollinger method, there is a reference to the "location" being identified in the Bollinger method, further suggesting that only certain bitts/fittings needed to be pull tested. While the "notes" of RCC–142N do require "retesting" of "all the deck fittings ... in compliance with 2.9," such requirement, read in conjunction with 2.9, does not create an internal conflict because the requirements of 2.9 do in fact require a certain type of testing on all replaced bitts: radiographing and dye penetrate or magnetic particle testing. Accordingly, ECR's interpretation of the Contract is correct, and ECR is entitled to an equitable adjustment.[59]

Although the Court finds that ECR is entitled to compensation for the additional testing required by the Government,

ECR's proof of damages has several flaws. A comparison between ECR Exhibit 239 and ECR Exhibit 246 indicates that while ECR agreed to a Contract modification of $98,000 for replacing the badly damaged bits pursuant to RCC–142N, only approximately $19,000 of such costs were listed as being associated with the "3.6–3.61 pull tests." [60] ECR Ex. 239. ECR's post-availability estimation of the cost of the additional pull testing, however, includes $39,000 in claimed ECR labor costs as well as approximately $38,000 in subcontractor costs. First, ECR's trial evidence fails to adequately explain how its claimed internal costs went from zero to $39,000 when the scope of the pull testing expanded. Second, ECR curiously did not present an invoice (or even a quote) from their subcontractor "Specialty Marine," but instead relied entirely on Mr. Wren's assertion that ECR was billed $33,200 for the additional testing. While this Court has repeatedly applied the jury verdict method, where appropriate, and relied on the fact that ECR

---

**58.** The Court acknowledges the evidentiary conflict between the written Contract "note" stating that the bitts at issue were removed as interferences and Mr. Wren's testimony indicating that deck repairs could have been completed without removing the bitts, but that the bitts were removed solely due to their deteriorated condition (i.e., not because they were an "interference"). Such evidentiary conflict, however, appears largely irrelevant as the Court agrees with ECR's legal contention that the testing requirements in ESR 12–2335 govern the resolution of this issue (rather than the testing requirements broadly applicable to any type of removed interference) because the ESR 12–2335 testing requirements were not only agreed to by the parties later in time, but they are specific to this issue. Cf. Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1369 (Fed.Cir.2005) ("Our precedent establishes as a principle of contract interpretation that a specific contract provision will control over a general contract provision."). Moreover, even if the interference standard applies, the Government failed to demonstrate that the contractually required "appropriate"

testing following the reinstallation of a bitt removed as an interference required a static weight pull test for each and every bitt. JE 60, at 009–23 § 3.8.

**59.** Alternatively, even if the interplay between RCC–142N and ESR 12–2335 creates an ambiguity, such difficult to identify ambiguity is latent, and because ECR's interpretation of the Contract documents is unquestionably reasonable, it must be followed. Lockheed Martin IR Imaging Systems, Inc. v. West, 108 F.3d 319, 322 (Fed.Cir.1997); see LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1316 (Fed.Cir. 2009) ("[T]he bar to proving patent ambiguity is high, and the inconsistency must be so 'obvious, gross, [or] glaring ... that plaintiff contractor had a duty to inquire about it at the start.'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1162 (Fed.Cir. 2004))).

**60.** Such figure represents a $16,600 subcontractor cost along with a 15% markup for profit/fee.

could not easily segregate its labor costs in a post hoc fashion, ECR's failure to present an invoice in this instance demonstrates: (1) a failure to provide actual cost data that should be available, rendering the jury verdict method inapplicable to the subcontractor costs; and/or (2) even if the jury verdict method could be permissibly applied, a failure to meet the reliability standard explained above for the jury verdict method of awarding damages with respect to the subcontractor costs.

In contrast to the subcontractor costs and direct ECR labor costs that likely could have been easily segregated, ECR did* present testimony establishing the danger/disruptive nature of the additional testing mandated by Defendant, including the fact that other work had to stop during the testing. Accordingly, the Court awards **ECR $9,707** for this line item, which includes **one sequential delay day** ($2,207 in delay damages), as well as $7,500 for disruption to other work resulting from ECR's need to perform the dangerous additional testing.[61] Again, while it appears likely that ECR incurred greater damages, ECR's evidence of damages was not compelling, and the Court will not engage in speculation to calculate the requested damages award.[62]

## J. Connex Box Issues—Test and Repair Equipment ECR 10 and Técnico E

■■■ ECR and Técnico both seek additional compensation under the Changes clause based on the fact that they expended additional time and effort as a result of Defendant providing large Connex boxes containing damaged, missing, and mislabeled THUNDERBOLT equipment that had previously been removed from the Vessel. ECR seeks $325,407 in direct and

disruption damages (and separately seeks delay damages). Similarly, Técnico seeks $15,750 in direct damages, as well as delay damages of approximately $23,000 and disruption damages of approximately $10,000 based on its efforts to: (1) survey the GFM steel in the Connex boxes; and (2) perform engineering work to determine how much additional steel would be necessary to perform the structural steel renewals. The Government asserts that ECR was required by Contract to both inventory the Connex boxes and to test equipment, and therefore, neither ECR nor Técnico are entitled to additional compensation. As discussed below, the Court awards ECR $35,000 in damages, but makes no award to Técnico.

Having considered the parties' respective positions on this issue, the following two findings control the analysis: (1) ECR was plainly on notice that the THUNDERBOLT was gutted at the time of its bid, and to the extent such gutted condition itself caused more work for ECR or its subcontractors, such risk was borne by ECR, not the Government; and (2) while additional costs associated with the gutted condition of the THUNDERBOLT, including time spent inventorying Connex boxes, are not otherwise a compensable Contract change, to the extent the Government provided ECR with inaccurate inventories of what was in the Connex boxes, and provided Connex boxes filled with scattered, unlabeled, and missing parts, Plaintiff is entitled to an equitable adjustment under the Changes clause for the additional labor necessary to locate and identify missing, misidentified, or unidentified parts. Cf. Trial Tr. 1736; JE 63, at 009–23 § 3.6.2 (indicating that removed interferences

---

**61.** While ECR seeks a four day Contract extension on this item, ECR Exhibit 243 states that "the testing was accomplished on 12/1/12"; therefore, ECR fails to demonstrate that there was more than one delay day.

**62.** As the Court expects a jury would react to the trial evidence, the Court cannot conceive of a valid justification for ECR failing to present an invoice from Specialty Marine.

must be tagged with labels bearing specific details and such tags must remain until item is reinstalled). Stated differently, pursuant to the fixed price Contract, ECR took on the risk of all the added costs associated with the fact that putting the THUNDERBOLT back together was a bit like a jigsaw puzzle, but they did not take on the risk that there were missing puzzle pieces, and blank puzzle pieces, as such fact was an unknown condition caused by the Navy that was not reported in the specification. See Olympic Marine Servs., Inc. v. United States, 792 F.Supp. 461, 462–64 (E.D.Va.1992) (explaining that the fuel tanks on a vessel that the United States hired the contractor to drain and clean were in an "unforeseen and substantially worse condition" than anticipated as a result of the United States' failure to properly maintain such tanks, leading the court to award the contractor an equitable adjustment stemming from the fact that the "United States had an affirmative duty to disclose the condition of the tanks, but failed to do so").

In determining the extent of the award on this line item, ECR relies in part on ECR Exhibit 232, which includes numerous CFRs documenting ECR's discovery of broken or damaged equipment and/or equipment that needs to be tested, removed, or replaced for other reasons. Several of such reports, however, appear unrelated to the Connex boxes containing missing or mislabeled equipment and/or inadequate inventories. Rather, such documents reveal that there were numerous disagreements during the availability as to whether work ECR asserted needed to be performed on certain equipment was within ECR's responsibility under the Contract terms, or whether it constituted new/

changed work that required additional compensation. ECR Ex. 232. Which of these equipment disputes, if any, were truly changes outside the scope of the Contract was not proven by ECR by a preponderance of the evidence at trial. Accordingly, ECR is not entitled to any compensation for such items.

As to the Connex box inventory issues, the first several pages of Exhibit 232, as well as trial testimony from Mr. Wren, and others, supports the factual finding by a preponderance of the evidence that, between the end of the MHI availability, and the start of the ECR availability, many items from the THUNDERBOLT's Connex boxes were "cannibalized" by Navy personnel for other PC vessels and/or other uses. See ECR Ex. 86 (Government Summary of various problems occurring during the THUNDER-BOLT/TEMPEST/SQUALL availabilities, including "Effects of cannibalized or missing equipment"). The result was that ECR was faced with inaccurate inventories, missing materials, and unlabeled materials in the Connex boxes causing ECR to incur additional labor costs not contemplated based on the specifications relied on by ECR when preparing its bid. ECR's claim does not seek compensation for the cost of any equipment or materials that were purchased in order to replace or repair damaged/missing items, but rather, seeks compensation for the additional man-hours expended to address the incorrect inventories, including cannibalized (missing) equipment, visibly damaged equipment, and equipment with no labels that required additional effort to determine what it was and where it belonged on the Vessel.[63] Based on the trial evidence establishing by a preponderance that the Gov-

---

**63.** ECR's damages estimate does include approximately $15,000 in "consumables," but does not explain which changes required consumables or otherwise explain why such con-

sumables resulted from changes outside the scope of the Contract. Accordingly, no compensation for "consumables" is awarded.

ernment caused ECR to incur additional costs not reasonably anticipated by the Contract documents, the Court utilizes the jury verdict method to award **ECR $35,000** in damages.

No additional delay days or disruption damages are awarded to ECR because the inaccurate inventories/missing material issues were discovered at the beginning of the availability, and the critical path was being delayed at that time by docking issues and the time dedicated to drafting the structural steel PCP. As to the additional testing and repair work that was allegedly performed near the end of the availability when ECR was reinstalling components and discovering them to be broken, ECR's limited proof on this issue is insufficient to provide a reliable basis to calculate any damages, to include damages based on delay or disruption.[64]

■ The above damages award does not include any damages associated with the inadequate supply of GFM steel in the Connex boxes, another issue discovered at the start of the availability. Notably, as discussed above in Part E, ECR released additional damages as to such matter when ECR signed MOD–5 and was compensated for providing the steel necessary for the remainder of the availability. Such bilateral modification similarly bars Técnico from recovering damages on its "Connex Box" claim because Técnico seeks additional compensation for its efforts to "survey" the unlabeled steel and perform an analysis to determine how much more steel was needed. ECR should have factored such costs into MOD–5, and no additional compensation is permitted pursuant to the release that ECR agreed to in such written modification.[65]

### K. TAOs—Técnico A

■ Técnico asserts that its performance of the structural steel renewals pursuant to the PCP was improperly hindered by the Government, beginning almost immediately after the PCP was approved, because the Government took far too long to approve the cutting of temporary access opening ("TAOs") in the THUNDERBOLT's hull. Técnico claims entitlement to $84,564 in direct damages, as well as delay damages for as many as nineteen days ($108,528 in delay damages), and as much as $63,422 in disruption damages. The Government asserts that no compensation is appropriate because it timely responded to the TAO requests and Técnico is itself at fault for requesting too many TAOs at the same time. As set forth below, the Court awards Técnico $137,120 in total damages, which includes damages for ten

---

64. ECR Exhibit 234, ECR's damages estimate dated August 17, 2013, indicates that an extension of "0 days" is required for this item. Mr. Wren, however, testified at trial that ECR suffered a multiple week delay (as long as 42 days) near the end of the availability as it was at that time when ECR reinstalled interferences that had been removed by MHI only to discover that they were not operational. Trial Tr. 592. As noted above, the Court finds ECR's proof lacking to the extent it seeks compensation for "additional testing" of equipment and even if the Court concluded otherwise, ECR fails to effectively demonstrate that a "critical path" delay occurred near the end of the availability as a result of the need to perform such additional testing.

65. As previously indicated, the Court agrees entirely with Defendant's contention that Técnico, as a subcontractor that is not in privity of contract with the Government, cannot recover for any change/growth work that it performed that is covered by a bilateral Contract modification and release negotiated by ECR. See ECF No. 57, at 11. However, the Court rejects the Government's characterization of the trial evidence as demonstrating that "most of the work at issue was subject to bilateral modifications" settled between ECR and the Government, id., instead finding that "some" of the work at issue is subject to bilateral modifications with release language, and some is not.

sequential delay days. ECR is awarded a ten day Contract extension and $22,070 in delay damages.[66]

After the PCP was approved in early February 2012, the structural steel renewal process could not begin in earnest until temporary access openings ("TAOs") were approved by the Government. More specifically, the trial evidence demonstrated that the unique design of a PC class vessel's structural support/girder system results in numerous small spaces that can only be effectively accessed for repairs through cutting a TAO.

As required by the Contract, ECR submitted its proposed locations as to where it wanted to cut TAOs at least three working days prior to when it wanted to cut the opening. JE 63, at 009–05. The Government, however, took well more than three days, and as to many of the initial TAOs requested, nearly three weeks, to approve the TAOs necessary to allow Técnico to perform the structural steel renewals as mandated in the PCP. The delays to the structural steel renewals, resulting from delayed TAO approvals, began immediately after the PCP was approved, and included delays based on: (1) the fact that the on-site Navy personnel lacked the necessary structural expertise and needed to communicate with an engineering team that was off-site, Trial Tr. 786;[67] and (2) the fact that even after off-site Navy engineers approved the requested TAOs, the on-site Navy SBS (Shipbuilding Specialist) and OAS (Quality Assurance Specialist) demanded that more information be added to ECR/Técnico's request before they would allow the actual opening to be cut in

the Vessel's hull. Id. at 787; ECR Ex. 300. Such delays were documented by contemporaneous reports by Técnico. Trial Tr. 789–90; ECR Exs. 299, 300. Moreover, it was the view of the Navy engineer responsible for approving TAOs on the THUNDERBOLT that, notwithstanding ECR's contractual obligation to request permission to cut a TAO three days before they intend to cut it, the sheer number of TAO's requested by ECR near the beginning of the steel work would take, "best case scenario," approximately "a month and a half" for the Navy to approve, and it was "not his issue" if the performance of the structural steel work was being held up while he reviewed the TAO requests. Trial. Tr. 1539.

Because a PCP was in place requiring ECR and Técnico to perform the structural steel renewals in a specifically sequenced fashion, the delay in approving the TAOs for the structural steel renewals, a critical path item, resulted in a day-for-day delay of the overall project, and ECR/Técnico have proven by a preponderance that the Government is solely responsible for such delays. Based on such Government-caused delay, which resulted in disruption to Técnico, an extension of the overall project, as well as additional man-hours that were otherwise unnecessary under the Contract (emails, meetings, and other Técnico efforts in order to attempt to get the TAOs approved), the Court hereby awards **Técnico $137,120**, consisting of $80,000 in direct and disruption damages and $57,120 in delay damages ($5,712 per day) resulting from ten sequen-

---

**66.** As set forth below, for each of Técnico's successful claim items associated with the critical path steel renewals, ECR is awarded delay damages as the Government-caused delay extended the availability, and thus increased ECR's costs by $2,207 per day of delay.

**67.** The Government's evidence suggested that Navy engineer Aaron Adams approved the TAOs as fast as he could; but even assuming such fact to be true, it fails to address Mr. Adams' level of experience and does not resolve the question as to why the Government only assigned a single engineer to review requests to cut numerous TAOs.

tial delay days. ECR is awarded $22,070 and **ten delay days** for this line item, which is compensation for the delay to the overall availability caused by the Government. ECR does not otherwise prove any direct costs or disruption damages.

### L. Frame 15 & 16—Técnico C

After the PCP was approved and the TAOs were cut, one of the first PCP steps involved repairs at "Frame 15 and 16" on the THUNDERBOLT. Upon commencing repairs, Técnico identified existing damage, to include: (1) newly discovered "out of tolerance" deflection; and (2) a "cheater plate," also referred to as a "Dutchman" or a "slug," which was evidently installed on both Frame 15 and Frame 16 during an earlier repair(s). Trial Tr. 851–52, 996, 1054. Técnico seeks $21,260 in compensation for change order repair work performed on Frame 15, as well as over $60,000 in disruption damages and up to $80,000 delay damages. The Government asserts that Técnico is not entitled to any compensation because it caused the damage to Frame 15 and because ECR was appropriately compensated through a bilateral change order to repair the damage to Frame 16. As set forth below, no equitable adjustment is awarded on this item.

Técnico discovered the damage to Frames 15 and 16 when it first removed the girder in that area. Id. at 853. Técnico then halted all steel work and identified, in a written CFR dated March 2, 2012, the need to replace a "section of Fr. 15 and Fr. 16." ECR Ex. 319. After issuing such CFR, several days passed and Técnico was unable to obtain a timely Government response. Frustrated with the mounting delay caused by the Government's inaction, Técnico called for a "pre fit-up" inspection of both frames, knowing that it would fail such inspection, but also knowing that it would force a response from the Government. Notwithstanding the fact that both Frame 15 and Frame 16 had been improp-

erly repaired in the past, the Government only approved the repair of Frame 16, acknowledging that such Frame had existing deflection. ECR Ex. 319. As to Frame 15, the Government blamed the apparent damage on Técnico. Trial Tr. 851–52. After additional conversations failed to remedy the parties' dispute as to Frame 15, and in an effort to avoid further delays, "Técnico just replaced it on [its] own." Id. at 852. Técnico now seeks compensation for the additional work it performed on Frame 15, as well as substantial disruption and delay damages that resulted from the Government's failure to act in a timely manner.

Having considered all of the relevant evidence, Técnico has demonstrated that it is more likely than not that, at an early stage in the structural steel renewal process, the Government's SBS did not fully appreciate the issue with the "cheater plate" discovered by Técnico on both frames. Id. at 1086–89, 1173–75; cf. ECR Ex. 319 (a CFR addressing both frames indicating in the text that the frames were "out of tolerance," but noting that there were electronic files attached, including two "jpeg" files with file names suggesting that there was a "slug" at Frame 15 and a "slug" at Frame 16). Técnico has further demonstrated that the Government moved far too slowly in responding to this issue, causing a delay to the structural steel renewal process of approximately one week. Trial Tr. 1088, 1173–74. However, notwithstanding such factual findings, Técnico's assertion that it is entitled to an equitable adjustment on this item fails for two reasons.

First, the vast majority of the cost at issue as to this line item is not the repair itself, but the delay/disruption caused by the Government's initial slow response time on addressing the joint issue of deflection/damage in adjacent Frames 15 and 16. After the Government finally inspected

the area, and issued a written response, ECR agreed to a bilateral Contract modification awarding ECR $9,000 and no Contract extension, to fully compensate ECR for the cost of repairs, delay and disruption associated with Frame 16. JE 14 (awarding $9,000 for RCC–76G). Such Contract modification released the Government from all further delay and disruption claims "incident to" the change order covering Frame 16, and does not include any reservation of rights language with respect to Frame 15 (as used by ECR and the Government with respect to the propulsion sequencing dispute). Id. While Técnico asserts that the issue with Frame 15 was slightly different from Frame 16 because the Government blamed the damage on Técnico, Técnico's evidence fails to effectively segregate the alleged costs/delay/disruption occurring solely because of the disagreement between Técnico and the Government as to Frame 15 from the joint delay/disruption caused by the Government's slow inspection time and slow written response to the CFR that addressed both frames. Stated differently, for better or worse, ECR released Defendant from any further damages associated with Defendant's delay inspecting the area reported in CFR 61 and delay issuing a written response directing ECR/Técnico on how to proceed. The effect of ECR's release is that Técnico, as subcontractor, cannot recover from the Government for such delay or disruption.

Second, while questions exist as to whether Técnico made the voluntary decision to repair Frame 15 (as contrasted with the Government ordering Técnico to make such repair),[68] even assuming that the Government did improperly mandate repairs to Frame 15 without providing reasonable compensation for such change, Técnico fails to present sufficient evidence to permit the Court to make a reasonable estimation of the costs of such physical repair. Notably, the initial cost estimate that Técnico provided for the physical repair of both Frames 15 and 16 in March of 2012 was a total of approximately $7,250–$8,500, along with a three to four day Contract extension (estimated at $5,712 for each delay day awarded). ECR Ex. 319. ECR ultimately negotiated and settled the repairs to Frame 16 with the Government for $9,000, which included all delay and disruption damages agreed to by the parties. JE 14. Without any compelling explanation, Técnico, now seeks over double that amount ($21,000) for the cost of physically repairing Frame 15 exclusive of delay and disruption damages. Moreover, Técnico seeks a maximum combined award for delay and disruption that exceeds $140,000, yet continues to refer back to the "released" delay beginning on March 2, 2012, as contrasted with demonstrating a subsequent delay specifically tied to Frame 15 (such delay, if proven, would likely be compensable as it would fall outside of ECR's "release").[69] In light of such diverging

**68.** See Trial Tr. 852 (indicating that Técnico made the decision to repair Frame 15 on its own); cf. Trial Tr. 1089 (appearing to establish that prior to the Government's written response to Técnico's CFR, the Government approved Técnico resuming work to avoid any further delays while the Frame 15 and 16 matter was resolved); ECR Ex. 2, at Ex. 30 (indicating in a July 2012 CFR and Government response that while Técnico was continuing to seek compensation for damages associated with Frame 15, the Government's

position was that such frame had been damaged by the contractor and the contractor had agreed to repair Frame 15).

**69.** Although appearing from context to be nothing more than a frustrated attempt at reopening negotiations, in July of 2012, Técnico reported in a CFR that its total costs for the Frame 15 issue, to include delay and disruption, were as much as $444,099. ECR Ex. 2, at Ex. 30

numbers, to include a lack of clarity regarding the actual effort needed, or cost expended, to perform the physical repair to Frame 15, any damages award assessed by the Court would be speculative. The Court therefore denies ECR/Técnico's request for an equitable adjustment on this item.

## M. Steel Deflection—Técnico G

As summarized above in the Court's findings of fact, ECR/ Técnico was responsible for replacing thousands of square feet of "deflected" (dented or bent) steel on the THUNDERBOLT's hull. During the availability, disputes arose regarding the method to measure deflection, what deflection should be compared against, and whether it was the Government's defective specification, or Técnico's defective performance, that caused numerous areas of the Vessel to require repairs not otherwise called for by the Contract. Asserting that the Government is at fault for such issues, Técnico seeks $206,588 in direct damages, approximately $50,000 in disruption damages and approximately $45,000 in delay damages based on eight claimed delay days. The Government opposes any award, maintaining that Técnico is solely at fault for any additional work that needed to be performed because Técnico caused the damage through, among other things, using high-heat welding and inadequate "strongback" support designed to preserve the integrity of the hull. Having resolved the disputed facts largely in Técnico's favor, the Court awards Técnico a total of $239,984. ECR is awarded $15,449 to represent seven sequential delay days caused by the Government.

The "deflection" tolerance pursuant to the THUNDERBOLT Contract was ¼ inch, meaning that the Vessel's hull, deck plates and supporting internal structure members were deemed "within tolerance" if they were not bent/warped/deformed more than ¼ inch. The ongoing problem

with defining deflection on the THUNDERBOLT, and determining who was responsible for paying for the repair of newly discovered deflection, is a complex issue, and the Court's resolution of such matter is based on the following enumerated factual findings:

(1) Members of the Government maintenance team and/or Government engineers providing guidance on the THUNDERBOLT availability changed the manner in which ECR/Técnico was instructed to measure deflection on multiple occasions. Unsurprisingly, when the testing method mandated by the Government changed, the results of testing for deflection changed.

(2) Técnico's employees and/or hired subcontracted help included welders that had a learning curve working with thin-plate steel, and some welds were performed using too much heat and/or were performed without adequate "strongback" support to reinforce the surrounding area to avoid causing additional deflection when removing and replacing steel plate. Specifically, the Contract requires that "Low distortion and/or low-heat welding processes shall be used for all welding" and that the low distortion processes and techniques "at a minimum shall include strongbacks, bracing, dogging, step welding and sequencing." JE 64 ¶ 2.1. An email sent by Carderock Naval Architect Thomas Helfrich in August of 2012 documents the Navy's position regarding ECR/Técnico's failure to fully comply with such requirements. ECR Ex. 390.

(3) The "Planning Memorandum" provided by Defendant at the start of the THUNDERBOLT availability that formed the "baseline" for measuring deflection was not accurate or up to date, as it was based on an outdated survey conducted before the Vessel was towed to ECR's facility. Specifically, between the time of the deflection survey used to create the

Government planning memorandum, and the structural steel work being performed by ECR/Técnico, the THUNDERBOLT was docked at MHI,[70] gutted at MHI, undocked, tied up pier-side for an extended period of time, towed to ECR, and ultimately docked at ECR using the newly formulated docking plan. See Trial Tr. 1571–74.

(4) At a point early in the availability, ECR and Defendant (represented by NSSA ship specialist Eddie Thomas) performed a joint survey of the THUNDERBOLT's hull to measure for deflection. This joint survey revealed approximately 750 square feet of shell plate that needed to be repaired that was not identified in the Government's planning memorandum. A CFR was issued and the Government initially agreed to compensate ECR for such additional work. However, the Government later changed course and, based on direction from Carderock Engineer Chris Foeller, determined that nearly the entire area was actually within tolerance and didn't need to be repaired. Much later in the availability, the Government blamed ECR/Técnico for causing deflection to various areas of the hull, to include areas within the 750 square feet previously identified as out of tolerance; ECR/Técnico were instructed to repair such areas without compensation. Id. at 800–11; ECR Exs. 358–61.

(5) Chris Foeller, the Carderock Engineer with superior knowledge regarding PC deflection issues, concluded in January of 2012, long after the Contract had been awarded and around the time that the PCP was being finalized, that the specification included references to the "wrong" requirements, that improper methods were being used to measure deflection, and that from his perspective "as the PC Hull ISEA," there "appears to be a lack of clear understanding and a lack of consistent understanding of the technical requirements for repairs of PCs internally within NSSA and ECR[ ]." ECR Ex. 361.

(6) In February of 2012, after ECR/Técnico learned that Mr. Foeller was disputing both the method being used to measure deflection and ECR/Técnico's understanding of the contractual standards, including those standards contained in Liaison Action Records ("LARs"),[71] a joint meeting was conducted by Jon Black of Técnico and Chris Foeller of Carderock, with the ECR Management team, Técnico management team, the Navy maintenance team working on the THUNDERBOLT, as well as the Quality Assurance representative from Técnico. The purpose of the meeting was to establish clarity regarding the standards that ECR/Técnico were being held to, including clarity regarding LAR "PC–1002 Rev A." Specifically, Técnico believed that such document provided conflicting guidance as to whether deflection was to be measured against the Vessel's "as built" condition or its "as surveyed" condition as reported in the specification. Trial Tr. 812–14. The Navy clarified at the meeting that the "as surveyed" condition would

---

**70.** While it does not appear that the trial record demonstrates the docking method used during the MHI availability, the Navy's decision to change the docking plan for the THUNDERBOLT, based on recently acquired engineering knowledge revealing that the prior method of docking was causing structural damage, occurred after ECR was awarded the THUNDERBOLT Contract, and thus, was much later in time than the docking at MHI. Trial Tr. 1353.

**71.** As explained by Técnico, a LAR is a document drafted by the Government that sets forth performance requirements established by the Government. Trial Tr. 809. Here, multiple PC-specific LARs were incorporated into the Contract, and some of these LARs had been authored by Mr. Foeller.

control. Id. at 812, 815, 1594; ECR Exs. 362, 390.

(7) At that same meeting, Técnico requested a demonstration as to how the Government wanted ECR/Técnico to measure deflection. The very next day, Thomas Helfrich, a subordinate to Chris Foeller at Carderock, provided a demonstration for ECR and Técnico. The method approved by the Government at this time required the use of an eighteen inch straight-edge (as contrasted with a 6 foot straight-edge previously used by ECR and Navy SBS Eddie Thomas during the joint survey that identified the additional 750 square feet of deflection). This same method was then used by ECR/Técnico and the Government to measure deflection for most of the remainder of the structural steel renewals, and was relied on to add, and subtract, areas of hull plate that needed to be repaired. Id. at 817–18.

(8) At some point several months later, the Government started taking the position that additional areas of the steel plating were deflected out of tolerance, and that there were areas where "rework" was necessary, due to deflection that the Government asserted was caused by Técnico. See, e.g., ECR Ex. 377 (dated July 27, 2012). Some of these areas of new work or "rework" were being identified by NSSA engineering representative Aaron Adams. Técnico initially performed the additional work as directed based on the pressure to complete the job in a timely manner, but eventually started challenging the Government's assertion that Técnico was responsible for causing such problems. See ECR Ex. 382–83 (documenting a dispute in late August/early September of 2012 regarding Técnico's alleged responsibility for causing additional deflection).

(9) Another meeting was held between the Government, ECR and Técnico in early September to discuss why Técnico was purportedly responsible for causing the ar-eas of additional deflection. Trial Tr. 819–21. Técnico explained that some of the areas the Government now claimed were deflected were within the 750 square feet identified as deflected in the December 2011 joint survey. Id.; ECR Ex. 383. Thomas Helfridge and Aaron Adams, at the request of ACO Kenny Rice, then provided a demonstration as to how they were measuring deflection. Trial Tr. 820–21. Such demonstration was not consistent with the method taught by Thomas Helfridge many months earlier, and was instead similar to the way that ECR had previously measured for deflection, although it utilized a string being pulled across multiple feet of the hull rather than a multi-foot straightedge. Id.

(10) Técnico was then instructed to survey the areas identified by the Government as out of tolerance, and Técnico disagreed with some of the Government's findings and found other areas mislabeled by the Government. Id. at 821, 827–28; ECR Ex. 386. Additionally, after Técnico documented its findings with detailed drawings and written comments, the Government asked Técnico to revise such drawings on multiple occasions in order to remove the verbiage and other details which helped explain why Técnico did not believe that the area was out of tolerance and/or why Técnico did not believe that the deflection was its responsibility. Trial Tr. 828–30. Técnico documented its objection to removing this critical explanatory language through multiple contemporaneous emails. ECR Exs. 386–88.

(11) Navy Carderock Engineer Thomas Helfrich acknowledged under oath that the only direct guidance in the Contract on how to measure deflection was the "4010 manual," and it states that deflection was to be measured along the minor dimension of the panel. Trial Tr. 1592. However, the trial evidence revealed that Defendant,

acting through Aaron Adams, was measuring deflection at various angles giving no regard to the 4010 manual's instructions. Specifically, Mr. Adams, a Navy engineer from MARMC/NSSA, was stationed on the THUNDERBOLT and he personally performed ongoing deflection surveys/tests during the availability. Mr. Adams asserts that "no one trained" him on how to measure deflection and that he believed that how to do so was "common knowledge." Id. at 1474. Moreover, Mr. Adams appears to have ignored the guidance from other Navy Engineers, including Thomas Helfridge, indicating that deflection on certain frames should be measured horizontally, not vertically. Id. at 1484–85. Mr. Adams testified that he believed there to be an "infinite" number of ways to measure deflection, utilizing any one of several measuring tools held at "an infinite number of angles" across any given section of hull plating. Id. at 1487–88.

Summarizing the above enumerated factual findings, ECR/Técnico has demonstrated by a preponderance of the evidence that the Government repeatedly changed the method used to measure deflection, at times deviating from the 4010 manual contractual standard, and that such inconsistent position led to Técnico being mandated to perform work and rework based on deflection that was not caused by ECR/Técnico. Moreover, the trial record demonstrates that the Government was not measuring the degree of hull deflection from the "as found" condition when measuring to determine whether ECR/Técnico was at fault for causing additional deflection. Such practice was in conflict with the contractual standard set forth in LAR PC–1002 Rev A and the clarification to such

LAR provided by the Government near the start of the structural steel renewals. See ECR Exs. 362, 390. By way of example, if an area of the hull was deemed to be deflected .24 inches at the beginning of the structural steel work, it was deemed "within tolerance" by the Government and did not require repair. If, however, several months later, after extensive structural steel renewal efforts had been conducted by Técnico, the deflection was measured (potentially by a different Navy representative using a different measurement method) to be deflected .26 inches, the Government would declare the area out of tolerance, assign blame to Técnico if Técnico had been performing work adjacent to such area, and require that the area be repaired by Técnico without compensation. This is the case even though the deflection increased, if at all, by far less than ¼ inch from its "as found" existing condition. See, e.g., Trial Tr. 1547–51; [72] cf. ECR Ex. 390 (indicating the agreement of Carderock Engineer Thomas Helfrich that the Vessel's original "as built" offsets are not controlling and that ECR was being required to maintain the current hull geometry, performing work in a manner that did not compromise the original design); ECR Ex. 362 (document clarifying deflection standards as outlined in LAR PC–1002 Rev A).

The Court's findings on this issue are further supported by the comparison of Joint Exhibit 64 to Joint Exhibit 65. Joint Exhibit 64 is LAR PC–1002 Rev A, which was expressly invoked in the THUNDERBOLT Contract, and provides technical direction for structural fairness. See ECR Ex. 15, at Item No: 110–11–002 ¶ 2.7 (invoking LAR PC–1002 Rev A). Joint Ex-

---

72. Not only would such a minor change in deflection be far less than ¼ inch from the baseline condition that would have been reflected in an accurate Government survey, but to provide additional context, it is undisputed that the summertime temperatures impacted the THUNDERBOLT's thin hull to such a degree that the THUNDERBOLT would lift up off of its docking blocks by several inches as the air temperature fluctuated. Trial Tr. 827.

hibit 65 is LAR PC–1103, which is dated June 20, 2011, an updated standard meant to replace LAR PC–1002 Rev A. Such updated LAR provides a clearer and more complete explanation of the Navy's expectations as to the requirements for maintaining a PC class vessel's structural fairness. Importantly, while the Navy as an entity was obviously aware of its own updated LAR prior to awarding the THUNDERBOLT Contract to ECR, such LAR was not invoked in the Contract documents prepared by NSSA, and ECR/Técnico were thus contractually bound to follow LAR PC–1002 Rev A, not LAR PC–1103.

LAR PC–1002 Rev A states that a Hull Geometry Survey shall be accomplished prior to any structural repairs and that such survey "will establish the baseline hull offsets." JE 64 at 2.2. The very next paragraph states that "Hull fairing tolerances shall be maintained within plus or minus ¼ inch of hull offsets established in paragraph 2.2." Id. at 2.3. Several paragraphs later, LAR PC–1002 Rev A states that "[d]uring required fit up inspection existing structure shall be within plus or minus ¼ inch of dimensions shown in references (e)-(u)," with such references appearing to be the "as-built" dimensions. Id. at 2.7. This arguably conflicting guidance referencing the as-built condition is why ECR/Técnico requested clarification from the Government in February 2012. See ECR Ex. 362.[73] As discussed above, the clarification provided by the Government was that ECR/Técnico was being held to the "as found" condition as referenced in ¶ 2.2, not the as built condition, although "when the contractor replaces things such as frames, the frame is to go back within ¼

inch of its original location." ECR Ex. 362; see Trial Tr. 1594–95 (testimony of Thomas Helfridge indicating that ECR/Técnico was required to maintain "the current hull shape as the baseline dimension" because "the as-built condition is—you cannot get to it"). The clarification of the requirement that the current hull geometry be maintained is consistent with the very next paragraph of LAR PC–1002 Rev. A, which states:

> Hull Geometry Survey—After all structural repairs are completed, a second hull measurement survey shall be accomplished. The finished lines shall be within plus or minus ¼ inch for transverse longitudinal dimensions compared to the hull offsets established in Paragraph 2.2.

JE 64 at 2.8.

For comparison purposes only (as it was not invoked in the Contract), LAR PC–1103 does not reference an initial survey or a post-repair structural survey. It does, however, retain the requirement that "[d]uring required fit up inspection existing structure shall be within plus or minus ¼ inch of dimensions shown in references (e)-(u)," with such references presumably being the same "as built" dimensions referenced in LAR PC–1002 Rev A. JE 65 ¶ 2.3.[74] More importantly, however, the updated LAR includes the following provision:

> Local fairness inspection by Cognizant Government representative shall be performed during pre fit-up and post fit-up of structural repairs. Local fairness tolerance shall be within plus or minus .25 inch for the installation piece itself; i.e. distortion to the installation due to weld-

---

**73.** Thomas Helfridge, Carderock Naval Architect, testified that "references e through u" in PC–1002 Rev A referred to the "as-built plans for the ship." Trial Tr. 1646.

**74.** The exhibit introduced at trial contains a blank page at page 4, and thus, the Court cannot confirm whether references (e) through (u) remain unchanged from PC–1002 Rev A. JE 65.

ing greater than or equal to .25 inches is unacceptable. Local fairness tolerance of plus or minus .25 inch also includes the relationship of the new installation to the existing structure unless stated otherwise in references (e)-(u).

JE 65, at 2.4.

At trial, Thomas Helfridge testified based on his contemporaneous notes from the THUNDERBOLT availability that, at one point during the availability, Aaron Adams had called Helfridge and told him that Chris Collins [75] had come to the maintenance trailer and quoted the 4010 manual stating the requirement that the "minimum dimension" of a panel is to be used to measure deflection. Trial Tr. 1606. Mr. Helfridge's trial testimony continued, reading from the notes he made during the availability, which stated:

> That is in fact true. However, when looking at new installs, deflection can be in a local area between stiffeners, and also part of a larger non-conformity that spans a greater distance than the minimum dimension. Deflections can be local or more global, i.e., to an entire or section of a new insert. The new installs must also interface with existing structure in an in-tolerance relationship. This is stated in the LAR PC–1103 Paragraph 2.4.

Id. at 1606–07. As noted above, LAR PC–1103 was not a governing Contract document, and thus, Mr. Helfridge's notes and testimony further demonstrate that ECR/Técnico was at times being held to a standard that was not required under the Contract. Accordingly, Técnico has demon-strated that it performed additional work at the Government's direction yet the Government improperly refused to provide additional compensation pursuant to the Changes clause.[76]

Turning to damages, ECR/Técnico has clearly demonstrated that it is entitled to an equitable adjustment based on the Government's inaccurate initial survey, inconsistent technique for measuring deflection, application of newly developed standards not incorporated into the Contract, and failure to consider the "as found" condition when faulting ECR/Técnico for causing newly identified deflection. Notwithstanding the expansion of the scope of work required by the Government, as well as "rework" demanded by the Government, Defendant subsequently refused to provide ECR/Técnico with "fair and reasonable" compensation for the additional work. See Olympic Marine Servs., 792 F.Supp. at 462 (summarizing the facts supporting the court's post-trial award of an equitable adjustment to the contractor based on the fact that the United States failed to disclose the "unforeseen and substantially worse condition" of the vessel); cf. ECR Ex. 60 § 2.18.4.1 (Navy "Joint Fleet Maintenance Manual" discussing "constructive change orders" occurring when "the Government provides defective specifications and the contractor incurs additional expense attempting to perform"). Plaintiff's trial evidence, however, fails to establish that all of the work/rework in question warrants additional compensation. As indicated above, the trial evidence demon-

---

75. It appears from ECR Ex. 39 that Chris Collins was the Project Manager employed by ECR on the TEMPEST. It is unclear whether he also performed work on the THUNDER-BOLT.

76. To the extent that the Government contends that PC–1002 Rev A ¶ 2.7 governs measuring for deflection at a weld seam after a new piece of structural steel is installed, such argument fails. Notably, the Contract document governing the structural steel renewals, 110–11–002, states that a fit-up inspection is performed "prior to welding," and thus, the standard applicable to approving a planned weld at pre fit-up in no way indicates that deflection is to be measured "across the weld" after a weld has been completed.

strates some shortcomings with Técnico's performance, including inadequate strong-backing at times and failure to use low-heat welding methods as necessary when working on the thin hull. Accordingly, having used the jury verdict method to calculate a claim-specific finding, the Court awards Técnico **$239,984**, consisting of $200,000 in direct and disruption costs, and $39,984 in .delay damages, caused by the Government's insistence that Técnico perform work and rework not otherwise required under the Contract. The Court awards ECR **$15,449** to represent **seven sequential delay days** caused by the Government as a result of its requirement that additional work and rework be performed by Técnico's welders. Such delay is deemed sequential because the structural steel was a critical path item and each hour that a worker was improperly rerouted, due to the application of the wrong standard or due to the outdated hull survey, he was diverted from performing a task that would have advanced completion of the structural steel renewals.

### N. Overgrind Survey—Técnico F

Técnico's second largest direct damages claim item (after the PCP) asserts that the Government applied the wrong contractual standard governing the grinding of "tack welds" that are left behind on the Vessel's hull after temporary support structures (strongbacks) were removed. Técnico asserts that the Government's instance that Técnico perform to a nearly unachievable level that was not required by the Contract resulted in thousands of hours being lost: (1) performing "surveys" of the "damage" to the hull Técnico allegedly caused; and (2) "repairing" grinding scars that were well-within contractual limits but were nevertheless demanded by the Government. Técnico seeks $321,959 in direct damages, up to $122,686 in disruption

damages and more than $225,000 in delay damages based on a claimed forty delay days. The Government opposes the claim in full, contending that Técnico was performing deficiently and being held to the proper contractual standard by Defendant. As set forth below, Técnico is awarded $375,680, which includes damages for fifteen sequential delay days. ECR is awarded $33,105 in delay damages.

The trial record clearly establishes that, for approximately two months during the summer of 2012, ECR/Técnico was being held to a standard whereby a repair was mandated by the Government if the grinding of tack welds on the· hull created a depression or gouge in the base metal resulting in a decrease in thickness of more than 10%, with such tolerance reduced to 5% in certain "critical" frames on the Vessel. See, e.g., Trial Tr. 858–68, 1477–78. The Government asserts that such 10%/5% standard is provided for in the Contract; however, near the end of the availability, the Government began accepting tack weld grinds that exceeded the 10%/5% standard. The Government's position on this issue appears to be that the changed standard was merely a voluntary relaxation of the contractual requirement to avoid further delays and/or damage caused by Técnico. In contrast, ECR/Técnico asserts that the Government was improperly holding Plaintiff to the wrong standard and that the governing Contract documents at all times expressly permitted tack weld grinding to reduce hull thickness by up to 20%.

Turning to the section of the Contract expressly governing structural steel renewals, Item No: 110–11–002, the Contract states as follows: "Install new material provided by 2.2 [Government Furnished Steel][77] in place of that removed in 3.1

**77.** As previously discussed herein, the Contract was modified during the availability to require ECR to provide the steel necessary to perform the renewals.

[Structural Steel PCP] and 3.1.1 [missing cross-reference][78] in accordance with 2.7 through 2.37, 2.50 and 2.51. Included within the range of references "2.7 through 2.37" are: 2.9–LAR PC–1005, "Patrol Coastal (PC) Craft Hull Wastage Limits"; and 2.37 NAVSEA 0900–LP–060–4010 Rev 2, "Fabrication, Welding and Inspection of Metal Boat and Craft Hull."

The Government asserts that LAR PC–1005 Rev A (reference 2.9) sets the limits for hull damage caused by grinding. ECR Ex. 65. While such technical document states on its face that it was "developed to provide allowable hull wastage limits" for PC class vessels, it defines "wastage" as: "acceptable corrosion limits and wear limits for the vessel's structure in a given area." Id. Such document sets the allowable corrosion/wear limits at 5% and 10% of hull thickness, depending on the location on the Vessel. Id. Notably, such document makes no mention of grinding scars, strongback removal, or anything similar.

In contrast to the LAR's reference to "corrosion" and "wear," NAVSEA 0900–LP–060–4010 Rev 2 (reference 2.37) (hereinafter the "4010 manual"), states on its face that it is a Navy "Technical Manual" for the "Fabrication, Welding, and Inspection of Metal Boat and Craft Hulls." JE 82. Such manual expressly addresses the procedure for removal of strongbacks and subsequent grinding, stating as follows:

> **14.5.4.1 Grinding.** Grinding may be employed to correct weld-edge conditions which do not meet the acceptance standards of Section 8, provided such grinding does not reduce plate thickness <u>by more than 1/16 inch or 20 percent—whichever is less</u>—below design thickness. Depth of grinding shall be meas-

ured from the unground surface adjacent to the ground area.

. . .

> **14.9 Removal of Welded Attachments.** In removal of attachments, the welds shall be removed by chipping, oxyfuel gas cutting, gouging, and/or grinding. Surface defects shall be faired out by grinding, <u>provided the depth limitations for weld-edge correction specified in 14.5.4.1 are not exceeded.</u> Where depth limitations will be exceeded, the defective areas shall be repaired by suitable preparation welding. Repairs shall be ground flush and inspected in accordance with Section 6.

Id. (emphasis added).

▇▇▇ Having reviewed the trial evidence and Contract documents, the Court agrees with ECR/Técnico, that: (1) no Contract ambiguity exists on this issue; (2) the 4010 manual is the governing document regarding both the acceptable procedure for removing strongbacks and the allowable depth of grinding down tack welds after the strongbacks are removed; and (3) the trial evidence clearly demonstrates that the Navy was holding ECR/Técnico to the wrong standard for two months and requiring substantial work and rework to areas that were within Contract specifications. Cf. ECR Ex. 356 (internal Government email invoking 4010 manual for the procedure for <u>removing strongbacks</u>, but apparently failing to recognize the express cross-reference in the 4010 to a grinding depth limit, instead asserting that the LAR governing corrosion and wear established grinding limits). Notably, not only does a "corrosion" standard appear on its face to be inapplicable to a gouge caused by a person actively grinding excess metal off of the hull of the

---

**78.** It appears to the Court that 3.1.1 was a section within 110–11–002 in the original Contract, JE 62, but did not appear in 110–11–002 in the Contract as modified by Errata 6, ECR Ex. 15. The apparently erroneous retention of such cross-reference has no impact on the Court's analysis.

Vessel, but the 4010 manual states as follows:

> 1.3 When reference to this document is made in the building specifications for a particular boat or craft, the requirements of this document supersede any conflicting requirement of other referenced specifications and standards, unless otherwise noted herein or in the particular building specifications.

JE 82. Based on such rule of priority, which was identified by Government Engineer Aaron ·Adams during the course of the availability, Trial Tr. 1480–82, the Government's refusal to award an equitable adjustment on this issue suggests a lack of reasonableness.[79]

Considering the extensive amount of additional repairs required by the Government, and the time the Government caused Técnico personnel to waste performing multiple "surveys" of thousands of scars on the exterior hull of the Vessel, first by using a "feeler gauge" and then by using ultrasonic testing, see Trial Tr. 874–77;

ECR Exs. 351–52, the Court awards Técnico a total of $375,680 in damages on this item. See 1 Government Contract Changes § 11:24 (explaining that "a direct order to perform the work in a certain way is clearly a 'change' even though the Contracting Officer believes it to be merely an interpretation of the specifications," and a compensable change may occur if "the contractor was directed to perform extra work under a separate contract clause which was later held not to apply to the work in question"); see also SIPCO Servs. & Marine, 41 Fed.Cl. at 217 (indicating that "although the government may insist upon contractor compliance with the terms of the contract, the government cannot impose a more stringent testing procedure or standard for demonstrating compliance than is set forth in the contract") (internal quotation marks and citation omitted). Such award includes $290,000 of direct and disruption damages and $85,680 in delay damages based on fifteen additional days of production support.[80] ECR is awarded

---

79. Mr. Adams testified at trial that notwithstanding the express direction in the 4010 manual regarding precedence, he later learned during "contractor officer training" that Chapter 11 of the FAR lays out criteria as to which documents take precedence, and the FAR purportedly states that "something that is designed specific to a class of ship takes precedence over something that is a general criteria for repair." Trial Tr. 1508–09. First, Mr. Adams was unable at the time of trial to identify the FAR provision that allegedly provides such rule. Id. at 1545. Second, the Court has not otherwise been pointed to such a FAR section or rule by Defendant's counsel during trial, or in post-trial filings, nor has Defendant demonstrated that such a generalized rule, if it exists, trumps the express precedence provision in the 4010. Third, even assuming that Mr. Adams is correct that a LAR specific to a vessel class automatically trumps the 4010, the Court finds that the "corrosion" criteria in the LAR at issue cannot act to trump the grinding standard in the 4010 because they cover two different topics. Fourth, alternatively assuming both that Mr. Adams is correct and that LAR PC–1005 .Rev

A can be reasonably interpreted as· providing a standard applicable to grinding scars, the Court finds that there is a latent ambiguity in the Contract that is only apparent after the words "corrosion" and "wear" are interpreted to include mechanical grinding to remove residue metal· from a tack weld, and because ECR/Técnico's reading of the contractual ambiguity authored by the Government is plainly ·reasonable, it must prevail· over the interpretation offered by the Government. States Roofing Corp. v. Winter, 587 F.3d 1364, 1368 (Fed.Cir.2009); cf. ECR Ex. 86 (Government Summary of various problems occurring during the ·THUNDERBOLT/TEMPEST/SQUALL availabilities, including the fact that contractual "welding requirements are captured in a variety of documents" that are "challenging to weave into a cohesive plan for practical application and demand specialized training").

80. As with other damage awards, such figure was calculated using the jury verdict method on an item-specific basis. It takes into consideration the fact that there was evidence at

$33,105 and **fifteen additional days** based on the Government's sequential delay. Such delay days are awarded because the trial record demonstrates by a preponderance that the Government's demand that ECR/Técnico perform substantial rework according to an incorrect standard resulted in a day-for-day extension to the job because, similar to the deflection line item, each hour/day that welders were performing needless repairs was an hour/day that such welder was not working toward completion of the structural steel repairs, a critical-path line item.

## O. Collar Issues—Técnico B

Técnico seeks $23,470 in compensation for direct costs, as well as approximately $6,000 in disruption damages and up to $40,000 in delay damages associated with Técnico's efforts designing, redesigning, and installing a "clip"/"collar" that was used to reinstall certain portions of the THUNDERBOLT's deck. The bulk of Técnico's requested damages are associated with its claim that the Government provided inconsistent direction regarding the permissible clip installation technique. The Government asserts that Técnico is not entitled to any compensation as any additional work performed by Técnico as a result of Técnico's failure to obtain proper approval prior to using a "work-around" installation procedure is entirely the fault of Técnico. As set forth below, the Court finds that Técnico fails to carry its burden to establish that it is entitled to compensation under the Changes clause on this issue.

It appears undisputed from the trial record that the THUNDERBOLT specification did not include a clip-design that would facilitate reinstallation of all deck plating that required repairs. Técnico issued a CFR in February of 2012 to report such matter to the Government, and ECR/Técnico subsequently met with Navy representatives, to include Government engineers, who agreed that there were some areas where clips/collars not described in the applicable specifications/LARs would be needed in order to reattach the deck. ECR Ex. 306. It is further undisputed that Técnico designed a collar/clip that was approved by the Government. Técnico, however, asserts that the Government not only approved its <u>initial</u> design/installation plan, but verbally approved a "work-around" method utilizing one less weld, with such method to be used in certain areas of the Vessel where there was <u>insufficient space</u> to use the approved clip and installation method that Técnico had engineered. Moreover, Técnico asserts that Government quality assurance specialists accepted and approved the use of the "work-around" method for several weeks. Notwithstanding such acceptance, the Government later: (1) mandated that Técnico modify its written engineering drawing to include a weld symbol that had not been used when employing the "work-around" method; and (2) questioned the efficacy of the clips already installed utilizing the work-around method in light of the fact that they were purportedly lacking a critical weld. Técnico subsequently complied with the Government's demand that it

---

trial indicating that some minimal amount of hull damage may have been caused by Técnico's improper removal of strongbacks. <u>See</u> ECR Exs. 345, 351, Govt. Ex. 103. Técnico's damage request, while still an estimation, did rely on specific evidence of how many tack welds were inspected and repaired in a certain zone of the Vessel, which was then used to extrapolate the estimation to other zones.

In fashioning a damages award, the Court considered the fact that the surveys and repairs were very time-consuming due to the countless tack welds that needed to be inspected and/or repaired, and the fact that, at least in some areas of the Vessel, Técnico was required by the Government to perform multiple time-consuming surveys using the wrong standard.

modify the clip engineering drawing to include the additional weld symbol, and hired a "Naval Architect" to analyze the integrity of the clips installed without such weld. Técnico asserts that the Government's inconsistent position regarding the "work-around" resulted in additional costs to Técnico for which compensation is due.

Técnico demonstrates by a preponderance of the evidence that the Government's specification lacked a design for a clip/collar that would facilitate the repair of certain areas of the deck and that Técnico's engineers designed a new clip/collar that was approved by the Government. To the extent Técnico's engineering efforts were not volunteered, and were necessary to effectuate the repairs due to a defect in the specification, this would typically result in a compensable change. See 2 Government Contract Changes § 18:6 ("[T]he costs of engineering effort expended to determine the nature and extent of defects in the specifications are includable in an equitable adjustment."). However, Técnico's evidence on this matter suffers from several infirmities.

■■ First, it is unclear from the record whether Técnico designed the collar because the specification was "defective," or whether the collars were a sensible solution to avoid a much more time-consuming and difficult (but possible) installation procedure. See Trial Tr. 883 (testimony from Técnico's engineer stating that without the newly designed collar it would be "extremely difficult to put the frame in"); see also ECR Ex. 2, at Ex. 19 (suggesting that Técnico was requesting the meeting with the Government to obtain "permission" to use proposed collars as a result of "issues ... fitting frames within tolerance without using collars"). Second, the Court finds

that Técnico's vague evidence as to the alleged approval of the work-around method from a NSSA representative "on the deck plates" fails to demonstrate by a preponderance that a Government official with the requisite authority actually approved use of the work-around design. See Trial Tr. 886, 1098–1102, 1117; compare ECR Ex. 307 (CFR authored by Técnico appearing to report NSSA's verbal approval of the "work-around" on July 2, 2012), with ECR Ex. 308 (Government ESR dated July 9, 2012 appearing to reject such method because it has an "incomplete weld"). Técnico's failure is notable because Técnico focuses the bulk of its damages claim on the expense/delay resulting from the Government's alleged inconsistent positions regarding the need for the additional weld. Third, even acknowledging that Técnico performed some degree of additional work not expressly required by the Contract (i.e., designing the clip), Técnico fails to demonstrate the degree to which Técnico's engineering efforts and/or use of either clip design were compelled by the Government as opposed to volunteered by Técnico.[81] See N. Star Alaska Hous. Corp. v. United States, 30 Fed.Cl. 259, 272 (1993) ("When the contractor elects to perform as a matter of its own free choice and without a formal change order, there is no valid claim for extra work without proof that the contract requirements were enlarged and that the additional work was not volunteered."). Even more importantly, Técnico fails to demonstrate that use of the approved clip design increased the cost of its performance. Cf. Government Contracts: Law, Administration, Procedure (Walter Wilson, Gen. Ed.), Ch. 28, Changes, § 28.280 (Matthew Bender) .("As a condition to any re-

81. The fact that Técnico appears to have arrived at the initial meeting with the Government with a proposed solution (the clip design) coupled with the fact that Técnico's engineering efforts seem quite limited provides circumstantial evidence that Técnico was volunteering a solution.

covery even where a change is established, the contractor must show that the change increased the contractor's cost of performance or the time for performance of the contract. A mere allegation is not enough."). Notably, while a contemporaneous CFR reveals Técnico's report that the specification lacked a suitable clip design, Técnico/ECR did not subsequently submit a follow-up CFR requesting additional compensation for designing the new clip or for the cost of purchasing/fabricating or installing such approved clip.[82]

Accordingly, the Court finds that Técnico has not proven its claim by a preponderance, both because Técnico fails to demonstrate that it received proper approval of the "work-around" clip design (thus negating the bulk of Técnico's damage claim that is predicated on the allegedly "changing" Government standard), and because Técnico failed to demonstrate that the specification was "defective" and/or that Técnico's apparently minimal engineering efforts were not volunteered.[83] Moreover, the Court separately finds that Técnico fails to prove its damages with a sufficient degree of certainty to support a reasonable estimation of damages, even

under the jury verdict method.[84] Therefore, no damages or delay days are awarded.

### P. Slot–Weld Zone 7—Técnico H

Técnico seeks additional compensation based on the fact that, during repairs of the stern of the Vessel, Técnico discovered both that the deck was not properly welded in its current state and that it was not possible to reinstall the deck as called for in the Contract because the areas beneath the deck were physically inaccessible. Somewhat similar to the collar issue, Técnico engineered a solution to the problem and utilized such solution, and now seeks $47,415 in direct damages, as well as $2,371 in disruption damages.[85] Defendant's post-trial filings indicate that the Government does not contest the fact that "reinstalling the main deck in accordance with the applicable Planning Memorandum would be impossible once the existing deck was removed," ECF No. 58 ¶ 117; however, the Government asserts that Técnico is not entitled to compensation because it removed the deck after discovering the issue but without affording the Navy an adequate opportunity to decide how, or whether, it wanted the deck repaired. Id.

---

**82.** As context, the Court notes that the clip issue first arose in February of 2012, ECR Ex. 318, and continued until at least September 2012, ECR Ex. 313, yet at trial, ECR/Técnico failed to point to any contemporaneous CFR or other written request seeking additional compensation for engineering or installing the clips.

**83.** The breakdown of Técnico's claim indicates that less than $2,000 of the claimed direct costs were associated with engineering efforts, and because such engineering efforts would not have resulted in any delay or disruption, the engineering costs represent less than 3% of Técnico's claim on this issue.

**84.** As suggested above, the strongest component of Técnico's claim is the effort it spent engineering a solution to what it contends was a defect in the specification. That said,

not only is it unclear from the trial record whether Técnico volunteered these minimal design services, but the claimed engineering expenses included both the "redesign" of the clip, arranging the third-party analysis of the integrity of the clips already installed through the "work-around" procedure, and something referred to as "start and stop of issues." ECR Ex. 2, at 28. Thus, it remains unclear what portion of such services, even if not volunteered, were associated with the initial legitimate engineering work as contrasted with the subsequent issues associated with Técnico's use of the "work-around" procedure without first obtaining proper approval from Defendant.

**85.** Técnico's disruption request under the "range method" would be approximately $10,000 higher. No delay damages are sought by Técnico.

¶ 118. For the reasons discussed below, the Court finds that Técnico's unilateral decision to proceed without approval results in its inability to recover on this issue.

In July of 2012, prior to removing the aft deck, Técnico identified "missing welds" on portions of such deck, further recognizing that if Técnico removed the deck, it would not be able to repair it without engineering a solution not otherwise reflected in the Contract documents. Técnico communicated this information to the Government, and Government engineer Aaron Adams stated that he wanted to check with the engineers working locally on the USS SQUALL at Colonna's shipyard to see how they had handled the same issue. Técnico did not hear back from Mr. Adams for several days, and made the unilateral decision to remove the deck and issue a CFR proposing the newly engineered solution. Técnico's first written report of the issue and proposed solution was made on July 12, 2012, but such proposal was rejected by the Government in favor of a revised proposal submitted the next day. ECR Ex. 2, at Exs. 90–91. It appears that the revised proposal was approved in writing by Government engineers on July 20, 2012 and was approved by Justin Thivierge on July 26, 2012. ECR Ex. 393. It further appears that ECR, on behalf of Técnico, first requested compensation for such change on July 20, 2012, JE 93, but that such request was denied by Justin Thivierge on July 26, 2012. Id. The denial notes that the Government is "paying for a repair and not the method" and that the contractor should have informed the Government of the issue prior to performing the work so that the Government could have evaluated the cost of going forward versus the possibility of a "descope for a credit." Id. Curiously, the CFR issued by Técnico on July 20, 2012 (the same day the Government engineers appeared to first approve Técnico's modified plan) appears to indicate not only that the deck had been

removed at that time, but that a "prefit inspection" had occurred on July 12, that a "fit inspection of flat bar" had occurred on July 13, and that a "final weld out inspection of flat bar" had occurred on July 20, 2012. While Técnico sought compensation in its July 20, 2012 CFR for eight delay days in addition to its direct damages, it now asserts that there were zero delay days associated with this item and that it was a "[l]ow disruption" event. ECF No. 56–2, at 142.

Although the record plainly establishes that Government engineers approved Técnico's proposed design after the deck had been removed, at a time when there was no option but to determine a procedure to reattach the deck, ECR Ex. 393, Técnico fails to demonstrate that the Contracting Officer, directly or indirectly authorized Técnico to begin down a path that would necessarily (according to Técnico) increase the cost of performance. See Winter v. Cath-dr/Balti Joint Venture, 497 F.3d 1339, 1345 (Fed.Cir.2007); cf. Trial Tr. 1988–89 (trial testimony of Mr. Rice stating: "We make it very clear to the contractor you don't work to CFRs, you don't work to ESRs, and you only work through RCCs that has been negotiated and settled and authorized by a warranted contracting officer."). Moreover, to the extent ECR/Técnico seek to recover on a theory of "constructive change" due to defective specifications and/or an "implied order," Técnico's claim fails for several reasons.

First, Técnico admits that it made the decision to remove the deck while the issue was being investigated by the Government, which deprived the Government of an opportunity to determine the best course forward. See JE 60, at 37 (Contract provision governing "Growth and New Work" indicating that while it is the Government's intention to award all growth work to the prime contractor, if "a fair and reasonable

price cannot be negotiated" for such work, the Government may elect to defer such work, perform such work itself, or seek bids from other MSRA contractors); Calfon Const. Inc. v. United States, 18 Cl.Ct. 426, 439 (1989), aff'd, 923 F.2d 872 (Fed. Cir.1990) (indicating that "notice as to constructive changes must be supplied by the contractor before such time that the Government would suffer if not apprised of the facts"); Ling–Temco–Vought, Inc. v. United States, 475 F.2d 630, 638 (Ct.Cl.1973) (explaining that "if the United States had been timely warned, it would have been able to make its own choice whether or not to end performance at once, and it is this choice of which the defendant was deprived").[86] Second, when Técnico initially determined that a more expensive procedure would be required, it informed the Government through a written CFR that a different procedure would be required, but ECR/Técnico did not notify the Government that Plaintiff's position was that additional compensation would be necessary for such change until the same day that the "final weld out inspection" of the work had occurred. See 1 Government Contract Changes § 11:26 ("A constructive change order will likely be absent, however, where the Government was not notified of the impact of its action, even if the contractor has been unjustifiably induced to adopt a more expensive manner of performance. The cases often have given critical weight to whether the contractor has sufficiently communicated to the Government that the contractor regarded the different method of performance as a change order, along with whether the Government has ordered the work."). Third, Técnico fails to demonstrate by a preponderance of the evidence that ECR should not have foreseen such issue when bidding on the Contract because the complicating factor, as explained by the trial witnesses, appears to have been created by the THUNDERBOLT's inherent structure that it shares with all PC Class vessels, not an unknown condition specific to the THUNDERBOLT.[87] See Sterling Millwrights, Inc. v. United States, 26 Cl.Ct. 49, 72 (1992) (indicating that, to be entitled to an equitable adjustment, a contractor must demonstrate that increased costs resulted from conditions materially different from those reflected in the bid documents and that "such conditions were reasonably unforeseeable in the light of all the information available to the contractor" (citing Johns–Manville Corp. v. United States, 12 Cl.Ct. 1, 33 (1987))).

Summarizing the above, having considered the relevant testimony and documentary evidence, the Court finds that Técnico fails to demonstrate that it is entitled to an

---

86. Técnico asserted at trial that, due to its concern regarding further delays to the structural steel work, Técnico felt compelled to remove the deck and perform the repair without waiting for a response from the Government. Trial Tr. 900. However, Técnico currently asserts that this claim item did not result in a single delay day to the availability and that it was a "low disruption" event. Técnico thus fails to make a strong showing that it was somehow "compelled" to remove the deck based on the Government's delay in responding to Técnico.

87. The above statement is not intended as a conclusion that ECR actually bore such bidding risk, but instead is a conclusion that

ECR/Técnico, as the party seeking damages, failed to demonstrate that ECR/Técnico did not bear such risk. Jon Black from Técnico testified that the weld joints "that were indicated in the drawings provided in the specifications" could not be made based on the fact that a person "physically could not get in there." Trial Tr. 896. However, the Court finds that such limited testimony, without more, does not demonstrate by a preponderance that the specification was defective and the Government was responsible to compensate ECR/Técnico for correcting such purportedly defective design, particularly when ECR/Técnico acted without Government direction.

equitable adjustment on this claim item under the Changes clause, either directly or pursuant to a constructive change theory. As detailed above, Técnico essentially admits that it acted unilaterally without direction from the Government, prior to attempting to negotiate a price increase, based on pressure that Técnico perceived regarding the slipping performance schedule.[88] No damages are awarded on this line item.

### Q. Excessive QA—Técnico I

 Técnico's next claim seeks $163,306 in direct damages as well as $16,331 in disruption damages based on what it characterizes as "excessive" quality assurance inspections that purportedly caused material delays in Técnico's performance of the structural steel renewals. The Government opposes such claim item on a factual basis, asserting that the Navy did not cause material delays to Técnico's performance based on the manner in which inspections were conducted. As set forth below, the Court finds that Técnico's trial evidence is insufficient to demonstrate that a constructive change occurred as a result of the Government inspectors' conduct.

Testimony from various trial witnesses provided differing viewpoints as to the degree that Government inspectors delayed the inspection process during the THUNDERBOLT availability. Plaintiff asserts that Government representatives performed more inspections than necessary and that Government inspection checkpoints took an excessive amount of time

for one or more of the following reasons: (1) the Government inspector lacked experience and was unwilling to approve work without first consulting with other individuals with more experience; (2) the Government inspector delayed the inspection because he was training other Government inspectors; and (3) work of adequate quality was being rejected either due to the inspector's personal heightened standards that exceeded Contract requirements or because the inspector was not familiar with the contractual acceptance standard. Plaintiff also asserts that Government QA representatives "roamed" the Vessel and inspected work that had been completed, at times questioning work that had already been approved by a different Government representative. Trial Tr. 1169.

Undercutting Técnico's claim that the Government is responsible for excessive time dedicated to inspections is the fact that the trial evidence demonstrates that the Contract itself, as well as the structural steel PCP written to comply with the Contract's requirements, called for far more inspections than the Técnico workforce was familiar with based on their experience in the industry. Such fact is further evidenced by Técnico's repeated requests that the Government "relax" the PCP, to include elimination of the requirement of certain "pre-fit" inspections. Such evidence suggests that, at least to a degree, ECR/Técnico seeks to shift the risk for underbidding the amount of time expected to be dedicated to inspections

---

**88.** Government ACO Jack Willoughby testified at trial that when a change is being negotiated, a contractor should not start performing work "until he's directed," acknowledging that such direction can be accomplished "with an email or orally." Trial Tr. 1745. Mr. Willoughby's testimony is consistent with Ms. Carvey–Boyd's testimony indicating that direction to proceed with a change can be made informally after an oral settlement had been reached. Trial Tr. 1757–58. Synthesizing such

testimony, while a formal written modification (MOD) need not be executed in all circumstances in order to support a finding that the Government ordered the contractor to perform additional work, here, the trial evidence clearly demonstrates that ECR, without formal or informal direction from the Government to proceed, elected to remove the deck in preparation for performing the yet to be approved slot-weld procedure.

from the contractor to the Government. Additionally, it is notable that the Contract not only required a greater number of inspections, but it included the atypical requirement that Government inspectors be present at inspections that are typically handled by the contractor. See Trial Tr. 1137–38 (testimony from Técnico's welding quality assurance manager Mike McGraw indicating: "On a normal basis, on any job that I've ever been on in the Navy, or for the Navy, usually the in-house QAS, Técnico's team or the prime contractor does any fit-ups or pre fit-ups. I've never seen a contract that had required the Navy to look at a fit-up prior to....").[89] Multiple witnesses also noted at trial that the small confined spaces inherent in the THUNDERBOLT's structural design contributed to inspection delays as the Técnico representative, ECR representative, and Navy representative often had to cycle through a small space one at a time in order to inspect the completed work. Critically, as to all delays resulting from express Contract requirements, or the unique design of PC class vessels, a design that ECR was well-aware of at the time of bidding, ECR/Técnico bears the risk of such costs.

In addition to the above, the Court found the trial testimony of Darius Whitfield to be credible and compelling on this issue. Mr. Whitfield was the closest thing to a "neutral" witness on this issue, because at the time of the THUNDERBOLT availability he was an ECR Quality Assurance Inspector, but at the time of trial, he was a MARMC inspector employed by the Government. Mr. Whitfield had been present on the THUNDERBOLT on behalf of ECR beginning prior to the Vessel's dock-ing in late 2011 and continuing until after Técnico finished the structural steel work in the fall of 2012. Trial Tr. 1318–19. Mr. Whitfield was present on the Vessel on a daily basis, as he typically worked at least twelve hour days, as many as six to seven days a week. Consistent with other trial testimony, see, e.g., Trial Tr. 1136–38, Mr. Whitfield testified that Government Quality Assurance Specialist ("QAS") Jessie Cohn was experienced and knowledgeable, but that the Government Shipbuilding Specialists ("SBSs") that performed some of the fit-up and pre fit-up inspections were neither experienced nor knowledgeable, and such SBSs contributed to some inspection delays, particularly near the beginning of the structural steel work. Id. at 1321–24. Mr. Whitfield characterized the SBSs' lack of knowledge as causing the Government inspection checkpoints to "tak[e] a little bit longer," and he further explained that at some point in the availability Mr. Cohn, as QAS, started either accompanying the SBSs to checkpoints or just doing the checkpoints himself. Id. at 1324–26. Mr. Whitfield's view was that when Mr. Cohn was present at a checkpoint it "made it a lot quicker" because Mr. Cohn was far more knowledgeable than the SBSs assigned to the THUNDERBOLT. Id. at 1324–27. On cross-examination, Mr. Whitfield indicated that he considered the SBSs to be "competent" notwithstanding their lack of experience and that he did not believe that the number of Navy inspectors present at any checkpoint was interfering with the inspections. Id. at 1336. On redirect examination, Mr. Whitfield indicated that while the Navy brought in additional inspectors from SERMC about half-

---

89. Because the trial testimony established that ECR/Técnico had to provide the Government four hours' notice prior to a scheduled Government inspection, it appears that the contractual requirement that the Government be present at all fit-ups and pre fit-ups likely caused far more delay than the fact that an individual inspection may have been ten or fifteen minutes longer than normal due to the fact that a standard needed to be verified or a redundant Government inspector was present.

way through the availability,[90] he did not believe that Mr. Cohn was "training" the SERMC personnel on how to perform inspections during Government checkpoints on the THUNDERBOLT. Id. at 1341.

Resolving the factual discrepancies between Mr. Whitfield's testimony and the testimony of several Técnico employees, the Court finds that Técnico has failed to demonstrate that it is entitled to an equitable adjustment on this line item. First, it appears more likely than not that the vast majority of the time that ECR/Técnico failed to anticipate was necessary for inspections resulted from express (and unique) Contract requirements and/or the small enclosed spaces that are necessarily present on a PC class vessel, suggesting that ECR underbid the initial Contract, not that a Government-imposed change occurred. Second, the Court notes that neither ECR nor Técnico has pointed the Court to a CFR documenting a contemporaneous request for additional compensation due to allegations that the Government prolonged inspections. As with other damage requests, the absence of a CFR provides useful context in evaluating this matter, particularly because the alleged delays began as early as February or March 2012. Third, while Técnico has demonstrated by a preponderance of the evidence that the inexperienced Government SBSs assigned to the THUNDERBOLT had a steep learning curve near the beginning of the availability that resulted in some delays during inspections, such delays were described largely at a macro level, and appear more akin to an anecdotal complaint than compelling evidence that the Government modified the Contract requirements and/or inhibited ECR/Técnico's performance beyond a de

minimis level. Accordingly, the Court awards no damages on this line item.

### R. Excessive/Unnecessary Firewatch— Técnico L

Técnico seeks $263,186 in additional compensation for what it labels as excessive/unnecessary "firewatch," which are the hours that a Técnico employee or hired laborer is required to stand watch, with a fire extinguisher, over craft-workers that are cutting or welding (referred to as "hotwork"). The Government opposes such claim, asserting that ECR/Técnico lacks evidence that Defendant mandated firewatch beyond that required by the Contract. Agreeing with the Government, the Court denies the request for an equitable adjustment on this issue.

 It is undisputed that the Contract required that ECR/Técnico assign a "firewatch" worker to any area on the Vessel where hotwork was being performed. If hotwork was being performed in a large open area with clear lines of sight, the Contract permitted one firewatch worker to watch up to four craft-workers performing hotwork. If, however, the hotwork was being performed in a small confined area with no clear lines of sight and sparks may be cast on either side of a bulkhead or other visual obstruction, multiple firewatch workers were required to watch a single person performing hotwork. JE 63, at Item No. 009–07 § 3.3.4. Similarly, if hotwork was being performed in an area where hot material may fall to another level of the Vessel, there must be a firewatch observer stationed on each level unless "positive means are available to prevent the spread or fall of hot material." Id. § 3.3.3.

Técnico prepared its subcontractor bid for the THUNDERBOLT steel renewals

---

**90.** SERMC is similar to MARMC, and is the Navy's Southeast Regional Maintenance Center.

based on estimating the need for one firewatch hour to every two hours of welding or other hotwork. Trial Tr. 922, 1006. Such bid essentially assumes that, on average, a firewatch worker would be able to observe two different hot-workers at one time. Id. Técnico viewed such bid to be conservative and appropriate, highlighting at trial that a Navy manual recommends that the minimum estimated firewatch is one firewatch hour to every four hours of planned welding work.

Notwithstanding Técnico's contention that its bid was conservative and appropriate, Técnico fails to demonstrate by a preponderance of the evidence that the Government mandated that ECR or Técnico provide firewatch above the standard required by the Contract. Testimony from Técnico employees Jon Black and Mark Oakley[91] regarding alleged Government demands during the availability is not compelling as both testified broadly and revealed their lack of personal knowledge supporting the claim that the Government was demanding firewatch in excess of the contractual standard. Cf. Trial Tr. 925–26 (revealing Mr. Black's acknowledgment that he did not have "any personal knowledge of the fact that the Navy required excessive firewatch on the vessel," although he witnessed what he considered to be an "abnormal" number of firewatch workers on the staging of the Vessel). Similarly, the limited testimony of Técnico's welding quality assurance manager (Mike McGraw) indicates that while he personally witnessed what he viewed as an excessive number of firewatch workers, he did not testify as to whether it was ECR, Técnico, or the Government that made the

decision to position firewatch workers at the observed locations. Id. at 1146. Accordingly, even assuming that redundant/excessive firewatch was utilized on the THUNDERBOLT, Técnico's evidence fails to demonstrate that the Government commanded ECR/Técnico to provide workers beyond the contractual requirement. See Delhur Indus., 95 Fed.Cl. at 453–54 (indicating that, to obtain an equitable adjustment, a contractor must prove "causation," that is, that the Government is responsible for delaying, augmenting or complicating the work and that Government's actions caused the contractor to incur additional costs).

In sum, while Técnico's evidence plainly demonstrates that the THUNDERBOLT availability utilized an atypical amount of firewatch, it fails to demonstrate that such firewatch was more than required under the express terms of the Contract. Moreover, even assuming that firewatch was provided beyond the contractual requirements, Técnico fails to demonstrate by a preponderance that the additional firewatch was demanded by the Government (as contrasted with being the decision of Técnico's own firewatch coordinator). Further undercutting any inference in favor of Técnico is the fact that, as discussed throughout this Opinion, it appears that both ECR and Técnico underestimated the complexity of a large-scale PC structural steel overhaul, failing to fully anticipate the degree to which the THUNDERBOLT's structural support system, which included numerous small areas with limited lines of sight, would complicate the steel renewal efforts. Therefore, Plaintiff fails to satisfy its burden of proof on this issue.[92]

---

91. Mr. Oakley is a Técnico Senior Vice President who handles operations for the company, and he was both part of the original bid process on the THUNDERBOLT and involved in pricing Contract changes during the availability. Trial Tr. 976–77, 980–81.

92. Importantly, for each change order for which Técnico is awarded damages herein that was based on growth/changed work that required firewatch, Técnico has already included in its claim the estimated number of firewatch hours utilized to accomplish the

## S. Weather Delays—Técnico K

■ Técnico seeks over $236,717.86 in direct damages, as well as $45,696 in delay damages and $4,734 in disruption damages based on the fact that the period of performance for structural steel was bid and originally planned to be performed during the winter months, but was ultimately performed during the summer months. Técnico contends that delays caused by the Government and unexpected growth work resulted in steel renewals being impacted by thunderstorms occurring during the late spring and summer of 2012, which resulted in additional costs based on water infiltration and other issues. The Government opposes any award on this line item, asserting that ECR was fully compensated for Government-caused delays negotiated through bilateral Contract modifications that included waiver provisions for additional damages, separately arguing that the timing of the completion of the structural steel repairs was delayed through ECR and Técnico's incompetence. As set forth below, while Técnico appears correct that a contractor may recover weather-related expenses if Government-caused delays extend the performance period into a time of unfavorable weather:[93] (1) Técnico fails to adequately document the dates on which storms allegedly caused damages; (2) Técnico fails to adequately demonstrate the date that they would have completed the structural steel work but for Government-caused delays that are not covered by a bilateral Contract modifica-

tion and release; and (3) even if the Court assumes that Técnico has demonstrated the potential for recovery based on an uncompensated change, Técnico's evidence regarding damages is insufficient to support a reasonable approximation of damages, even under the jury verdict method.

■ First, Técnico's theory of recovery on this claim requires it to demonstrate that Government-caused delays led to damages that would not have otherwise occurred. However, with limited exceptions, Técnico failed to demonstrate which storms, on which dates, caused damages. At trial, ECR/Técnico introduced various CFRs created during the availability documenting losses from several storms in late June of 2012, two storms in July of 2012, and a single storm occurring on August 15, 2012. ECR Exs. 398, 400–404; see also ECR Ex. 2, at Exs. 95–101. ECR then provided generalized weather related data in support of its assertion that forty-four thunderstorms occurred during the summer of 2012, with approximately 30% of such storms occurring during August. Such evidence was intended to support Técnico's claim that it suffered damages in twenty-two storms, a purportedly conservative estimate that damage was caused 50% of the time a thunderstorm passed through the area. However, after reviewing the trial evidence, the Court finds that, but for the handful of storms expressly documented by the trial exhibits, Técnico's claim that it suffered damages on twenty-

---

new/changed work. Técnico's effort to recover damages for the leftover pool of firewatch hours that are essentially unexplained and unaccounted for is akin to a failed claim under the "actual cost method," seeking to shift the risk for unexplained excessive costs from the contactor to the Government. As with ECR's engine alignment claims, the Court again notes that a similar issue arose in Colonna's Shipyard, 2015 WL 9008222, at *10–11, and while this Court does not rely on the findings made in such factually distinct

matter, the Court notes that the resolution of the unexplained additional firewatch issue is consistent across both cases.

93. See Fireman's Fund Ins. Co. v. United States, 92 Fed.Cl. 598, 706 n. 123 (2010) ("Weather delays are compensable to the extent that construction activities that were scheduled for periods of favorable weather are pushed into periods of unfavorable weather due to government-caused delay.").

two occasions is both speculative and conflicts with Técnico's apparent failure to contemporaneously document storm-damage on more than a limited number of occasions. Moreover, the CFRs that document storm damage appear to be presented as "information only" reports to justify why work was not being performed, as contrasted with contemporaneous claims that additional compensation was due.

Second, even assuming that wind and rain damage caused new work and rework during twenty-two storms occurring between May and August of 2012, Técnico fails to effectively demonstrate the date that the steel work would have been completed but for Government-caused delays recognized by the Court in this Opinion (PCP, TAO, Deflection, Overgrind). See Fireman's Fund Ins. Co. v. United States, 92 Fed.Cl. 598, 706 n. 123 (2010) ("'The court may deny an equitable adjustment ... if the contractor fails to prove that, but for the government delay, the contractor work would have been completed before the onset of the [unfavorable] weather.'" (quoting George Sollitt Constr., 64 Fed.Cl. at 239) (alteration in original)). Notably, as discussed herein, Técnico cannot recover damages of any kind for delay/disruption that is a direct result of growth work, new work, or changed work for which a bilateral agreement and release was reached between ECR and the Government. The two-month docking delay released by ECR appears to be the greatest delay that impacted Técnico's period of performance. While Técnico contends that it could have completed its work before the end of the summer even with the docking delay, Técnico's argument on this point is not compelling in light of the fact that Técnico did not finish until late September or early October, Trial Tr. 905, and Técnico fails to account for the delays it caused, including delays associated with the lengthy period of time that it took Técnico to write the PCP, and delays caused by Técnico's inability to adequately staff its welding workforce. See, e.g., Govt. Exs. 92, 108; Trial Tr. 1120–21. Similarly, Técnico's position fails to adequately account for unexpected delays for which ECR took on the risk through its fixed price bid, including delays associated with the THUNDERBOLT'S inherent structural challenges, including numerous small spaces, and delays associated with what was described at trial as atypical inspection requirements that were dictated by the Contract. Accordingly, Técnico fails to carry its burden to demonstrate that, but for Government-caused delays, the steel work would have been completed prior to the storms occurring in May, June, July or the first half of August.[94]

Third, even overlooking the above two infirmities, the Court finds that Técnico's proof of damages is far too speculative on this issue. Técnico did not attempt to estimate the cost of the storms for which it has documentary evidence of specific shift shutdowns, but instead, speculated that of the forty-four storms occurring between May and August, damages occurred during twenty-two. Not only is such unsupported conclusion undercut by the fact that Técnico apparently did not find it necessary to issue contemporaneous CFRs to notify the Government of twenty-two different storm delays, but it in no way distinguishes be-

---

94. For comparison sake, the Court has concluded that the Government caused sequential delays that impacted Técnico's performance period in the following amounts: PCP—seven days; TAO—ten days, Deflection—seven days; Overgrind—fifteen days. These Government-caused delays prolonged Técnico's performance by a total of thirty-nine days. Accepting Técnico's evidence that structural repairs were completed in late September or early October, subtracting thirty-nine days from the completion date would result in a "but for" estimated completion date of mid to late August.

tween damages from a large storm as contrasted with a small storm, nor does it attempt to categorize the loss by month, a critical showing in light of the fact that storms within May, June and July were surely within Técnico's period of performance in light of bilateral Contract extensions and delays properly attributable to ECR/Técnico rather than the Government.

For the above reasons, the Court denies Técnico's claim for storm related damages in its entirety.

### T. Joint Effort Costs—ECR 16

Analytically similar to the amassed total of unaccounted for "excessive" firewatch hours claimed by Técnico, ECR seeks $1,092,798 in what it labels "Joint Effort Costs—Structural Work" for the total additional labor hours that ECR employees worked assisting Técnico in performing Técnico's structural steel responsibilities. The Government's opposition to such line item appears to be addressed within its challenge to additional compensation being owed for the PCP and the other various structural steel work claim items, as well as its broader contention that ECR and Técnico's proof of damages as to all claim items is speculative. Although this Court has awarded both ECR and Técnico damages on their PCP claim items, and has further awarded Técnico damages on three other claim items associated with structural steel work performed on the THUNDERBOLT, the Court finds that ECR's proof of damages is insufficient to support a reasonable damages estimate on this line item. Accordingly, no damages are awarded.

█ During the availability, ECR created an internally-tracked billing "line item" in order to attempt to capture the scope of additional work that ECR spent assisting Técnico with the structural steel renewal process. Such hours broadly reflect not just additional efforts directly tied to the PCP (for which ECR is already awarded substantial compensation by this Court), but additional labor hours expended by ECR to help Técnico respond to all of the issues outlined in Técnico claim Items A through L. First, for all the same reasons that the Court denied Técnico compensation on Items B, C, E, and H through L, ECR does not have a meritorious claim for any "joint effort" costs. Second, as to all Técnico line items for which ECR seeks "joint effort" damages, ECR's evidence of damages is an unreliable conglomerated claim that is starkly different from the issue by issue damage estimates found by the Court to be sufficiently reliable to support an award under the jury verdict method. Such claim fails to quantify estimates for specific additional efforts, associated with a specific additional task, performed by a worker of an identified trade. See Datalect Computer Servs., Ltd. v. United States, 41 Fed.Cl. 720, 728 (1998) (concluding that because the plaintiff did "not provide[ ] the court with sufficient evidence to make a reasonable approximation of the damages incurred ... application of the jury verdict method would yield an arbitrary award"). Rather, ECR's proof of damages on this claim item merely documents unanticipated "total costs" incurred by ECR during the structural steel renewal process, failing to effectively segregate work performed as a result of a specific uncompensated Contract change from additional work performed for which ECR, as prime contractor, rightly bore the risk.[95]

---

**95.** For example, ECR's failure at the time of bidding to fully appreciate the complexities associated with a complete overhaul of a PC class vessel, ECR's failure to fully appreciate the extent to which the "released" docking delay would contribute to further delays as a result of the THUNDERBOLT and TEMPEST being worked in parallel, Técnico's struggles maintaining its welding workforce, etc.

Further evidencing the unreliability the conglomerated claim is the fact that ECR and Técnico advance the across-the-board estimate that ECR provided additional "joint effort" labor amounting to 35% of each and every line item for which Técnico seeks compensation. While the Court does not doubt that ECR did in fact provide "joint effort" support for Contract changes for which Técnico is being awarded damages herein, a blanket 35% estimate across each change, regardless of its type, and in the absence of some reliable evidence as to how/why such change required ECR, rather than Técnico, to incur additional costs, is unreliable on its face, and is insufficient to provide a basis for a reasonable estimation of damages. Accordingly, the Court finds that ECR has failed to advance sufficient evidence to support a reliable approximation of the damages incurred by ECR (beyond delay day expenses) as to the individual line items for which Técnico successfully proves that it is entitled to damages. ECR's "joint effort" claim is therefore denied in full.

### U. Delay Days and Liquidated Damages—ECR 17 and 18, Técnico Item N

ECR asserts that Government-caused delays resulted in delivery of the completed Vessel approximately four months after the scheduled delivery date. ECR acknowledges, however, that some of such delay is "concurrent delay," and thus seeks a production support daily delay of $2,207 for only ninety-nine days. Additionally, ECR seeks the reversal of the $731,739 liquidated damages credit asserted by the Gov-

ernment due to ECR's late-delivery of the Vessel.[96] Consistent with the discussion of the individual claim items above, the Government asserts that ECR/Técnico is solely responsible for the late delivery of the Vessel and that the Government properly assessed liquidated damages as a result of such late delivery. As set forth below, ECR is entitled to a partial award both on its claim for delay day damages and its effort to reverse the Government's assessment of liquidated damages.

First, as to affirmative compensation for delay days, the Court has individually analyzed and awarded the appropriate compensation due to ECR and Técnico when considering each individual claim item addressed above. Accordingly, no additional analysis (or award) associated with ECR Item 17, or Técnico Item N, is necessary.[97]

Second, as to liquidated damages, as set forth herein in greater detail in Part II. C.3, case law cited by ECR supports the following: (1) the Government bears the initial burden of establishing both that ECR failed to substantially perform by the Contract completion date and that the period for which the Government assessed liquidated damages is proper, George Sollitt Constr., 64 Fed.Cl. at 243; (2) the burden then shifts to ECR to demonstrate that any proven delay was excusable, id.; and (3) when there are concurrent delays caused by both parties, such period of delay is precluded from forming the basis for a liquidated damages award. See Sterling Millwrights, Inc., 26 Cl.Ct. at 68 (explaining that, absent clear proof of apportionment, when both parties contribute to

---

**96.** The Contract provided for liquidated damages for late delivery at the daily rate of $5,650, but included a "cap" on the maximum permissible liquidated damages of ten percent of the original Contract price. The Government asserts that ECR delivered the THUNDERBOLT 135 days after the scheduled completion date which results in a calculation that exceeds the ten percent cap (135

× $5,650 = $ 762,750). Accordingly, the Government assessed the maximum contractual liquidated damages of $731,739.

**97.** The same conclusion applies to Técnico Item M which separately seeks damages for "disruption." The Court analyzed and awarded Técnico disruption damages within the analysis of Técnico's successful claim items.

a delay, neither party is permitted to recover delay damages, especially when the delays are "concurrent or intertwined").

Here, the Government failed to demonstrate by a preponderance of the evidence that the Vessel was not substantially completed until April 23, 2013, the date the Government used to calculate liquidated damages. See 3 Bruner & O'Connor Construction Law § 8:26 ("[T]he owner is generally not entitled to assess liquidated damages after the date of substantial completion."). Rather, the trial record revealed, through contemporaneous documents from the THUNDERBOLT availability, including multiple documents authored by the Government, that the availability was substantially completed near the beginning of April, 2013. Although evidentiary conflicts exist as to the precise date of substantial completion, the most compelling evidence before the Court (contemporaneous Navy records) establishes that the availability was substantially completed on April 4, 2013. ECR Exs. 289, 442.[98] The Government's claim for liquidated damages is thus reduced from a maximum of 135 days to a maximum of 116 days.

As previously discussed herein, in determining whether ECR has carried its burden to rebut the Government's evidence of delayed delivery, the Court adopts a legal standard that permits the Government to assess liquidated damages even in the face of Government-caused delays, as long as the delays at issue can be clearly apportioned to the appropriate party. While such legal interpretation is favorable to the Government, as set forth in the item-by-item analysis above, the trial record establishes that the Government is solely responsible for a total of seventy-five sequential delay days (the total number of

days for which ECR was awarded delay damages above). Moreover, in addition to such sequential delay days, the trial evidence supports a finding, by a preponderance of the evidence, that the availability was extended another sixteen days based on "concurrent" and intertwined critical path delays caused by both parties. Accordingly, the Court finds that ECR has effectively rebutted a total of ninety-one of the 116 days for which the Government can potentially recover liquidated damages.

Based on the above findings, the Government has demonstrated that it is entitled to liquidated damages for twenty-five days (116–91 = 25), which at a contractual rate of $5,650 per day, results in a total liquidated damages figure of $141,250. As the Government has previously assessed $731,739 in liquidated damages, the maximum figure permitted by Contract, ECR is awarded $590,489, the difference between the amount retained by the Government and the figure to which the Government is entitled.

### V. MIC Claims—ECR 20

 In addition to the subcontractor pass-through claims advanced by ECR on behalf of Técnico, ECR seeks a total of $650,000 on behalf of its wholly-owned subsidiary "MIC." MIC is an industrial coatings company that provided blasting/coating/ painting services on the THUNDERBOLT. While MIC originally asserted that it was owed approximately $1,250,000 in change order work, ECR subsequently settled such claim with MIC for $650,000, and ECR now seeks to recover such reduced figure from the Government. The Government opposes the MIC claim in its entirety, asserting that some of the damages sought by MIC have been released by bilateral modifications, that

---

**98.** Exhibit 442 is a NSSA "Certificate of Completion" stating that the availability was completed on April 4, 2013.

"rework" performed by MIC associated with Hurricane Sandy is not the responsibility of the Government, and that ECR fails to carry its burden to establish an entitlement to an equitable adjustment as it failed to provide any witness at trial with personal knowledge of MIC's claims. Agreeing with the majority of the Government's arguments on this point, the instant claim is denied in its entirety.

■ Unlike the subcontractor pass-through claims advanced by ECR on behalf of Técnico, ECR did not carry its burden to demonstrate by a preponderance of the evidence that the Government violated the Changes clause by failing to provide an equitable adjustment regarding work performed by MIC. First and foremost, ECR did not call any witnesses who worked for MIC and had direct personal knowledge sufficient to attest to the facts necessary to support ECR's pass-through claim seeking additional compensation under the Changes clause. Second, the witnesses who were called at trial as to this issue, ECR's president (Jorge Rivera) and vice-president (Bill Wren), could only speak in generalities as to portions of this pass-through claim, although Mr. Wren asserted that he had personal knowledge as to some of the MIC claim items.[99] While the MIC REA was introduced at trial as a joint exhibit, the lack of supporting evidence by a witness with direct knowledge leads the Court to ascribe insufficient weight to the REA to find that ECR has demonstrated by a preponderance of the evidence both that the work in question was "demanded by the Navy" (directly or indirectly) and that it was not otherwise required under the terms of the Contract.[100] Colonna's Shipyard, 2015 WL

99. The MIC REA was prepared by former MIC president Bruce McCrickard, and former president Ronnie Kinsel, as well as another individual employed by MIC named Mark Robino. Trial Tr. 612. Mr. Wren testified at trial that he also played a role coordinating and compiling the REA, although he acknowledged that he had personal knowledge as to only some of MIC's claims. Id. at 612, 615. As highlighted by Defendant as impeachment evidence during cross-examination, Mr. Wren stated during a pre-trial deposition that Mr. Robino would be necessary to "give explicit information on [MIC's] claim" and that Mr. Wren did not have personal knowledge as to any of MIC's claims (although Mr. Wren asserts that he backtracked from/clarified such statements later in his deposition). id. at 644–45, 647. Prior to trial, former MIC president McCrickard left the company, and Mr. Kinsel, who had taken over as president, passed away in the summer of 2014. Id. at 382. Notably, ECR did not call Mr. McCrickard or Mr. Robino as a trial witness (Mr. Wren asserted that Mr. Robino could not be located), but instead relied on Mr. Wren's limited testimony and the written MIC REA. While the Court allowed Mr. Wren to testify as to his somewhat limited knowledge regarding MIC matters over Defendant's objection, the Court noted on the record that it would later determine the amount of weight to appropriately ascribe to Mr. Wren's testimony. Id. at 648. Having carefully considered all of the trial evidence, the Court ascribes minimal weight to Mr. Wren's testimony regarding MIC's claims, separately noting that very limited portions of Mr. Wren's testimony effectively tie MIC's claims to alleged uncompensated Contract changes mandated by the Government.

100. A review of the MIC REA reveals that some claimed damages are based on delays caused by issues released by ECR, including the docking delay and the inadequate supply of GFM steel. ECR Ex. 3, at 2. While MIC's REA provides what appears on its face to be a precise task by task breakdown of specific hours spent (or estimated to have been spent) on numerous painting/coating/blasting tasks, what is critically missing is credible evidence demonstrating by a preponderance of the evidence that such work is compensable growth/changed work mandated by the Government (for which an equitable adjustment may be warranted) as contrasted with work for which ECR bore the risk. Moreover, it is unclear whether damages awarded herein, such as damages on the Hurricane Sandy line item, already include compensation for work addressed in the MIC REA.

9008222, at *10. Stated differently, while the Court does not doubt that MIC performed work and rework that it did not originally anticipate performing, "[t]o receive an equitable adjustment from the Government, a contractor must show three necessary elements—liability, causation, and resultant injury," and proof of such elements is lacking as to MIC's claim in light of ECR's failure to call any trial witness capable of explaining the claims in the written REA. Servidone Const. Corp., 931 F.2d at 861. Accordingly, ECR's pass-through claim, predicated on work performed by MIC, is denied.

### W. REA Preparation— ECR 22, Técnico 0

Both ECR and Técnico seek to recover the costs incurred to investigate, prepare, and submit their REA to the Navy, a step taken more than a year prior to commencing litigation. ECR seeks $74,428, consisting of $16,097 in "in house" costs and $58,331 in costs arising from hiring an outside consultant/counsel. Técnico seeks $94,770, consisting of $44,770 in "in house" costs and $50,000 in costs arising from hiring an outside consultant/counsel. In response to ECR and Técnico's request for reimbursement of REA costs, the Government advances a legal, rather than factual, defense, contending that such costs are not recoverable because they were incurred in connection with "the prosecution" of a claim. 48 C.F.R. § 31.205–47(f)(1). As set forth below, the Court finds that a partial award is appropriate as to both ECR and Técnico.

 Applicable law establishes that REA preparation costs, including outside consultant fees, are recoverable if they qualify as a " 'contract administration cost,' " which include efforts at negotiating settlements of contract disputes, but are not recoverable if they constitute a " 'cost incidental to the prosecution of a claim.' "

Tip Top Const., Inc. v. Donahoe, 695 F.3d 1276, 1283 (Fed.Cir.2012) (quoting Bill Strong Enters., Inc. v. Shannon, 49 F.3d 1541, 1550 (Fed.Cir.1995), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1579 (Fed.Cir.1995)); see SUFI Network Servs., Inc. v. United States, 105 Fed.Cl. 184, 193 (2012) (explaining that REA preparation costs are "presumptively compensable as an equitable adjustment" when certain conditions are met).

Here, the Court rejects ECR's suggestion that the costs at issue are automatically recoverable merely because they were incurred before a "claim" was perfected through the issuance of the Contracting Officer's "final decision." See Meridian Eng'g Co. v. United States, 122 Fed.Cl. 381, 420–21 (2015) (surveying recent developments in Federal Circuit case law on REA preparation costs, and recognizing that the standard remains whether the costs were incurred for "the genuine purpose of materially furthering the negotiation process" or whether they were incurred in connection with the prosecution of a Contract Disputes Act claim, even if a formal CDA "claim" had not yet been submitted (citing Bill Strong, Reflectone, and Tip Top)). However, the Court similarly rejects the Government's suggestion that because ECR's submission of the REA culminated in the filing of this lawsuit, and appears to have satisfied the formal requirements for the submission of a CDA "claim," the costs at issue should necessarily be deemed "claim prosecution" costs. See 1 Government Contract Costs & Pricing § 54:11 ("[B]ecause only costs associated with the "prosecution" or "defense" of a claim or appeal are unallowable, even after a CDA claim is submitted, the costs may still be allowable, provided they are incurred for the genuine purpose of materially furthering the negotiation process."); In Re Grumman Aerospace Corp. Ex Rel.

Rohr Corp., ASBCA No. 50090, 01–1 B.C.A. (CCH) ¶ 31316 (Feb. 12, 2001) ("From our perspective then, the mere filing of a CDA claim does not automatically require a conclusion that costs incurred thereafter are unallowable costs of prosecuting a claim against the Government. The answer must depend on an examination of the evidence presented."); cf. Reflectone, 60 F.3d at 1579 ("[A]s we previously noted, '[t]here is no necessary inconsistency between the existence of a valid CDA claim and an expressed desire to continue to mutually work toward a claim's resolution.' The parties are not prevented or discouraged from settling their differences because the first written demand for payment as a matter of right that is not merely a routine request for payment is recognized and treated as a CDA 'claim.' If anything, such a rule promotes settlement by preventing procrastination." (quoting Transamerica Ins. Corp. v. United States, 973 F.2d 1572, 1579 (Fed. Cir.1992))); Bill Strong, 49 F.3d at 1551, n. 9 (expressing "no view" on the recoverability of consulting costs incurred after the relationship of the parties "ripened in to a FAR 33.201 claim," but finding that costs incurred prior to a CDA claim arising are presumptively recoverable); Tip Top, 695 F.3d at 1283 (indicating that REA preparation costs can be recovered "even if negotiation eventually fails and a [Contract Disputes Act] claim is later submitted").[101] Rather, this Court finds that applicable legal standard requires the Court to make a case-specific inquiry into " 'the objective reason why the contractor incurred the cost.' " Tip Top, 695 F.3d at 1283 (quoting Bill Strong, 49 F.3d at 1550).

■ Consistent with the above, the Court of Federal Claims recently concluded that the automatic bar to the recovery of attorney's fees set forth in FAR § 33.205–47(f)(1) is not applicable to costs incurred prior to the issuance of the Contracting Officer's final decision, basing such conclusion in part on a scholarly writing interpreting the meaning of the undefined FAR term "prosecution" as it relates to making a claim. SUFI Network Servs., 105 Fed.Cl. at 193 (citing Michael W. Clancy, 1995 Year in Review: The Federal Circuit's Government Contracts Decisions, 25 Pub. Cont. L.J. 537, 586–87 (1996)). As explained by Clancy:

FAR 31.205–47 applies to judicial and administrative proceedings and criminal investigations. It does not, by its title or its terms, apply to the preparation of a claim for submission to the Contracting Officer, or to the Contracting Officer's fact-finding process, or to the claim negotiation process. The Contracting Officer is not a judicial official and is not empowered to compel testimony. Fur-

---

101. In Tip Top, the Federal Circuit concluded that, on the facts before the court, negotiations finally ended when the contractor "submitted its claim under the CDA." Tip Top, 695 F.3d at 1284. Such conclusion, however, appears to be properly interpreted as a case-specific factual finding regarding the purpose behind the formal CDA claim in that case, i.e., it marked the end of the year-long negotiation process (as further evidenced by the fact that the contracting officer's final decision was issued five days after the CDA claim was submitted). In contrast, here, ECR submitted its REA (arguably at the Government's invitation) for the purpose of documenting its claims in order to start the negotiation process aimed at a global resolution of all claims. At the same time, ECR submitted an REA certification that appears to concurrently qualify the REA as a CDA "claim," although ECR's focus was plainly directed at amicably negotiating a settlement rather than demanding a "final decision" from the Contracting Officer. As discussed in greater detail below, ECR's submittal of a follow-up letter in March of 2014 demanding a "final decision" from the Contracting Officer appears to be the functional equivalent of the submission of the CDA claim in Tip Top.

ther, the fact-finding and negotiation process is neither an administrative or judicial proceeding, nor any other type of proceeding. Rather, claim preparation, fact finding, and all other activities leading to a Contracting Officer's final decision are part of normal contract administration.

Furthermore, FAR 31.205–47(f) provides that costs are unallowable only if incurred in connection with "the prosecution of [CDA] claims or appeals against the Federal Government ...." The term "prosecution" is not defined in FAR 31.205–47 or any other provision of the FAR. Black's Law Dictionary defines the term "prosecution" as a "criminal action" and "every step" in a civil litigation action from "its commencement to its final determination." Thus, "prosecution" begins with the commencement of a litigation action. Under the CDA, litigation commences with the contractor's filing of a notice of appeal with a Board of Contract Appeals or filing suit in the CFC after the issuance of a final decision by a Contracting Officer. Accordingly, interpreted according to its plain terms, FAR 31.205–47(f) only makes the costs of litigation, commencing with the initiation of a legal action in the CFC or at a Board of Contract Appeals, unallowable.

This construction of FAR 31.205–47(f) provides a "bright-line" test for unallowability, which will preclude extensive litigation over the allowability of claim preparation costs. All costs incurred in the preparation and attempted settlement of an REA, including those incurred after claim submission in responding to a Contracting Officer's fact-finding questions, and supporting a DCAA audit and negotiations, are allowable contract administration expenses. This construction is also consistent with the Federal Circuit's "objective purpose" test in Bill Strong Enterprises:

costs incurred as part of the submission and negotiation of a claim are allowable, while costs incurred for the purpose of prosecuting a claim in litigation are unallowable.

Moreover, this bright-line test is equitable to both parties. The Government has received the benefit of the contractor's effort in performing extra work and the benefit of the contractor's increased costs attributable to the Government. Correspondingly, the contractor is entitled to be compensated. This payment obligation is a contract administration function of the Government under the FAR. Likewise, as the Federal Circuit concluded in Bill Strong, the process for the contractor to obtain payment (the REA process) is an integral part of contract administration, which benefits the Government. In sum, based on the plain terms of FAR 31.205–47 and the principles enunciated in Bill Strong, legal and other consultant costs incurred in the preparation and negotiation of claims are allowable costs.

Id. at 586–87 (alterations in original) (footnotes omitted). Having concluded that § 33.205–47 did not bar recovery of attorney-assisted REA/claim preparation costs, the Court in SUFI went on to perform the "objective purpose" analysis dictated by the Federal Circuit, explaining as follows:

To summarize, at this liability stage of the proceedings, attorneys' fees and expenses incurred in preparation of an REA under a Changes clause are themselves presumptively compensable as an equitable adjustment where:

(i) The contractor incurred the costs due to (a) formal or constructive changes to the contract, (b) governmental defect or delay, or (c) the Government's breach, see Clancy, supra, at 582 (internal footnotes omitted);

(ii) (a) The contractor incurred the costs in furtherance of information exchange or negotiation with the Government, whether or not it ultimately succeeded in forestalling a Board appeal, Bill Strong, 49 F.3d at 1549–50, or (b) the Government received some other benefit from the expenditure, id. at 1545; and

(iii) Where applicable, the contractor incurred the costs before the actual filing of its Board appeal, FAR § 33.205–47(f)(1); see also FAR § 9.403 (2011); Clancy, supra, at 585–86.

SUFI Network Servs., 105 Fed.Cl. at 193–94 (internal footnote omitted). After applying the above analysis to the facts of the case, the court concluded that "SUFI's attorneys' fees claim involves compensable contract administration costs within the meaning of Bill Strong." [102] Id.

Turning to the case-specific facts of the matter pending before this Court, it is undisputed that ECR and Técnico prepared their REA more than a year before the Contracting Officer issued a "final decision," the event that defines the outer bounds of the "contract administration" negotiation process. Accordingly, FAR § 33.205–47(f)(1) does not operate as an automatic bar to ECR recovering consultant/attorney's fees. SUFI Network Servs., 105 Fed.Cl. at 192–93; In Re Grumman Aerospace Corp., ASBCA No. 50090, 01–1 B.C.A. (CCH) ¶ 31316. Rather, the Court must apply the "objective reason" test established by the Federal Circuit, taking into account all case-specific facts, including the timing of the REA submittal, the timing of the CDA claim submittal, the timing of the Contracting Officer's final decision, and the negotiating posture of ECR and the Government before, at the time, and after the REA was submitted.

 Having considered such objective case-specific facts, the Court finds that ECR/Técnico has demonstrated that the REA was submitted for the purpose of creating a written, well-documented, consolidated negotiating position in order to amicably resolve the previously stalled "piecemeal" settlement discussions with the Government as to: (1) ECR's and Técnico's numerous affirmative claims that collectively sought millions of dollars in compensation under the Changes clause; (2) the Government's recent assertion that the Government was entitled to multiple "credits" amounting to hundreds of thousands of dollars; and (3) the Government's recent assessment of over $730,000 in liquidated damages. ECR Exs. 1–3. Such finding is based on the text of the REA, the credible trial testimony of Mr. Wren, and others, and documents in the record. Notably, the text of the REA expressly indicates that it is intended as an opening position in planned negotiations, further requesting a meeting with the Government to negotiate a resolution within sixty days and explaining the importance to ECR of timely resolving the REA before the end of the fiscal year. ECR Ex. 1, at 86. Moreover, the REA highlights the fact that ECR would be entitled to additional damages (interest) if the proposed negotiations failed and ECR actively pursued a CDA "claim," but ECR expressly stated that it was not seeking to recover interest at that time because its intent was to pursue resolution of the REA through negotiations. Id. at 84. For reasons unknown to the Court, the Government failed to engage in

---

**102.** The FAR provision cited above did not technically govern the dispute at issue in SUFI, nor did it govern in Tip Top; however, both courts relied on the FAR and the Bill Strong line of precedent for "guidance" on how to classify the costs at issue in such respective cases. SUFI Network Servs., 105 Fed.Cl. at 195; Tip Top, 695 F.3d at 1281–83.

any form of negotiations with ECR/Técnico over a six month period after receiving the REA.[103]

·In addition to the ·text of the REA, the trial record appears to demonstrate that, beginning around October of 2012, and continuing through the spring and summer of 2013, ECR utilized the services of its outside consultant/counsel to assist ECR in efforts to negotiate settlements with the Government. See ·ECR Ex. 291 (ECR's attorney/consultant invoices documenting substantial outside , costs for which ECR presently seeks recovery that were incurred during the last six months of the availability when both sides were actively endeavoring to negotiate Contract changes); ECR Ex. ·108 (email from Ms. Carvey–Boyd to Mr. Wren discussing successful negotiations approximately a week prior to the end of the availability, referencing the fact that Ms. Carvey–Boyd knew that Mr. Wren was meeting with an attorney prior to providing proposals for additional Contract modifications to be negotiated). The fact that a substantial portion of the outside fees ECR now seeks to recover were incurred before the end of the availability during a time when ECR was clearly attempting to negotiate settlements stands in stark contrast to a case where an outside consultant/attorney is hired only after negotiations fail and a contractor makes the determination that its only remaining option is to · pursue a CDA "claim" as a necessary step to litigation or an appeal to the appropriate board of contract appeals.

Moreover, the Court finds that trial testimony established that Mr. Wren was at all times willing to negotiate with the Government, and although negotiations be-

came somewhat contentious near the end of the availability, particularly when ·the Government began asserting that it was entitled to "credits" against the Contract, Mr. Wren was always professional when dealing with the Government Contracting Officers and was always willing to sit down and attempt to reach a fair and reasonable settlement of the outstanding issues. See ECR Exs. 105, 108, 282. While the trial record clearly reveals a breakdown . to a degree from both sides during the time-sensitive closeout of the availability, which appears to have been influenced by the Navy's operational priority of getting . the THUNDERBOLT on a scheduled "heavy lift" to the Middle East, the Court finds that the trial record as a whole, including the credible testimony of Mr. Wren, supports the finding that ECR and Técnico prepared their REA for the · purpose of negotiating a global settlement to the vast number of disputes that could not : effectively be resolved in a piecemeal fashion during the Contract closeout. See ECR Ex. 196 (Ms. Carvey–Boyd's June 3, 2013 email to Mr. Wren explaining the Government's unilateral modification regarding the LOA change, further indicating that the Government believed that ECR's evidence was lacking on the issue and that the "REA will be East Coast's opportunity to present a full spectrum as to why the hours are needed and be compensated accordingly."). There is also evidence in the record suggesting that the Government took affirmative steps that made the submission of the REA part of the Contract negotiation/close-out process as it appears that the Government made the decision to withhold over $775,000 in "retainage" payments owed to ECR "until the REA [being

---

**103.** The ·Government bears responsibility for failing to take advantage of the opportunity to benefit from ECR's REA submittal in order to resolve or, at a minimum, streamline the matters in dispute through joint negotiations.

Stated differently, the Government's unilateral refusal to come to the negotiating table does not act to transform ECR's efforts to further "contract administration" into efforts associated with "the prosecution of a claim."

prepared by ECR] was properly disposed." ECR Ex. 287.

Six months after submitting its REA, ECR sent a letter to Mr. Rice further documenting the fact that ECR had for many months intended to negotiate and settle the REA, but that the Navy had not held any meetings with ECR or otherwise engaged in negotiations despite several requests and reminders from ECR that the matter remained outstanding. ECR Ex. 5. ECR's letter then confirmed that, consistent with its earlier request that the matter be resolved quickly through negotiations, the Navy's failure to come to the table had impacted ECR and its subcontractors to such a degree that Plaintiff had "no choice but to take action to move the REA forward in the disputes process." Id. ECR's March 2014 letter therefore expressly requested a "Final Contracting Officer's Decision" within sixty days, although it does not foreclose the possibility of meeting for negotiations. Id. The fact that ECR waited nearly six months to make such demand, particularly when considered in the context of the financial hardship the instant dispute caused to a company of ECR's size, is powerful evidence establishing that, even though ECR's REA appears to meet the technical requirements for a CDA claim, ECR's sole focus in preparing the REA was to secure additional compensation from the Government through a negotiated settlement. ECR's focus on settlement plainly changed in March of 2014 when it sent the follow-up letter demanding a Contracting Officer's final decision.

In September of 2014, Mr. Rice issued a Final Decision denying in full ECR's (and its subcontractors') claims for equitable adjustments. Govt. Ex. 60. As evidenced by the fact that ECR and Técnico waited six months after submitting the REA before abandoning the hope for a negotiated settlement, the record as a whole demonstrates by a preponderance that, in contrast to the facts of Meridian Eng'g, here, it was the Government and not the contractor that made the decision to cease all negotiations. Meridian Eng'g Co., 122 Fed. Cl. at 422. Moreover, the REA preparation costs and fees ECR and Técnico seek to recover were all incurred between October of 2012 and September of 2013, the latter date being the date that the REA was submitted for the purpose of facilitating a global settlement of the outstanding issues. Accordingly, no costs requested by Plaintiff are associated with internal or external expenditures incident to the subsequent prosecution of their CDA claim.[104]

In determining the quantum of damages to award, both ECR and Técnico demonstrated at trial that they spent months preparing their detailed REA, which included not only drafting the REA itself, but compiling hundreds of pages of CFRs, estimate sheets, and other supporting documentation. The need for such efforts appears reasonable based on the complexity/length of the REA, to include claims for over $11,166,000 based on approximately forty discrete claim item categories in dispute. Moreover, both ECR and Técnico used a very conservative hourly rate to calculate the "in house" claimed costs (although Técnico claims more than three times as many "in house" hours). Additionally, it is notable that the Government has not advanced a factual challenge to the "in house" costs nor the reasonableness of ECR or Técnico's reliance on an outside consultant/counsel to both assist in efforts to negotiate matters near the end of the availability and/or to assist in the subse-

---

104. ECR and Técnico's REAs each include an "estimate" of $1,750 in outside fees that appear to be earmarked for negotiations/audit-

ing of the REA expected to occur after September of 2013. Such fees are excluded from the award made by the Court.

quent preparation of the omnibus REA. In determining the proper award, the Court notes that the record reveals that ECR and Técnico's fee request includes some "estimated" hours by their consultant/counsel that were not yet billed at the time the REA was prepared (and were not clarified through updated bills submitted at trial), future hours for planned negotiations (which never occurred), and finally, all outside consultant hours were an "estimate" to the extent that ECR and Técnico were at the same time obtaining outside assistance on the THUNDERBOLT availability and the TEMPEST availability and the consultant costs did not break down the time attributable to each availability. Additionally, with respect to Técnico's REA, the Court observes that the majority of the claim items Técnico sought to negotiate were ultimately determined by the Court to lack merit (at least on the evidence presented).

Considering all of these facts, to include the fact that the Government failed to engage in any negotiations regarding the REA, as well as the Court's finding that ECR and Técnico both advanced multiple meritorious claims in their REA (which further justifies ECR and Técnico's efforts to prepare the REA), the Court utilizes the jury verdict method to award **ECR $60,000, and Técnico $75,000,** in REA preparation costs.

## X. ECR 21A & 21B—G&A Expenses; Profit

The final damages calculation to be addressed herein, with the exception of interest, is ECR's recovery of "General and Administrative" ("G&A") expenses and "profit" on work performed by its subcontractor, Técnico. It does not appear that the Government disputes ECR's contention that it is entitled to a 10.25% G&A markup on subcontractor costs and a further 10% markup after the G&A is added to the subcontractor costs. Accordingly, as the total pass-through award in this case owed to Técnico is **$1,097,784**, ECR is awarded **$112,523** in G&A markup ($1,097,784 × 10.25%). Additionally, ECR is awarded **$121,031** to reflect ECR's entitlement to a 10% profit on the Técnico subcontractor costs after G&A markup (($1,097,784 + $112,523) × 10.00%).

## Y. Interest

ECR/Técnico seeks interest from the date the REAs were submitted to the Navy. The Government does not challenge the appropriateness of such an award, if ECR/Técnico succeeds on any pending damages claims, nor does it challenge Plaintiff's contention that the proper rate is the "Treasury rate." Accordingly, the Court awards interest at such rate beginning on the date that the REAs were submitted.[105] As stated by ECR's counsel during closing arguments, consistent with

---

**105.** The Government does not dispute the fact that applicable law provides for interest to begin accruing under the CDA on the date that a CDA claim is submitted to the Contracting Officer. As indicated above, the Court finds that ECR submitted its REA for the sole purpose of resolving the numerous outstanding disputes through a global negotiated settlement, and had the Government been willing to engage in settlement discussions, it would arguably be more consistent with the determination of an "equitable" adjustment that interest begin accruing after such negotiations failed and the contractor requested, formally or by implication, a final decision under the CDA. However, here, interest is awarded at the Treasury rate from the date the certified REAs were submitted in light of: (1) the Government's failure to negotiate the REA; (2) the Government's failure to challenge ECR's assertion that interest should begin accruing on such date, and (3) the Court's finding that such date is consistent with the determination of an "equitable" adjustment in this case based on the Government's actions during the Contract close-out period and the period immediately following the submission of the REA.

established practice in the field of government contracts, counsel for the parties are instructed to confer in an effort to jointly determine the mechanics of the interest calculation.

### Z. Damages Summary

Based on all of the calculations above (exclusive of interest), the total damages figure awarded to Plaintiff in this case is $3,915,754, consisting of $2,817,970 awarded to ECR for its direct claims, and $1,097,784 awarded to ECR for the pass-through claims advanced by ECR on behalf of Técnico.[106]

### IV. Conclusion

As set forth in detail above, following a ten day bench trial in which Plaintiff sought over $11,166,000 in damages, the Court makes a **PARTIAL DAMAGE AWARD** in Plaintiff's favor in the amount of **$3,915,754**, exclusive of the interest awarded above.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

---

106. Although there is not a request before the Court to rule on such matter, it appears that the parties are in agreement that the Government will be required to pay ECR some amount of "retainage" that is still being held by the Government on the THUNDERBOLT Contract.